**From** "Hargrave, Caryn L Ms CIV USAR AMC"
<Caryn.Hargrave@us.army.mil>
    **To** "Neal Nelson" <neal@nna.com>
  **Date** Mon, 25 Apr 2011 09:11:19 -0400
**Subject** RE: Freedom of Information Act Request 2009-131
(UNCLASSIFIED)


Classification: UNCLASSIFIED
Caveats: NONE

I will check and let you know. Thanks

**From** "Neal Nelson" <neal@nna.com>

**To** "Hargrave, Caryn L Ms CIV USAR AMC"
<Caryn.Hargrave@us.army.mil>

**Date** Mon, 09 May 2011 20:43:56 GMT

**Subject** Re: Freedom of Information Act Request 2009-131
(UNCLASSIFIED)


Ms. Hargrave,

My bank cleared the check on May 4.

Do you have an estimate for when the
pre-disclosure notification process
will be complete?

Thanks,

Neal Nelson

**From** "Hargrave, Caryn L Ms CIV USAR AMC"
<Caryn.Hargrave@us.army.mil>

**To** "Neal Nelson" <neal@nna.com>

**Cc** "Talbot-Bedard, Margaret M Ms CIV USA"
<margaret.talbotbedard@us.army.mil>

**Date** Tue, 10 May 2011 13:27:03 -0400

**Subject** RE: Freedom of Information Act Request 2009-131
(UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Mr. Nelson - Thank you for letting us know about the check.

As far as the response process, I believe the last status was that the
appropriate contacts at Fort Huachuca were compiling the information
requested, as well as appropriate contact at the companies in order to
dispatch the Predisclosure Notifications.

I am leaving this position as FOIA attorney, and so I also wanted to
introduce Ms. Margaret Talbot-Bedard, copied here, as the incoming
FOIA
attorney. Any further communication should be directed to her.

Thank you.

**From** "Neal Nelson" <neal@nna.com>

**To** "Talbot-Bedard, Margaret M Ms CIV USA"
<margaret.talbotbedard@us.army.mil>

**Date** Tue, 10 May 2011 19:57:51 GMT

**Subject** RE: Freedom of Information Act Request 2009-131
(UNCLASSIFIED)

Ms. Talbot-Bedard,

I received an email from Caryn Hargrave. She gave me
your name and said you would be my future point of
contact for FOIA matters.

I paid for pre-disclosure notification processing back
around March 22, 2011 (Requests 2007360 and 2009131).

I was asking Caryn to provide me with an estimate for
when the PDN will be complete and thus when I will know
the results.

Thank you,

Neal Nelson

From "Neal Nelson" <neal@nna.com>

To "Hargrave, Caryn L Ms CIV USAR AMC" <Caryn.Hargrave@us.army.mil>

Cc "Talbot-Bedard, Margaret M Ms CIV USA"
<margaret.talbotbedard@us.army.mil>

Date Wed, 11 May 2011 19:01:52 GMT

Subject Re: Freedom of Information Act Request 2009-131 (UNCLASSIFIED)

Ms. Hargrave and Ms. Talbot-Bedard,

I sent an email to Ms. Talbot-Bedard yesterday and
have not received a reply. Did Ms. Talbot-Bedard
receive the email?

I don't understand the delay in performing the PDN.

EO 12600 requires: "Sec. 6. Whenever a FOIA requester
brings suit seeking to compel disclosure of
confidential commercial information, each agency's
procedures shall require that the submitter be
promptly notified."

These Section 6 notices should have gone out last
March when I filed my suit. This Section 6 notice
process should have resulted in an exact count of the
number of submitters with their appropriate notice
addresses.

I have an EO 12600 notice that was sent out by the
Department of Energy. It mandates a response from
the submitter in two weeks.

I sent in my pre-payment in March.

When do you estimate that the pre-disclosure
notification process will be complete?

Neal Nelson

**From** 'Talbot-Bedard, Margaret M Ms CIV USA"
<margaret.talbotbedard@us.army.mil>

    **To** 'Neal Nelson" <neal@nna.com>

    **Cc** "Edwards, Ellen P CIV USA IMCOM"
<Ellen.Edwards@us.Army.Mil>, "Hanson, Eric K CPT MIL USA"
<eric.k.hanson@us.army.mil>

    **Date** Wed, 11 May 2011 15:59:57 -0400

**Subject** RE: Freedom of Information Act Request 2009-131
(UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Sir-I received your email and am working on your response. I appreciate
your patience and your understanding as I try to come up to speed on
your

requests, as well as all those others that are currently in process.

V/R,

MaggieB

Margaret M. Talbot-Bedard
Attorney-Advisor

Office of the Chief Counsel
Staff Judge Advocate Division
U.S. Army CECOM Life Cycle Management Command
ATTN: AMSEL-LG-JA
6001 Combat Drive, Room C3133
Aberdeen Proving Ground, MD 21005
(443) 861-5260

**From** "Neal Nelson" <neal@nna.com>

**To** "Talbot-Bedard, Margaret M Ms CIV USA"

<margaret.talbotbedard@us.army.mil>

**Date** Wed, 11 May 2011 20:02:51 GMT

**Subject** Re: Freedom of Information Act Request 2009-131

(UNCLASSIFIED)

Ms. Talbot-Bedard,

Thank you for acknowledging receipt of my email.

Neal

**From** "Neal Nelson" <neal@nna.com>

**To** "Talbot-Bedard, Margaret M Ms CIV USA"
<margaret.talbotbedard@us.army.mil>

**Cc** "Edwards, Ellen P CIV USA IMCOM"
<Ellen.Edwards@us.Army.Mil>, "Hanson, Eric K CPT MIL USA"
<eric.k.hanson@us.army.mil>

**Date** Wed, 18 May 2011 12:45:37 GMT

**Subject** Re: Freedom of Information Act Request 2009-131
(UNCLASSIFIED)


Margaret,

I have not seen a response to my requests about
a target date for completion of the pre-disclosure
notification process. Did I miss an email?

Neal

**From** "Talbotbedard, Margaret M USA CIV (US)"
<margaret.m.talbotbedard.civ@mail.mil>
   **To** "Neal Nelson" <neal@nna.com>
   **Cc** "Edwards, Ellen P USA CIV (US)" <ellen.p.edwards.civ@mail.mil>,
"Hanson, Eric K CPT USA MIL (US)" <eric.k.hanson4.mil@mail.mil>
   **Date** Wed, 18 May 2011 17:20:33 +0000
**Subject** RE: Freedom of Information Act Request 2009-131 (UNCLASSIFIED)


Classification: UNCLASSIFIED
Caveats: NONE

No Sir- as I thought Caryn was responding. The administrative processing
was never my responsibility at other organizations I had been assigned to.
The processing will be in accordance with law and regulation and the FOIA
Officer or Manager usually oversees that process. I will ask that if they
have not reasserted administrative processing responsibility that they do so
immediately and contact you.

I have been assured that the records custodian is processing the review of
records. As I understand the case, they first had to search and locate
responsive records then identify the owner of the information. As this
information is for older records, identifying the owner and their current
contact information is more difficult. I will contact the FOIA
Officer/Manager at
Fort Huachuca and ensure that your request is being properly processed and
determine if they can provide you an estimate.

v/r MaggieB

**From** "Neal Nelson" <neal@nna.com>

**To** "Talbotbedard, Margaret M USA CIV (US)"
<margaret.m.talbotbedard.civ@mail.mil>

**Date** Wed, 18 May 2011 17:31:21 GMT

**Subject** Re: Freedom of Information Act Request 2009-131
(UNCLASSIFIED)

Thank you for your reply. I will wait to hear
from you. - Neal

From "Neal Nelson" <neal@nna.com>

   To "Talbotbedard, Margaret M USA CIV (US)" <margaret.m.talbotbedard.civ@mail.mil>

   Cc "Edwards, Ellen P USA CIV (US)" <ellen.p.edwards.civ@mail.mil>, "Hanson, Eric K CPT USA MIL (US)"
<eric.k.hanson4.mil@mail.mil>

   Date Thu, 19 May 2011 12:49:18 GMT

Subject Re: Freedom of Information Act Request 2009-131 (UNCLASSIFIED)


Ms. Talbotbedard,

On March 31 I sent an email to Ellen Edwards with the question:
"Who will be my follow up point of contact for the pre-disclosure
notification process?"

Later that day Ms. Edwards replied:
"Your contact is Caryn Hargrave, caryn.hargrave@us.army.mil."

On May 10 Ms. Hargrave sent me an email with the following statement:
"I am leaving this position as FOIA attorney, and so I also wanted to
introduce Ms. Margaret Talbot-Bedard, copied here, as the incoming FOIA
attorney. Any further communication should be directed to her."

Thus I have been lead to believe that you are my point of contact.

I am also puzzled by the statement in your May 18 email:
"As I understand the case, they first had to search and locate
responsive records then identify the owner of the information.
As this information is for older records, identifying the owner
and their current contact information is more difficult."

EO 12600 states: "Sec. 6. Whenever a FOIA requester
brings suit seeking to compel disclosure of confidential
commercial information, each agency's procedures shall
require that the submitter be promptly notified."

When I filed my suit last year, any searches for names and
addresses should have been done at that time to meet the prompt
notification requirement. Does your comment suggest that the
Army did not send out the notices that are required by EO 12600?

Furthermore, Ms. Hargrave provided a declaration to the court
that included the "45 vendors" statement. The Federal Rules
require personal knowledge when providing facts as evidence,
so Ms. Hargrave should have personal knowledge concerning those
45 vendors. Why not consult the list of companies that Ms.
Hargrave used as the basis for her declaration?

Finally, please provide me with an estimate of the date when
the pre-disclosure notification process will be completed.

Thank you,

Neal Nelson

**From** "Neal Nelson" <neal@nna.com>

**To** connie.r.quinn.civ@mail.mil

**Date** Tue, 24 May 2011 15:19:15 GMT

**Subject** Freedom of Information Act Request 2009-131 (UNCLASSIFIED) (fwd)

Ms. Quinn,

I have been notified by Margaret Talbotbedard that
you are my point of contact for the pre-disclosure
notification processing that the Army has required
prior to release of information that I requested
under the Freedom of Information Act.

Please provide me with the current status of this
processing and also provide me with an estimated
completion date for this process.

Thank You,

Neal Nelson

**From**  "Neal Nelson" <neal@nna.com>

**To**  "Talbotbedard, Margaret M USA CIV (US)"
<margaret.m.talbotbedard.civ@mail.mil>

**Cc**  "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>,
"Edwards, Ellen P USA CIV (US)" <ellen.p.edwards.civ@mail.mil>, "Hanson, Eric
K CPT USA MIL (US)" <eric.k.hanson4.mil@mail.mil>

**Date**  Tue, 31 May 2011 13:30:58 GMT

**Subject** Re: Freedom of Information Act Request 2009-131 (UNCLASSIFIED)

Ms. Talbotbedard,

Eight days ago I sent an email to Ms. Quinn asking
her for a comment on status and requesting of her
an estimate of the process completion date.

I have heard nothing.

Please insure that Ms. Quinn responds to reasonable
requests, such as this one, in a timely fashion.

Neal Nelson

**From** "Talbotbedard, Margaret M USA CIV (US)"
<margaret.m.talbotbedard.civ@mail.mil>

**To** "Neal Nelson" <neal@nna.com>

**Cc** "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>

**Date** Tue, 31 May 2011 14:13:28 +0000

**Subject RE:** Freedom of Information Act Request 2009-131 (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Sir-unfortunately her computer crashed last week so we are trying to
recreate all of her files.

Margaret M. Talbot-Bedard
Attorney-Advisor

Office of the Chief Counsel
Staff Judge Advocate Division
U.S. Army CECOM Life Cycle Management Command
ATTN: AMSEL-LG-JA
6001 Combat Drive, Room C3133
Aberdeen Proving Ground, MD 21005
(443) 861-5260

**From** "Neal Nelson" <neal@nna.com>

**To** "Talbotbedard, Margaret M USA CIV (US)" <margaret.m.talbotbedard.civ@mail.mil>

**Cc** "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>, "Edwards, Ellen P USA CIV (US)" <ellen.p.edwards.civ@mail.mil>, "Hanson, Eric K CPT USA MIL (US)" <eric.k.hanson4.mil@mail.mil>

**Date** Tue, 31 May 2011 13:30:58 GMT

**Subject** Re: Freedom of Information Act Request 2009-131 (UNCLASSIFIED)

Ms. Talbotbedard,

Eight days ago I sent an email to Ms. Quinn asking her for a comment on status and requesting of her an estimate of the process completion date.

I have heard nothing.

Please insure that Ms. Quinn responds to reasonable requests, such as this one, in a timely fashion.

Neal Nelson

**From** "Talbotbedard, Margaret M USA CIV (US)"
<margaret.m.talbotbedard.civ@mail.mil>
    **To** "Neal Nelson" <neal@nna.com>
    **Cc** "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>
  **Date** Tue, 31 May 2011 14:13:28 +0000
**Subject** RE: Freedom of Information Act Request 2009-131 (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Slr-unfortunately her computer crashed last week so we are trying to
recreate all of her files.

Margaret M. Talbot-Bedard
Attorney-Advisor

Office of the Chief Counsel
Staff Judge Advocate Division
U.S. Army CECOM Life Cycle Management Command
ATTN: AMSEL-LG-JA
6001 Combat Drive, Room C3133
Aberdeen Proving Ground, MD 21005
(443) 861-5260

**From** "Neal Nelson" <neal@nna.com>

**To** "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>

**Cc** "Talbotbedard, Margaret M USA CIV (US)"
<margaret.m.talbotbedard.civ@mail.mil>, "Rudkin, Michael J USA CIV (US)"
<michael.j.rudkin.civ@mail.mil>, "Edwards, Ellen P USA CIV (US)"
<ellen.p.edwards.civ@mail.mil>, "Hanson, Eric K CPT USA MIL (US)"
<eric.k.hanson4.mil@mail.mil>, "Barber, Arlie J USA CIV (US)"
<arlie.j.barber.civ@mail.mil>

**Date** Tue, 31 May 2011 15:46:25 GMT

**Subject** Re: Freedom of Information Act Request - FP-11-028645
(UNCLASSIFIED)


Ms. Quinn,

Thank you for your email.

Neal Nelson

**From** "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>

**To** "Neal Nelson" <neal@nna.com>

**Cc** "Talbotbedard, Margaret M USA CIV (US)"
<margaret.m.talbotbedard.civ@mail.mil>, "Rudkin, Michael J USA CIV (US)"
<michael.j.rudkin.civ@mail.mil>, "Edwards, Ellen P USA CIV (US)"
<ellen.p.edwards.civ@mail.mil>, "Hanson, Eric K CPT USA MIL (US)"
<eric.k.hanson4.mil@mail.mil>, "Barber, Arlie J USA CIV (US)"
<arlie.j.barber.civ@mail.mil>, "Quinn, Connie R USA CIV (US)"
<connie.r.quinn.civ@mail.mil>

**Date** Tue, 21 Jun 2011 14:54:51 +0000

**Subject** Freedom of Information Act Request - FP-11-028645 (UNCLASSIFIED)


Classification: UNCLASSIFIED
Caveats: FOUO

Mr. Nelson:

AS noted in my email dated 31 May 2011, I indicated that the suspense date
for a response to your Freedom of Information Act request FP-11-028645
was
22 June, but that an extension to 22 July would probably be required.

This is to notify you that the suspense date for this response has been
extended to 22 July. Fort Huachuca and many employees have been
affected by
the Monument fire, and with evacuations and closures, work schedules have
been affected. Hopefully operations will return to normal soon and another
extension will not be required. I apologize for the unavoidable delay.

Please refer to Control Number FP-11-028645 in any correspondence
regarding
this FOIA request. If you have any questions, my contact information is
below.

Thank you for your continued patience.

**From** "Neal Nelson" <neal@nna.com>

    **To** "Quinn Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>, "Neal Nelson" <neal@nna.com>

    **Cc** "Talbotbedard Margaret M USA CIV (US)" <margaret.m.talbotbedard.civ@mail.mil>, "Rudkin Michael J USA CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Edwards Ellen P USA CIV (US)" <ellen.p.edwards.civ@mail.mil>, "Hanson Eric K CPT USA MIL (US)" <eric.k.hanson4.mil@mail.mil>, "Barber Arlie J USA CIV (US)" <arlie.j.barber.civ@mail.mil>, "Quinn Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>

    **Date** Tue, 21 Jun 2011 10:57:42 -0500

**Subject** Re: Freedom of Information Act Request - FP-11-028645 (UNCLASSIFIED)

  **Client** Atmail 6.20.8

Ms. Quinn,

Thank you for your email.

Neal Nelson

**From** "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>

**To** "Neal Nelson" <neal@nna.com>

**Cc** "Talbotbedard, Margaret M USA CIV (US)" <margaret.m.talbotbedard.civ@mail.mil>, "Rudkin, Michael J USA CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Edwards, Ellen P USA CIV (US)" <ellen.p.edwards.civ@mail.mil>, "Hanson, Eric K MAJ USA MIL (US)" <eric.k.hanson4.mil@mail.mil>, "Barber, Arlie J USA CIV (US)" <arlie.j.barber.civ@mail.mil>, "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>

**Date** Fri, 22 Jul 2011 19:49:22 +0000

**Subject** RE: Freedom of Information Act Request - FP-11-028645 (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: FOUO

Mr. Nelson:

AS noted in my email dated 21 June 2011, I indicated that the suspense date for a response to your Freedom of Information Act request FP-11-028645 had been extended to 22 July 2011.

This is to notify you that the suspense date for this response has been extended to 22 August 2011. Due to the amount of information and the number of contractors that must be connected for pre-disclosure notifications, this action is quite complex. I apologize for the unavoidable delay.

Please refer to Control Number FP-11-028645 in any correspondence regarding this FOIA request. If you have any questions, my contact information is below.

Thank you for your continued patience.

Connie R. Quinn
Information Management Specialist

**From** "Neal Nelson" <neal@nna.com>

    **To** "Quinn Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>, "Neal
Nelson" <neal@nna.com>

    **Cc** "Talbotbedard Margaret M USA CIV (US)"
<margaret.m.talbotbedard.civ@mail.mil>, "Rudkin Michael J USA CIV (US)"
<michael.j.rudkin.civ@mail.mil>, "Edwards Ellen P USA CIV (US)"
<ellen.p.edwards.civ@mail.mil>, "Hanson Eric K MAJ USA MIL (US)"
<eric.k.hanson4.mil@mail.mil>, "Barber Arlie J USA CIV (US)"
<arlie.j.barber.civ@mail.mil>, "Quinn Connie R USA CIV (US)"
<connie.r.quinn.civ@mail.mil>

    **Date** Sat, 23 Jul 2011 08:13:24 -0500

**Subject RE:** Freedom of Information Act Request - FP-11-028645
(UNCLASSIFIED)

  **Client** Atmail 6.20.8


Ms. Quinn,

Thank you for the status email.

Neal Nelson

**From** "Edwards, Ellen P USA CIV (US)" <ellen.p.edwards.civ@mail.mil>

**To** "neal@nna.com" <neal@nna.com>

**Date** Tue, 26 Jul 2011 12:08:41 +0000

**Subject** FW: Freedom of Information Act Request - FP-11-028645
(UNCLASSIFIED)

Classification: UNCLASSIFIED

Caveats: NONE

Mr. Nelson,

You do not have to copy me anymore, I will be retiring on 31 Aug 11 and Fort
Monmouth is closing on 15 Sep 11. I am waiting to hear who my replacement
will be in APG, Maryland. Thanks and good luck to you. Ellen

Ellen Edwards

Installation FOIA Officer

US Army Garrison

ATTN: IMNE-MON-HRR

Fort Monmouth, NJ 07703

comm: 732-532-1769, DSN: 992-1769

ellen.p.edwards.civ@mail.mil

**From** "Neal Nelson" <neal@nna.com>

**To** "Edwards Ellen P USA CIV (US)" <ellen.p.edwards.civ@mail.mil>

**Date** Tue, 26 Jul 2011 07:47:03 -0500

**Subject** Re: FW: Freedom of Information Act Request - FP-11-028645 (UNCLASSIFIED)

**Client** Atmail 6.20.8

Hi Ellen,

I do a reply all to Ms. Quinn's email. If she copies you I will copy you..

Thanks for your "good luck". Sorry I have been a problem for you when I have been trying to get information from the TIC.

Neal

**From** "Edwards, Ellen P USA CIV (US)" <ellen.p.edwards.civ@mail.mil>

**To** "Neal Nelson" <neal@nna.com>

**Date** Tue, 26 Jul 2011 12:48:46 +0000

**Subject** RE: FW: Freedom of Information Act Request - FP-11-028645
(UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

No Problem, my job is ending and hopefully, I will have a great retirement.
Ellen

Ellen Edwards
Installation FOIA Officer
US Army Garrison
ATTN: IMNE-MON-HRR
Fort Monmouth, NJ 07703
comm: 732-532-1769, DSN: 992-1769
ellen.p.edwards.civ@mail.mil

**From** "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>
    **To** "Neal Nelson" <neal@nna.com>, "Barber, Arlie J USA CIV (US)"
<arlie.j.barber.civ@mail.mil>
    **Cc** "Talbotbedard, Margaret M USA CIV (US)"
<margaret.m.talbotbedard.civ@mail.mil>, "Rudkin, Michael J USA CIV (US)"
<michael.j.rudkin.civ@mail.mil>, "Quinn, Connie R USA CIV (US)"
<connie.r.quinn.civ@mail.mil>, "Hanson, Eric K MAJ USA MIL (US)"
<eric.k.hanson4.mil@mail.mil>, "Watt, Tiffany C SFC USA MIL (US)"
<tiffany.c.watt.mil@mail.mil>
    **Date** Fri, 23 Sep 2011 20:05:10 +0000
**Subject** RE: Freedom of Information Act Request - FP-11-028645
(UNCLASSIFIED)


Classification: UNCLASSIFIED
Caveats: FOUO

Mr. Nelson:

AS noted in my email dated 23 August 2011, I indicated that the suspense
date for a response to your Freedom of Information Act request
FP-11-028645 had been extended to 22 September 2011.

The suspense date for this response has been extended to 21 October 2011.
The specialist compiling the response to your FOIA request is working
diligently to complete everything required to complete this action, and he is
certain he will have all he needs soon. I apologize once again for the delay.

Please refer to Control Number FP-11-028645 in any correspondence
regarding this FOIA request. If you have any questions, my contact
information is below.

Thank you for your continued patience.



Connie R. Quinn
Information Management Specialist
ACC-APG-Huachuca Desert Division
Operational Support Team

**From** "Neal Nelson" <neal@nna.com>

**To** "Quinn Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>, "Neal Nelson" <neal@nna.com>

**Cc** "Talbotbedard Margaret M USA CIV (US)" <margaret.m.talbotbedard.civ@mail.mil>, "Rudkin Michael J USA CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Edwards Ellen P USA CIV (US)" <ellen.p.edwards.civ@mail.mil>, "Hanson Eric K MAJ USA MIL (US)" <eric.k.hanson4.mil@mail.mil>, "Barber Arlie J USA CIV (US)" <arlie.j.barber.civ@mail.mil>, "Quinn Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>

**Date** Wed, 24 Aug 2011 08:16:47 -0500

**Subject** RE: Freedom of Information Act Request - FP-11-028645 (UNCLASSIFIED)

**Client** Atmail 6.20.8

Ms. Quinn,

Thank you for your status email message.

Neal

**From** "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>

**To** "Neal Nelson" <neal@nna.com>, "Barber, Arlie J USA CIV (US)" <arlie.j.barber.civ@mail.mil>

**Cc** "Talbotbedard, Margaret M USA CIV (US)" <margaret.m.talbotbedard.civ@mail.mil>, "Rudkin, Michael J USA CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>, "Hanson, Eric K MAJ USA MIL (US)" <eric.k.hanson4.mil@mail.mil>, "Watt, Tiffany C SFC USA MIL (US)" <tiffany.c.watt.mil@mail.mil>

**Date** Fri, 23 Sep 2011 20:05:10 +0000

**Subject** RE: Freedom of Information Act Request - FP-11-028645 (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: FOUO

Mr. Nelson:

AS noted in my email dated 23 August 2011, I indicated that the suspense date for a response to your Freedom of Information Act request FP-11-028645 had been extended to 22 September 2011.

The suspense date for this response has been extended to 21 October 2011. The specialist compiling the response to your FOIA request is working diligently to complete everything required to complete this action, and he is certain he will have all he needs soon. I apologize once again for the delay.

Please refer to Control Number FP-11-028645 in any correspondence regarding this FOIA request. If you have any questions, my contact information is below.

Thank you for your continued patience.

Connie R. Quinn
Information Management Specialist
ACC-APG-Huachuca Desert Division
Operational Support Team

**From** "Neal Nelson" <neal@nna.com>

    **To** "Quinn Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>, "Neal Nelson" <neal@nna.com>, "Barber Arlie J USA CIV (US)" <arlie.j.barber.civ@mail.mil>

    **Cc** "Talbotbedard Margaret M USA CIV (US)" <margaret.m.talbotbedard.civ@mail.mil>, "Rudkin Michael J USA CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Quinn Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>, "Hanson Eric K MAJ USA MIL (US)" <eric.k.hanson4.mil@mail.mil>, "Watt Tiffany C SFC USA MIL (US)" <tiffany.c.watt.mil@mail.mil>

  **Date** Fri, 23 Sep 2011 15:24:49 -0500

**Subject** RE: Freedom of Information Act Request - FP-11-028645 (UNCLASSIFIED)

  **Client** Atmail 6.20.8

Ms. Quinn,

Thank you for your email.

Neal Nelson

**From** "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>

   **To** "Neal Nelson" <neal@nna.com>, "Barber, Arlie J USA CIV (US)"
<arlie.j.barber.civ@mail.mil>

   **Cc** "Talbotbedard, Margaret M USA CIV (US)"
<margaret.m.talbotbedard.civ@mail.mil>, "Rudkin, Michael J USA CIV (US)"
<michael.j.rudkin.civ@mail.mil>, "Hanson, Eric K MAJ USA MIL (US)"
<eric.k.hanson4.mil@mail.mil>, "Watt, Tiffany C SFC USA MIL (US)"
<tiffany.c.watt.mil@mail.mil>, "Quinn, Connie R USA CIV (US)"
<connie.r.quinn.civ@mail.mil>

   **Date** Wed, 26 Oct 2011 21:25:40 +0000

**Subject** RE: Freedom of Information Act Request - FP-11-028645
(UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Mr. Nelson:

As noted in my email dated 23 September 2011, I indicated that the
suspense date for a response to your Freedom of Information Act request
FP-11-028645 had been extended to 21 October 2011.

The suspense date for this response has once again been extended,
until 21 November 2011. The specialist compiling the response to your FOIA
request is working diligently to complete everything required to complete
this action, but he is still awaiting a response from several of the
contractors involved in this action. I apologize once again for the delay.

Please refer to Control Number FP-11-028645 in any correspondence
regarding this FOIA request. If you have any questions, my contact
information is below.

Thank you for your continued patience.

CONNIE R. QUINN
Information Management Specialist

**From** "Neal Nelson" <neal@nna.com>

    **To** "Quinn Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>, "Neal Nelson" <neal@nna.com>, "Barber Artie J USA CIV (US)" <arlie.j.barber.civ@mail.mil>

    **Cc** "Talbotbedard Margaret M USA CIV (US)" <margaret.m.talbotbedard.civ@mail.mil>, "Rudkin Michael J USA CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Hanson Eric K MAJ USA MIL (US)" <eric.k.hanson4.mil@mail.mil>, "Watt Tiffany C SFC USA MIL (US)" <tiffany.c.watt.mil@mail.mil>, "Quinn Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>

    **Date** Thu, 27 Oct 2011 05:33:00 -0500

**Subject** RE: Freedom of Information Act Request - FP-11-028645 (UNCLASSIFIED)

    **Client** Atmail 6.20.8

Ms. Quinn,

Thank you for your email.

Neal Nelson

From "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>

To "Neal Nelson" <neal@nna.com>, "Barber, Arlie J USA CIV (US)" <arlie.j.barber.civ@mail.mil>

Cc "Talbotbedard, Margaret M USA CIV (US)" <margaret.m.talbotbedard.civ@mail.mil>, "Rudkin, Michael J USA CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Hanson, Eric K MAJ USA MIL (US)" <eric.k.hanson4.mil@mail.mil>, "Watt, Tiffany C SFC USA MIL (US)" <tiffany.c.watt.mil@mail.mil>, "Rosen, Marc J USA CIV (US)" <marc.j.rosen.civ@mail.mil>, "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>

Date Tue, 29 Nov 2011 16:26:24 +0000

Subject Freedom of Information Act Request - FP-11-028645 (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Mr. Nelson:

Please find attached a partial response to your Freedom of Information Request
FP-11-028645.

The specialist working on this action has sent additional pre-disclosure
notifications to other companies and contractors without receiving any
response as of this date. Some of these companies may have gone out of
business, while others may have been bought by other interests. Since we did
not want to extend the suspense again, we determined it was authorized to
provide a partial initial release of information.

We possess potential commercial/financial information from about 20 other
businesses and continue to either ascertain valid contact information or
validate their response. This request will remain open until we can
successfully process all documents in accordance with Executive Order 12600 to
conclusion.

If you have any questions, please contact me as shown below.

Thank you.

CONNIE R. QUINN
Information Management Specialist
Operational Support Team
ACC-APG-Huachuca Desert Division
2133 Cushing Street, Building 61801
Fort Huachuca, AZ 85613-7070
Phone: 520-538-9278 - DSN 879-9278
E-mail: connie.r.quinn.civ@mail.mil

| Date | Timeframe | Company | Payment |
|---|---|---|---|
| November 2003 | Sometime Jan-Nov 2003 | Janus Research Group | $19,523.00 |
| August 2004 | Report Date Aug 2004 | TippingPoint | $44,154.00 |
| August 2004 | Report Date Aug 2004 | 3E Technologies International Inc | Not Available |
| August 2005 | 20 Jun-5Aug 2005 | 3E Technologies International Inc | $18,513.00 |
| August 2005 | 20 Jun-5Aug 2005 | 3E Technologies International Inc | $36,422.00 |
| December 2005 | 15 Aug-25 Oct 2005 | SPI Dynamics | $41,421.00 |
| February 2006 | 18 Aug-31 Oct 2005 | PatchLink Corp | $39,913.00 |
| February 2007 | No report located | Fortress | $47,048.00 |
| April 2007 | 5 Mar-21 Mar 2007 | Pointsec | $3,900.00 |
| February 2009 | 27 Oct-6 Feb 2009 | Triumpfant | $89,436.00 |

**From** "Neal Nelson" <neal@nna.com>

**To** "Quinn Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>, "Neal Nelson" <neal@nna.com>, "Barber Arlie J USA CIV (US)" <arlie.j.barber.civ@mail.mil>

**Cc** "Talbotbedard Margaret M USA CIV (US)" <margaret.m.talbotbedard.civ@mail.mil>, "Rudkin Michael J USA CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Hanson Eric K MAJ USA MIL (US)" <eric.k.hanson4.mil@mail.mil>, "Watt Tiffany C SFC USA MIL (US)" <tiffany.c.watt.mil@mail.mil>, "Rosen Marc J USA CIV (US)" <marc.j.rosen.civ@mail.mil>, "Quinn Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>

**Date** Tue, 29 Nov 2011 14:32:15 -0600

**Subject** Re: Freedom of Information Act Request - FP-11-028645 (UNCLASSIFIED)

**Client** Atmail 6.20.8

Ms Quinn,

Thank you for the information that you provided with your 11/29/2011 email.

My understanding from Executive Order 12600 is that if a submitter does not provide a persuasive objection in a timely fashion the requested information must be released.

Any companies that have not yet responded after this extended period of time have certainly failed to provide a persuasive objection in a timely fashion.

In accordance with the FOIA and Executive Order 12600, please provide to me all of the information covered by my FOIA requests that was not included with your November 29 email.

Neal Nelson

**From** "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>

**To** "Neal Nelson" <neal@nna.com>, "Barber, Arlie J USA CIV (US)" <arlie.j.barber.civ@mail.mil>

**Cc** "Talbotbedard, Margaret M USA CIV (US)" <margaret.m.talbotbedard.civ@mail.mil>, "Rudkin, Michael J USA CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Hanson, Eric K MAJ USA MIL (US)" <eric.k.hanson4.mil@mail.mil>, "Watt, Tiffany C SFC USA MIL (US)" <tiffany.c.watt.mil@mail.mil>, "Rosen, Marc J USA CIV (US)" <marc.j.rosen.civ@mail.mil>, "Quinn, Connie R USA CIV (US)" <connie.r.quinn.civ@mail.mil>

**Date** Mon, 12 Dec 2011 22:00:15 +0000

**Subject** Freedom of Information Act Request - FP-11-028645 (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Mr. Nelson:

Please find attached additional information in response to your Freedom of Information Request FP-11-028645.

The specialist working on this action is still awaiting response from two companies to the pre-disclosure Notifications, one company needs additional time, and another has requested additional information.

We continue to work to validate responses. This request will remain open until we can successfully process all documents in accordance with Executive
Order 12600 to conclusion.

If you have any questions, please contact me as shown below.

CONNIE R. QUINN
Information Management Specialist
Operational Support Team
ACC-APG-Huachuca Desert Division
2133 Cushing Street, Building 61801
Fort Huachuca, AZ 85613-7070
Phone: 520-538-9278 - DSN 879-9278

| Date | Timeframe | Company | Payment |
|---|---|---|---|
| January 2001 | | Harris | $24,087.00 |
| January 2001 | | Harris | $6,677.86 |
| January 2001 | | Harris | $13,624.00 |
| March 2002 | | Unisys | $3,122.00 |
| April 2003 | | DELL | $58,625.00 |
| August 2003 | | Hercules | |
| November 2003 | Sometime Jan-Nov 2003 | Janus Research Group | $19,523.00 |
| December 2003 | | Citadel Security Software Inc | |
| July 2004 | | BAE System | |
| August 2004 | Report Date Aug 2004 | TippingPoint | $44,154.00 |
| August 2004 | Report Date Aug 2004 | 3E Technologies International Inc | Not Available |
| June 2005 | 8 Feb-18Mar 2005 | Secure Computing | |
| August 2005 | 20 Jun-5Aug 2005 | 3E Technologies International Inc | $18,513.00 |
| August 2005 | 20 Jun-5Aug 2005 | 3E Technologies International Inc | $36,422.00 |
| December 2005 | 15 Aug-25 Oct 2005 | SPI Dynamics | $41,421.00 |
| February 2006 | 18 Aug-31 Oct 2005 | PatchLink Corp | $39,913.00 |
| March 2006 | | Enterasys | |
| May 2006 | 6 Mar-17 Mar 2006 | FourScout Technologies | |
| August 2006 | 3 May-20 Jun 2006 | Juniper Networks | $322,846.00 |
| November 2006 | | Juniper Networks | See Footnote 2 |
| November 2006 | 2 Oct-20 Oct 2006 | GuardianEdge | |
| February 2007 | No report located | Fortress | $47,048.00 |
| March 2007 | 30 Oct-31 Dec 2006 | Juniper Networks | |
| April 2007 | 5 Mar-21 Mar 2007 | Pointsec | $3,900.00 |
| June 2007 | 7 May-1 Jun 2007 | Juniper Networks | |
| September 2007 | 9 Apr-27 Apr 2007 | Mobile Armor | $28,640.00 |
| September 2007 | 25 Jun-17 Aug 2007 | GuardianEdge | $22,178.00 |
| September 2007 | | GuardianEdge | $29,338.00 |
| November 2007 | 10 Sep-5 Oct 2007 | Cisco | $31,867.00 |
| November 2007 | | Cisco | $5,652.00 |
| November 2007 | | Cisco | $5,652.00 |
| November 2007 | 24 Sep-19 Oct 2007 | Juniper Networks | $29,772.00 |
| December 2007 | 22 Oct-19 Nov 2007 | Cisco | $46,533.00 |
| June 2008 | 10 Mar-25Apr 2008 | Juniper Networks | $23,677.00 |
| June 2008 | | Juniper Networks | $167,000.00 |
| July 2008 | 10-16 Apr, 12-23 May 2008 | Cisco | $104,000.00 |
| August 2008 | 24Jun-11 Jul 2008 | Cisco | See Footnote 2 |
| December 2008 | 8 Sep-31 Oct 2008 | ForeScout Technologies | $55,727.00 |
| January 2009 | 11 Aug-25 Sep 2008 | Cisco | $49,269.00 |
| January 2009 | | Cisco | $38,967.00 |
| January 2009 | | Cisco | $49,269.00 |
| January 2009 | | Cisco | $91,347.00 |
| February 2009 | 8 Dec 2008- 2 Jan 2009 | Trapeze Networks | $47,990.00 |
| February 2009 | 27 Oct-6 Feb 2009 | Triumpfant | $89,436.00 |
| March 2009 | 5 Jan - 19 Feb 2009 | ForeScout Technologies | $47,878.00 |

Subject: Final Response to FOIA Request FP-11-028645 (UNCLASSIFIED)

From: "Quinn, Connie R CIV (US)" <connie.r.quinn.civ@mail.mil>

To: Neal Nelson <neal@nna.com>, "Talbotbedard, Margaret M CIV USARMY CECOM (US)" <margaret.m.talbotbedard.civ@mail.mil>, "Rosen, Marc J CIV (US)" <marc.j.rosen.civ@mail.mil>, "Barber, Arlie J CIV (US)" <arlie.j.barber.civ@mail.mil>

Cc: "Quinn, Connie R CIV (US)" <connie.r.quinn.civ@mail.mil>, "Rudkin, Michael J CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Watt, Tiffany C SFC USARMY (US)" <tiffany.c.watt.mil@mail.mil>, "Hanson, Eric K MAJ USARMY (US)" <eric.k.hanson4.mil@mail.mil>

Mon, 12 Mar 2012 15:14:13 +0000

Classification: UNCLASSIFIED
Caveats: NONE

Mr. Nelson:

Please see the attached final response to your Freedom of Information Act (FOIA) Request FP-11-028645.

I apologize for the delay in finalizing the information you had requested. Normally information is not compiled for a FOIA request, but only existing documentation is released. It was very difficult to find and compile the information you had requested.

If you have any questions, please contact me as shown below.

Thank you,

CONNIE R. QUINN
Information Management Specialist
Operational Support Team
ACC-APG-Huachuca Division
2133 Cushing Street, Building 61801
Fort Huachuca, AZ 85613-7070
Phone: 520-538-9278 - DSN 879-9278
Email: connie.r.quinn.civ@mail.mil

NOTE: I will be out of the office March 14 through 23.

Classification: UNCLASSIFIED
Caveats: NONE





**DEPARTMENT OF THE ARMY**
U.S. ARMY CONTRACTING COMMAND
ABERDEEN PROVING GROUND
2133 CUSHING ST., BLDG 61801
FORT HUACHUCA, AZ 85613

REPLY TO
ATTENTION OF

CCAP-CCH-D

12 March 2012

Neal Nelson
222 N. River Street
East Dundee, IL 60118

Dear Mr. Nelson,

In your FOIA Request Number FP-11-028645 , you requested the following information about the U.S. Army Technology Integration Center (TIC) at Fort Huachuca:

- The name of the non-government organization; the amount of money paid to the TIC by the non-government organization; and the approximate dates that the non-government organization used the TIC facilities.

In response to your request, please see the attached documents.

Please refer to FOIA Control No. FP-11-028645 in all correspondence regarding this FOIA request. You may refer any correspondence concerning your request to the undersigned FOIA Coordinator, Connie Quinn, at (520) 538-9278 or email to connie.r.quinn.civ@mail.mil.

Respectfully,

Connie R. Quinn
FOIA Coordinator

| Date | Timeframe | Company | Payment |
|------|-----------|---------|---------|
| January 2001 | | Harris | $24,087.00 |
| January 2001 | | Harris | $6,677.86 |
| January 2001 | | Harris | $13,624.00 |
| March 2002 | | Unisys | $3,122.00 |
| April 2003 | | DELL | $58,625.00 |
| August 2003 | | Hercules | No Records Available |
| September 2003 | | Allied Telesyn | $19,910.00 |
| November 2003 | Sometime Jan-Nov 2003 | Janus Research Group | $19,523.00 |
| December 2003 | | Citadel Security Software Inc | B4 |
| December 2003 | | Fortinet Inc | B4 |
| June 2004 | | IBM, eTouch, BearingPoint | No Records Available |
| July 2004 | | BAE System | B4 |
| August 2004 | Report Date Aug 2004 | TippingPoint | $44,154.00 |
| August 2004 | Report Date Aug 2004 | 3E Technologies International Inc | No Records Available |
| February 2005 | | Extreme | $107,688.00 |
| February 2005 | | Tumbleweed Communications | No Records Available |
| June 2005 | 8 Feb-18Mar 2005 | Secure Computing | B4 |
| August 2005 | 20 Jun-5Aug 2005 | 3E Technologies International Inc | $18,513.00 |
| August 2005 | 20 Jun-5Aug 2005 | 3E Technologies International Inc | $36,422.00 |
| December 2005 | 15 Aug-25 Oct 2005 | SPI Dynamics | $41,421.00 |
| February 2006 | 18 Aug-31 Oct 2005 | PatchLink Corp | $39,913.00 |
| February 2006 | | Lockdown Networks | No Records Available |
| March 2006 | | Enterasys | No Records Available |
| May 2006 | 6 Mar-17 Mar 2006 | FourScout Technologies | No Records Available |
| August 2006 | 3 May-20 Jun 2006 | Juniper Networks | $322,846.00 |
| November 2006 | | Juniper Networks | No Records Available |
| November 2006 | 2 Oct-20 Oct 2006 | GuardianEdge | No Records Available |
| February 2007 | No report located | Fortress | $47,048.00 |
| March 2007 | 30 Oct-31 Dec 2006 | Juniper Networks | No Records Available |
| April 2007 | 5 Mar-21 Mar 2007 | Pointsec | $3,900.00 |
| May 2007 | | Fortinet | No Records Available |
| June 2007 | 7 May-1 Jun 2007 | Juniper Networks | No Records Available |
| September 2007 | 9 Apr-27 Apr 2007 | Mobile Armor | $28,640.00 |
| September 2007 | 25 Jun-17 Aug 2007 | GuardianEdge | $22,178.00 |
| September 2007 | | GuardianEdge | $29,338.00 |
| November 2007 | 10 Sep-5 Oct 2007 | Cisco | $31,867.00 |
| November 2007 | | Cisco | $5,652.00 |
| November 2007 | | Cisco | $5,652.00 |
| November 2007 | 24 Sep-19 Oct 2007 | Juniper Networks | $29,772.00 |
| December 2007 | 22 Oct-19 Nov 2007 | Cisco | $46,533.00 |
| June 2008 | 10 Mar-25Apr 2008 | Juniper Networks | $23,677.00 |
| June 2008 | | Juniper Networks | $167,000.00 |
| July 2008 | 10-16 Apr, 12-23 May 2008 | Cisco | $104,000.00 |
| August 2008 | 24Jun-11 Jul 2008 | Cisco | No Records Available |
| December 2008 | 8 Sep-31 Oct 2008 | ForeScout Technologies | $55,727.00 |
| January 2009 | 11 Aug-25 Sep 2008 | Cisco | $49,269.00 |
| January 2009 | | Cisco | $38,967.00 |
| January 2009 | | Cisco | $49,269.00 |
| January 2009 | | Cisco | $91,347.00 |
| January 2009 | 7 Jul-31 Oct 2008 | IBM | B4 |
| February 2009 | 8 Dec 2008- 2 Jan 2009 | Trapeze Networks | $47,990.00 |
| February 2009 | 27 Oct-6 Feb 2009 | Triumpfant | $89,436.00 |
| March 2009 | 5 Jan - 19 Feb 2009 | ForeScout Technologies | $47,878.00 |

Subject: Re: Final Response to FOIA Request FP-11-028645 (UNCLASSIFIED)

From: "Neal Nelson" <neal@nna.com>

To: "Quinn Connie R CIV (US)" <connie.r.quinn.civ@mail.mil>, "Neal Nelson" <neal@nna.com>, "Talbotbedard Margaret M CIV USARMY CECOM (US)" <margaret.m.talbotbedard.civ@mail.mil>, "Rosen Marc J CIV (US)" <marc.j.rosen.civ@mail.mil>, "Barber Arlie J CIV (US)" <arlie.j.barber.civ@mail.mil>

Cc: "Quinn Connie R CIV (US)" <connie.r.quinn.civ@mail.mil>, "Rudkin Michael J CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Watt Tiffany C SFC USARMY (US)" <tiffany.c.watt.mil@mail.mil>, "Hanson Eric K MAJ USARMY (US)" <eric.k.hanson4.mil@mail.mil>

Mon, 12 Mar 2012 11:21:12 -0500

Ms. Quinn,

Thank you for your email.

What does the notation "B4" mean?

Neal

Subject: RE: Final Response to FOIA Request FP-11-028645 (UNCLASSIFIED)

From: "Quinn, Connie R CIV (US)" <connie.r.quinn.civ@mail.mil>

To: Neal Nelson <neal@nna.com>, "Talbotbedard, Margaret M CIV USARMY CECOM (US)"
<margaret.m.talbotbedard.civ@mail.mil>, "Rosen, Marc J CIV (US)" <marc.j.rosen.civ@mail.mil>, "Barber, Arlie J
CIV (US)" <arlie.j.barber.civ@mail.mil>

Cc: "Rudkin, Michael J CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Watt, Tiffany C SFC USARMY (US)"
<tiffany.c.watt.mil@mail.mil>, "Hanson, Eric K MAJ USARMY (US)" <eric.k.hanson4.mil@mail.mil>, "Quinn,
Connie R CIV (US)" <connie.r.quinn.civ@mail.mil>

Mon, 12 Mar 2012 16:30:21 +0000

Classification: UNCLASSIFIED
Caveats: NONE

Following is the explanation for the B4 exemption:

(b)(4) EXEMPTION - Trade Secrets, Commercial or Financial Information

This exemption protects "trade secrets and commercial or financial information
obtained from a person [that is] privileged or confidential." This exemption
is intended to protect the interest of both the government and submitter of
information.

CONNIE R. QUINN
Information Management Specialist
Operational Support Team
ACC-APG-Huachuca Division
2133 Cushing Street, Building 61801
Fort Huachuca, AZ 85613-7070
Phone: 520-538-9278 - DSN 879-9278
Email: connie.r.quinn.civ@mail.mil

NOTE: I will be out of the office March 14 through 23.

Subject: RE: Final Response to FOIA Request FP-11-028645 (UNCLASSIFIED)

From: "Neal Nelson" <neal@nna.com>

To: "Quinn Connie R CIV (US)" <connie.r.quinn.civ@mail.mil>, "Neal Nelson" <neal@nna.com>, "Talbotbedard Margaret M CIV USARMY CECOM (US)" <margaret.m.talbotbedard.civ@mail.mil>, "Rosen Marc J CIV (US)" <marc.j.rosen.civ@mail.mil>, "Barber Arlie J CIV (US)" <arlie.j.barber.civ@mail.mil>

Cc: "Rudkin Michael J CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Watt Tiffany C SFC USARMY (US)" <tiffany.c.watt.mil@mail.mil>, "Hanson Eric K MAJ USARMY (US)" <eric.k.hanson4.mil@mail.mil>, "Quinn Connie R CIV (US)" <connie.r.quinn.civ@mail.mil>

Mon, 12 Mar 2012 11:43:05 -0500

Ms. Quinn,

Are you saying that for those locations in the spread sheet
where a "B4" appears in place of a dollar amount, the Army is
claiming that the dollar amount is being withheld under FOIA
Exemption (b)(4)?

Neal

Subject: RE: Final Response to FOIA Request FP-11-028645 (UNCLASSIFIED)

From: "Quinn, Connie R CIV (US)" <connie.r.quinn.civ@mail.mil>

To: Neal Nelson <neal@nna.com>, "Talbotbedard, Margaret M CIV USARMY CECOM (US)"
<margaret.m.talbotbedard.civ@mail.mil>, "Rosen, Marc J CIV (US)" <marc.j.rosen.civ@mail.mil>, "Barber, Arlie J
CIV (US)" <arlie.j.barber.civ@mail.mil>

Cc: "Rudkin, Michael J CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Hanson, Eric K MAJ USARMY (US)"
<eric.k.hanson4.mil@mail.mil>, "McLeod, Michelle S CIV (US)" <michelle.s.mcleod.civ@mail.mil>, "Quinn,
Connie R CIV (US)" <connie.r.quinn.civ@mail.mil>

Tue, 13 Mar 2012 16:04:58 +0000

Classification: UNCLASSIFIED
Caveats: NONE

Mr. Nelson: Please see the attached response letter and a copy of Executive
Order 12600.

Please reply to all if you have any comments or concerns. As I will be out of
the office until March 26th, any reply you send will be addressed by my
co-workers until I return.

Thank you.

CONNIE R. QUINN
Information Management Specialist
Operational Support Team
ACC-APG-Huachuca Division
2133 Cushing Street, Building 61801
Fort Huachuca, AZ 85613-7070
Phone: 520-538-9278 - DSN 879-9278
Email: connie.r.quinn.civ@mail.mil

NOTE: I will be out of the office March 14 through 23.



**DEPARTMENT OF THE ARMY**
U.S. ARMY CONTRACTING COMMAND
ABERDEEN PROVING GROUND
2133 CUSHING ST., BLDG 61801
FORT HUACHUCA, AZ 85613

13 March 2012

REPLY TO
ATTENTION OF

CCAP-CCH

Neal Nelson                                                      13 March 2012
222 N. River Street
East Dundee, IL 60118

Dear Mr. Nelson:

In your FOIA Request Number FP-11-028645, you requested the following information about the U.S. Army Technology Integration Center (TIC) at Fort Huachuca:

* The name of the non-government organization; the amount of money paid to the TIC by the non-government organization; and the approximate dates that the non-government organization used the TIC facilities.

I processed your FOIA request and provided you a spreadsheet in answer to your questions. I provided interim responses on November 29 and December 12, 2011. The final was provided on March 12, 2012.

As the FOIA Officer and Release Agent, I processed this request in accordance with Army Regulation 25-55. Due to the nature of the information involved, we were required to follow Executive Order 12600. I have attached a copy of this for your information. Based on the results of this process, I have determined that I do not have authority to release the information under Exemption 4 of the FOIA, 5 U.S.C. § 552(b)(4). FOIA Exemption 4 protects trade secrets, commercial, or financial information obtained from a person or organization outside the government.

This exemption balances and safeguards the interests of both the federal government and entities that submit commercial and financial information to the government. It may be invoked for the benefit of the person who has provided commercial or financial information if it can be shown that "public disclosure is likely to cause substantial harm to his competitive position." *Nat'l Parks v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974).

However, as a releasing agent only, I may not deny your request, but must instead refer it to the Initial Denial Authority (IDA), if you request such referral in writing. Please advise this office in writing no later than March 27, 2012, if you desire to take the steps necessary to initiate the formal denial process. This response should not be construed as a denial of any portion of your request. If I do not hear from you by this time, I will consider the matter closed.

2

Please refer to FOIA Control No. FP-11-028645 in all correspondence regarding this FOIA request. You may refer any correspondence concerning your request to the undersigned FOIA Coordinator, Connie Quinn, at (520) 538-9278 or email to connie.r.quinn.civ@mail.mil.

Respectfully,

Connie R. Quinn
FOIA Coordinator

**Executive Order 12600--Predisclosure notification procedures for confidential commercial information**

**Source:** The provisions of Executive Order 12600 of June 23, 1987, appear at 52 FR 23781, 3 CFR, 1987 Comp., p. 235, unless otherwise noted.

By the authority vested in me as President by the Constitution and statutes of the United States of America, and in order to provide predisclosure notification procedures under the Freedom of Information Act concerning confidential commercial information, and to make existing agency notification provisions more uniform, it is hereby ordered as follows:

**Section 1.** The head of each Executive department and agency subject to the Freedom of Information Act shall, to the extent permitted by law, establish procedures to notify submitters of records containing confidential commercial information as described in section 3 of this Order, when those records are requested under the Freedom of Information Act (FOIA), 5 U.S.C. 552, as amended, if after reviewing the request, the responsive records, and any appeal by the requester, the department or agency determines that it may be required to disclose the records. Such notice requires that an agency use good-faith efforts to advise submitters of confidential commercial information of the procedures established under this Order. Further, where notification of a voluminous number of submitters is required, such notification may be accomplished by posting or publishing the notice in a place reasonably calculated to accomplish notification.

**Sec. 2.** For purposes of this Order, the following definitions apply:
(a) "Confidential commercial information" means records provided to the government by a submitter that arguably contain material exempt from release under Exemption 4 of the Freedom of Information Act, 5 U.S.C. 552(b)(4), because disclosure could reasonably be expected to cause substantial competitive harm.
(b) "Submitter" means any person or entity who provides confidential commercial information to the government. The term "submitter" includes, but is not limited to, corporations, state governments, and foreign governments.

**Sec. 3.** (a) For confidential commercial information submitted prior to January 1, 1988, the head of each Executive department or agency shall, to the extent permitted by law, provide a submitter with notice pursuant to section 1 whenever:
> (i) the records are less than 10 years old and the information has been designated by the submitter as confidential commercial information; or
> (ii) the department or agency has reason to believe that disclosure of the information could reasonably be expected to cause substantial competitive harm.

(b) For confidential commercial information submitted on or after January 1, 1988, the head of each Executive department or agency shall, to the extent permitted by law, establish procedures to permit submitters of confidential commercial information to designate, at the time the information is submitted to the Federal government or a reasonable time thereafter, any information the disclosure of which the submitter claims could reasonably be expected to cause substantial competitive harm. Such agency procedures may provide for the expiration, after a specified period of time or changes in circumstances, of designations of competitive harm made by submitters. Additionally, such procedures may permit the agency to designate specific classes of information that will be treated by the agency as if the information had been so designated by the submitter. The head of each Executive department or agency shall, to the extent permitted by law, provide the submitter notice in accordance with section 1 of this Order whenever the department or agency determines that it may be required to disclose records:

(i) designated pursuant to this subsection; or

(ii) the disclosure of which the department or agency has reason to believe could reasonably be expected to cause substantial competitive harm.

Sec. 4. When notification is made pursuant to section 1, each agency's procedures shall, to the extent permitted by law, afford the submitter a reasonable period of time in which the submitter or its designee may object to the disclosure of any specified portion of the information and to state all grounds upon which disclosure is opposed.

Sec. 5. Each agency shall give careful consideration to all such specified grounds for nondisclosure prior to making an administrative determination of the issue. In all instances when the agency determines to disclose the requested records, its procedures shall provide that the agency give the submitter a written statement briefly explaining why the submitter's objections are not sustained. Such statement shall, to the extent permitted by law, be provided a reasonable number of days prior to a specified disclosure date.

Sec. 6. Whenever a FOIA requester brings suit seeking to compel disclosure of confidential commercial information, each agency's procedures shall require that the submitter be promptly notified.

Sec. 7. The designation and notification procedures required by this Order shall be established by regulations, after notice and public comment. If similar procedures or regulations already exist, they should be reviewed for conformity and revised where necessary. Existing procedures or regulations need not be modified if they are in compliance with this Order.

Sec. 8. The notice requirements of this Order need not be followed if:
(a) The agency determines that the information should not be disclosed;
(b) The information has been published or has been officially made available to the

public;

(c) Disclosure of the information is required by law (other than 5 U.S.C. 552);

(d) The disclosure is required by an agency rule that (1) was adopted pursuant to notice and public comment, (2) specifies narrow classes of records submitted to the agency that are to be released under the Freedom of Information Act, and (3) provides in exceptional circumstances for notice when the submitter provides written justification, at the time the information is submitted or a reasonable time thereafter, that disclosure of the information could reasonably be expected to cause substantial competitive harm;

(e) The information requested is not designated by the submitter as exempt from disclosure in accordance with agency regulations promulgated pursuant to section 7, when the submitter had an opportunity to do so at the time of submission of the information or a reasonable time thereafter, unless the agency has substantial reason to believe that disclosure of the information would result in competitive harm; or

(f) The designation made by the submitter in accordance with agency regulations promulgated pursuant to section 7 appears obviously frivolous; except that, in such case, the agency must provide the submitter with written notice of any final administrative disclosure determination within a reasonable number of days prior to the specified disclosure date.

**Sec. 9.** Whenever an agency notifies a submitter that it may be required to disclose information pursuant to section 1 of this Order, the agency shall also notify the requester that notice and an opportunity to comment are being provided the submitter. Whenever an agency notifies a submitter of a final decision pursuant to section 5 of this Order, the agency shall also notify the requester.

**Sec. 10.** This Order is intended only to improve the internal management of the Federal government, and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person.

Subject: RE: Final Response to FOIA Request FP-11-028645 (UNCLASSIFIED)

From: "Neal Nelson" <neal@nna.com>

To: "Quinn Connie R CIV (US)" <connie.r.quinn.civ@mail.mil>, "Neal Nelson" <neal@nna.com>, "Talbotbedard Margaret M CIV USARMY CECOM (US)" <margaret.m.talbotbedard.civ@mail.mil>, "Rosen Marc J CIV (US)" <marc.j.rosen.civ@mail.mil>, "Barber Arlie J CIV (US)" <arlie.j.barber.civ@mail.mil>

Cc: "Rudkin Michael J CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Hanson Eric K MAJ USARMY (US)" <eric.k.hanson4.mil@mail.mil>, "McLeod Michelle S CIV (US)" <michelle.s.mcleod.civ@mail.mil>, "Quinn Connie R CIV (US)" <connie.r.quinn.civ@mail.mil>

Tue, 13 Mar 2012 14:28:20 -0500

Ms. Quinn,

Attached please find my letter requesting that you initiate the formal denial process.

Thank you,

Neal

# NEAL NELSON & ASSOCIATES
222 NORTH RIVER STREET, EAST DUNDEE, ILLINOIS 60118-1332

March 13, 2012

Ms. Connie Quinn
Department of the Army
U.S. Army Contracting Command
Aberdeen Proving Ground
2133 Cushing Street
Building 61801
Fort Huachuca, Arizona 85613

Re: FP-11-028645

Dear Ms. Quinn,

Please accept this letter as my formal request for you to initiate the formal denial process for
my FOIA requests identified by your control number FP-11-028645.

Thank you,

Neal Nelson

Subject: RE: Final Response to FOIA Request FP-11-028645 (UNCLASSIFIED)

From: "Neal Nelson" <neal@nna.com>

To: "Quinn Connie R CIV (US)" <connie.r.quinn.civ@mail.mil>, "Neal Nelson" <neal@nna.com>, "Talbotbedard Margaret M CIV USARMY CECOM (US)" <margaret.m.talbotbedard.civ@mail.mil>, "Rosen Marc J CIV (US)" <marc.j.rosen.civ@mail.mil>, "Barber Arlie J CIV (US)" <arlie.j.barber.civ@mail.mil>

Cc: "Rudkin Michael J CIV (US)" <michael.j.rudkin.civ@mail.mil>, "Hanson Eric K MAJ USARMY (US)" <eric.k.hanson4.mil@mail.mil>, "McLeod Michelle S CIV (US)" <michelle.s.mcleod.civ@mail.mil>, "Quinn Connie R CIV (US)" <connie.r.quinn.civ@mail.mil>

Mon, 19 Mar 2012 12:23:14 -0500

Ms. Quinn,

I sent you an email with a letter attached in a ".doc" format
as a formal request for review by the initial denial authority.

Did you receive my message?

Was the letter satisfactory in content and format?

Thank you,

Neal Nelson

Subject: RE: Final Response to FOIA Request FP-11-028645 (UNCLASSIFIED)

From: "McLeod, Michelle S CIV (US)" <michelle.s.mcleod.civ@mail.mil>

To: "neal@nna.com" <neal@nna.com>

Cc: "Talbotbedard, Margaret M CIV USARMY CECOM (US)" <margaret.m.talbotbedard.civ@mail.mil>

Tue, 20 Mar 2012 17:55:14 +0000

Classification: UNCLASSIFIED
Caveats: NONE

Mr. Nelson,

This is an acknowledgement of your formal denial letter.

V/r

Michelle S. McLeod
CECOM FOIA Officer
443-861-5266

# EXHIBIT 8



**DEPARTMENT OF THE ARMY**
HEADQUARTERS, US ARMY INFORMATION SYSTEMS ENGINEERING COMMAND
FORT HUACHUCA, ARIZONA 85613-5300

REPLY TO
ATTENTION OF

January 25, 2005

Technical Director/Deputy

Mr. Neal Nelson
Neal Nelson & Associates
302 East Main Street
East Dundee, Illinois 60118-1324

Dear Mr. Nelson:

This is in response to your letter dated December 15, 2004. The prior letters and emails from Mr. Bradford, Mr. Rosen and me referred to therein, speak for themselves, and will not be commented upon further. You indicate that you have information regarding the Technology Integration Center (TIC) competing with your firm; again, we have previously responded to your concerns on this issue and will not comment further.

The major point of your letter is to clarify a statement made by Mr. Bradford, regarding ownership of the RTE software. At no time has the Army claimed that it owns the intellectual property rights to this software. Mr. Bradford's statement about software ownership referred to the fact that the Army had purchased a copy of the software, with those rights that allow the Government to use the software perpetually and without any further compensation to your company. In 1997, the Army paid your company $96,000.00 for a perpetual 1000 User RTE License for the software, as well as additional maintenance fees and other payments since that time. Under this license, the Government is entitled to continue to use the software, without further obligation to your company, along with whatever improvements have been made to the software.

We would also like to address an additional matter. As you know, you and Mr. Bradford agreed verbally that you would be provided with scripts that run on the RTE kernel. These scripts were developed in cooperation between you, Government personnel and Government contractors.

-2-

About a year after their development, they were made available for your use. Henceforth, we will be unable to provide your company with any scripts that are developed by Government personnel or Government contractors.

Sincerely,

BRAD N. BLAU
Deputy/Technical Director

# NEAL NELSON & ASSOCIATES

302 EAST MAIN STREET, EAST DUNDEE, ILLINOIS 60118-1324

February 3, 2005

Mr. Brad N. Blau
Deputy/Technical Director
Department of the Army
Information Systems Engineering Command
Fort Huachuca, Arizona 85613-5300

Dear Mr. Blau,

Your January 25, 2005 letter stated repeatedly that the Command will not comment
further regarding the TIC's alleged competition with my firm. I regretfully accept your
decision on this topic and I will pursue this issue through other channels.

The balance of this letter is in reference to the second paragraph of your January 25, 2005
letter relating to the 1000 user license.

If you refer to Army Publication TR No AMSEL-IE-TI-04-014 titled "ETHERNET
SWITCH EVALUATION PLAN" dated May, 2004, Appendix H, Section H-2.2,
Paragraph f (page H-8) titled "Mix Baseline Script" you will find a list of traffic "flows".
These flows are generated by my RTE software. Each flow results from a single RTE
emulated user. The list includes "672 WWW flows, 240 FTP flows, ..." plus some
additional VoIP and Mulitcast users in unspecified numbers. The total of the listed flows
(users) is 1248. If you interview the technicians that run this test you will discover that
the "Mix" test actually runs 1800 RTE users. This is a clear violation of the TIC's 1000
user license.

When Dan Bradford told me that he was going to use my software in the "commercial"
lab to run tests for Extreme, I told him that his license would not permit that use. My
statement was based on the fact that: when the software was installed and configured in
both the I3MP lab and the commercial lab at the same time, the TIC would be running
3600 emulated users. This would be a flagrant violation of the 1000 user license.

In response, Mr. Bradford: 1) Terminated my 18 year working relationship with the TIC
and its predecessor organizations, 2) Sent me a letter stating that he owned my software
and could run whatever tests he wanted with it, and 3) Offered testing services to
Extreme in spite of my objections. These actions constituted a conscious, willful and
flagrant violation of the clearly specified 1000 user license limitation.

Is the Command interested in working with me to uncover the full extent of the license abuse and formulate an appropriate response? If so, please notify me no later than 5:00 P.M. Central Standard Time on Thursday February 11, 2005.

Respectfully,

Neal Nelson

Message                                                                    Page 1 of 1

**From:** "Rosen, Marc J CECOM Legal Office-Huachuca" <Marc.Rosen@us.army.mil>
  **To:** neal@nna.com
 **Date:** 16 Feb 2005, 04:27:09 PM
**Subject:** Recent Correspondence

---

HTML content follows

Message
Mr. Nelson:
Mr. Blau has asked me to contact you regarding your most recent correspondence with him and to be the
Command's point of contact for you on this issue. I understand that you are asserting that there was a violation of
the license which was purchased for use of the RTE emulation software, which has been described elsewhere as
a perpetual 1000 user license. I would appreciate it if you would provide me with a copy of that license signed by
the Army, or refer me to that document in the documentation you have previously provided. In addition, I would
appreciate it if you would provide me with an exact description of the alleged violation of that license. Thank you.

Marc J. Rosen, Esq.
U.S. Army Communications and Electronics Command
Legal Office, Ft. Huachuca Division
c/o USAISEC, TIC
ATTN: AMSEL-IE-TI, Bldg. 53302
Ft. Huachuca, AZ 85613-5300
(520) 533-4168
(520) 533-7196 (Fax)

From: neal@nna.com [mailto:neal@nna.com]
Sent: Tuesday, May 03, 2005 1:20 PM
To: Blau, Brad HQISEC
Subject: Re: Marc

Brad,

I believe you told me that Marc was going to take
care of the 3,600 users versus 1,000 user licence
issue at the TIC. I have not been notified of any
progress on this topic. Has it been dealt with?

Neal

**From:** "Blau, Brad C-E LCMC HQISEC" <Brad.Blau@US.ARMY.MIL>
**To:** "'neal@nna.com'" <neal@nna.com>
**Date:** 06 May 2005, 09:39:51 AM
**Subject:** RE: Marc

Neal,

I will have Marc check into this and get back with you.

Thanks
Brad

# NEAL NELSON & ASSOCIATES

302 EAST MAIN STREET, EAST DUNDEE, ILLINOIS 60118-1324

September 30, 2005

Dr. Edward G. Elgart
Director, CECOM Acquisition Center
Ft Monmouth NJ 07703

Dear Dr. Elgart:

My firm, Neal Nelson & Associates is a small business and offers licensed software products and engineering services to benchmark and validate computer and network performance.

For over 18 years I proudly supported testing activities and had a business relationship with the US ARMY, Information Systems Engineering Command, Technology Integration Center (TIC) at Ft. Huachuca AZ.

This business relationship has in recent times been terminated based on this company having identified the following issues and raised them to the ARMY management chain:

The first issue is that although the TIC has a licensed authority to use my company's software to emulate 1,000 simultaneous users, they have been running tests with at least 3,600 emulated users. I would request that the TIC either use the software within the licensed limits or upgrade the license to cover their actual use. I would also like to be compensated for the past violation.

The second area of concern is that the TIC has chosen to use my intellectual property licensed product to compete with my business in the commercial marketplace. This is a niche market and given that the TIC is utilizing government funded facilities and personnel, it has been difficult to compete and I have lost a considerable portion of my customer base to their activities. Although there may not be an explicit prohibition against this in the law, it violates the policies of AR 73-1 and my understanding of the government's intent to not adversely impact public sector businesses through competition. I would request that the TIC cease commercial competition with my business.

In the summer of 2004 I uncovered the software licensing issues with the Technology Integration Center. In an attempt to resolve these problems I have had numerous communications with individuals starting with the TIC director, Dan Bradford and continuing up to General Mazzucchi at CECOM Command Group. The issues remain unresolved.

A brief description of the problem is as follows: The TIC purchased a license from my firm to use some Remote Terminal Emulation (RTE) software. RTE software assists with the testing of computer hardware, software and network equipment by emulating user keystrokes and mouse movements. The license granted was a 1,000 user license. The favorable price offered for this license was granted based on anticipated use within the US Government.

In the summer of 2004 I learned that the TIC had been using my software in the TIC "Commercial Lab" to run tests for non-government users. I considered this to be inappropriate since 1) the government had not requested nor received a license to use my software in competition with the services that my firm offered to the commercial market and 2) by running the I3MP/CUITN tests with my software in both the I3MP and the commercial lab at the same time, the total number of emulated users would exceed 3,600, far beyond the 1,000 user license limit.

in July of 2004 I delivered a letter to Dan Bradford requesting that the TIC not use my software in the commercial lab. In September of 2004 Dan sent me an email notifying me that the TIC was going to use my software in the commercial lab to provide testing for Extreme Networks. The TIC ran the tests for Extreme which resulted in 3,600 active users and since last summer the TIC has regularly run tests at user levels far beyond the 1,000 user limit. The TIC has made no attempt to either limit their use to the 1,000 user level or purchase a license consistent with their actual use.

I have attached the following documents to this letter to assist with investigation of this matter:

1) A memo documenting the various procurement events that resulted in granting the 1,000 user software license.

2) A copy of my letter to Dan dated 12 Jul 2004 wherein I request that he not use my software in the TIC commercial lab.

3) A copy of an email dated 13 Sep 2004 from Dan Bradford to me wherein he tells me that the TIC is going to offer testing services to Extreme (in the commercial lab with my software).

   There were numerous communications with the TIC and ISEC during the fall of 2004. Copies of these have not been included.

4) A letter from Brad Blau dated 25 Jan 2005 wherein Brad provides acknowledgment from ISEC that the TIC has a 1,000 user license.

5) A letter from me to Brad Blau dated 03 Feb 2005 wherein I explain that the TIC is running tests with 3,600 active users and that this is not authorized by a 1,000 license.

   There were more letters and emails to various individuals at both ISEC and CECOM. Copies of these letters have not been included. After 14 months of dialog, notices and requests the TIC continues to use the software in ways that are inconsistent with their 1,000 user license.

6) A copy of a computer "shell script" that runs one of the test sequences of the I3MP/CUTIN network test. The "user counts" have been highlighted and it is clear that the user count for step ?? is 1,800. Obviously when this test is run in two different labs the active user count for the site will be 3,600.

Finally, please note that during a period of time over 18 years I personally performed numerous consulting tasks while working as a contractor inside in TIC facility. While working on these tasks I would occasionally use my software tools to assist in completing my assignments. I also allowed Army staff members to use my software, under my direction, when we were working together on projects where I was involved. My use of my software while I worked on specific projects can not be construed as granting any additional license to use the tools after the completion of my tasks, or to otherwise authorize continued use of the software in my absence.

Sincerely,

Neal Nelson



DEPARTMENT OF THE ARMY
U.S. ARMY COMMUNICATIONS-ELECTRONICS LIFE CYCLE
MANAGEMENT COMMAND - SOUTHWEST SECTOR
FORT HUACHUCA, ARIZONA 85613-5000

AMSEL - AC

Neal Nelson & Associates
Attn: Mr. Neal Nelson-President
302 East Main Street
East Dundee, IL 60118-1324

12/13/05

Reference: Letter dated 30 September 2005

Mr. Nelson,

I have received your letter dated 30 September 2005. In that letter, you expressed your concerns involving the use by USAISEC and the Technology Integration Center of the Remote Terminal Emulation Tool, and regarding issues such as an increase in the number of emulated users with that tool, and the use of your licensed product in a manner you believe competes with your company in violation of regulations, as well as other issues.

I have forwarded your letter to the C-E LCMC IG (Communications Electronics Life Cycle Management Command Inspector General), for further review of the issues you raised, concurrent with the Inspector General's review of these matters, which was already under way as requested by General Mazzucchi.

We will defer to the C-E LCMC IG investigation.

If you have any further questions on this matter, you may contact the Inspector General's office. Thank you.

Edward G. Elgart
Director, Acquisition Center
Communication-Electronics, Life Cycle Management
Command

# EXHIBIT 9

# NEAL NELSON & ASSOCIATES

302 EAST MAIN STREET, EAST DUNDEE, ILLINOIS 60118-1324

August 1, 2005

General Michael Mazzucchi
U.S. Army Communications-
Electronics Command (CECOM)
Command Group
Building 1207
Fort Monmouth, NJ 07703

Dear General Mazzucchi:

Last summer I became aware of some activities at the Technology Integration
Center, Fort Huachuca. I felt that these activities were violating Army policies
and violating the terms of a software license. I had been a contractor supporting
the Army's mission for over 18 years and I spoke to the director of the TIC, in
private, on several occasions about this topic. I learned that the director
supported the activities and had instructed his staff to continue.

The TIC was, and is, competing against my firm by providing testing services to
non-government commercial customers. This is a violation of Army Policy 73-1,
Chapter 7 - Testing for Commercial Entities, Section 7-4, Paragraph b, "Use of
any Army facility by a commercial enterprise is allowed only if it does not
increase the cost to operate the facilities and after insuring that the Army is
not competing with U.S. commercial sector in providing such services."

The TIC was also running my company's software at user levels that far exceeded
the 1,000 user license that the TIC had purchased. I delivered a letter to the
TIC director requesting that the TIC stop running these inappropriate tests.

Shortly after I delivered my request, my working relationship with the TIC was
terminated. Following my termination I reported the inappropriate use to Colonel
Brown's office. After ten months of dialog, Colonel Brown's office reported to me
that both issues were closed. The TIC is apparently continuing its inappropriate
behavior in both categories.

On July 5, 2005 I wrote a letter to Victor Ferlise wherein I stated "Please inform
me of the procedure to follow to file a complaint against Colonel Brown for these
improper acts."

Mr. Ferlise answered my letter on July 20, 2005 and suggested that I should take
the issues to the contracting officer. I am puzzled by this response since I doubt
that contracting officers are tasked with investigating violations of Army policy.

Before I follow Mr. Ferlise's suggestion and file a complaint with the contracting
officer (which in this case is GSA) I would like to again request that someone inform
me of the proper procedure to file a complaint within the CECOM chain of command.

I have repeatedly tried to have these issues addressed through the chain of command,
and without the involvement of outsiders like the GSA. But I feel that the issues
must me resolved, and the Army policy must be followed, by all Army personnel, even
those stationed out in the Arizona desert.

Thank you for your assistance in this matter.

Sincerely,

Neal Nelson

TELEPHONE (847) 851-8900          FACSIMILE: (847) 851-8901          E-MAIL office@nna.com

# NEAL NELSON & ASSOCIATES

302 EAST MAIN STREET, EAST DUNDEE, ILLINOIS 60118-1324

August 19, 2005

General Michael Mazzucchi
U.S. Army Communications–
Electronics Command (CECOM)
Command Group
Building 1207
Fort Monmouth, NJ 07703

Dear General Mazzucchi:

On August 1, 2005 I sent you a letter regarding some violations
of license terms and violations of Army policy at the Technology
Integration Center (TIC), Fort Huachuca, Arizona (copy attached).

As of this date I have received neither an acknowledgment nor
reply to this letter.

If you have asked someone to look into this topic, I really feel
that they should talk to me. I have proof for every one of my
allegations on this topic.

If I do not hear from someone in your office by September 1st,
I will assume that you office has no interest in investigating
these mis-deeds.

Sincerely,

Neal Nelson



**DEPARTMENT OF THE ARMY**
HEADQUARTERS, U.S. ARMY COMMUNICATIONS-ELECTRONICS COMMAND,
PROGRAM EXECUTIVE OFFICE COMMAND, CONTROL AND COMMUNICATIONS TACTICAL
AND FORT MONMOUTH
FORT MONMOUTH, NEW JERSEY 07703-5000

REPLY TO
ATTENTION OF

SEP 7 - 2005

Office of the Commanding General
And Program Executive Office

Mr. Neal Nelson
Neal Nelson & Associates
302 East Main Street
East Dundee, Illinois 60118-1324

Dear Mr. Nelson:

I am in receipt of your letter dated August 1, 2005 regarding the Technology Integration Center (TIC), Information Systems Engineering Command (ISEC), at Fort Huachuca, Arizona. In accordance with your request to have the issues that you raised be addressed by the Communications-Electronics Life Cycle Management Command (C-E LCMC), I have been briefed regarding each of your concerns. Based upon my review, it is my opinion that there has been no violation of U.S. Army policy or regulations, or of the terms of any software license agreements. Furthermore, I have seen no indication of any improper, illegal or inappropriate action by Colonel Brown, the former ISEC Commander, or any other ISEC personnel.

Nevertheless, I have forwarded your correspondence to the C-E LCMC Inspector General, Mr. Archie Ackley, and directed that his office expeditiously conduct a full inquiry into the matters that you have raised. Mr. Ackley will apprise you of the results of that inquiry upon its completion.

Sincerely,

Michael R. Mazzucchi
Major General, U.S. Army
Commanding and Program Executive Officer

# NEAL NELSON & ASSOCIATES

302 EAST MAIN STREET, EAST DUNDEE, ILLINOIS 60118-1324

September 16, 2005

General Michael Mazzucchi
U.S. Army Communications-
Electronics Command (CECOM)
Command Group
Building 1207
Fort Monmouth, NJ 07703

Dear General Mazzucchi:

Thank you for your letter dated September 7, 2005, and the time that
you have spent considering my difficulties with the TIC.

As I mentioned in previous communications I have proof of TIC misdeeds.
I have attached the following four photocopies of communications to
this letter as an example:

1) Two pages from Army Policy 73-1 specifying that Army labs may
only offer testing services after confirming that they are not
competing with the commercial sector.

2) A copy of an email dated 03 Aug 2004 from me to Dan Bradford
wherein I notify him that I am trying to make a sale to Extreme
Networks.

3) A copy of an email dated 13 Sep 2004, 02:29 PM from Dan Bradford
to me wherein he tells me that the TIC is going to offer testing
services to Extreme.

4) A copy of an email dated 13 Sep 2004, 04:19 PM from me to Dan
wherein I point out that Army Policy 73-1 prohibits the TIC from
offering services that compete with the commercial sector and
requesting that the TIC not offer services to Extreme.

The TIC did provide services to Extreme. These services were competition
with testing services offered by my firm.

I have in my possession proof of some TIC misdeeds. I know where to
locate proof of other TIC misdeeds. I believe that an independent
investigation by a qualified technical person may uncover even more
TIC misdeeds.

You mentioned in your letter that this topic had been referred to
C-E LCMC Inspector General Mr. Archie Ackley. How do I contact Mr.
Ackley to provide him with the information that I have?

Sincerely,


Neal Nelson

# NEAL NELSON & ASSOCIATES

302 EAST MAIN STREET, EAST DUNDEE, ILLINOIS 60118-1324

November 1, 2005

Mrs. Raywood
C-E LCMC Inspector General's
Office Attention: AMSEL-IG
U.S. Army Communications-
Electronics Command (CECOM)
Fort Monmouth, NJ 07703

Dear Mrs. Raywood:

Attached you will find copies of documents pertinent to the dispute between my firm and the Army's Technology Integration Center (TIC) at Fort Huachuca, Arizona.

These documents relate to the topic of competition between the TIC and U.S. commercial sector, including my firm. We will prepare and send a separate letter addressing the topic of software licensing.

Attachment A) is a photocopy of Title 10 Section 2539b, the section that allows commercial firms to use government facilities. Please note that subsection (a) includes the words "under regulations prescribed by the Secretary of Defense and when determined by the Secretary of Defense or the Secretary concerned to be in the interest of national defense,".

This specifies two criteria for proper use of government facilities: 1) "under regulations" (the Army regulation for activities under Section 2539b is Army Policy 73-1, see below), and 2) "to be in the interest of national defense".

Attachment B) includes copies of pages 27 and 28 from Army Policy 73-1. Section 7-4,a,2 specifies that this is the section covering use of Army facilities under Section 2539b. This paragraph re-states "when in the interest of national defense". Section 7-4-b adds the two additional requirements "does not increase the cost to operate the facilities" and "after ensuring that the Army is not competing with U.S. commercial sector".

Attachment C) is a copy of my company's sales brochure which includes a photograph of my benchmarking laboratory and descriptions of some of the tests performed by my firm.

Attachment D) is a set of copies of invoices from 1998 through 2003 for testing services that my company has provided to network vendors such as Cabletron, Hewlett Packard, Bay Networks and Nortel Networks. These documents prove that my firm is in the business of providing laboratory testing services to manufacturers of networking equipment.

Attachment E) is a copy of a letter dated 12 July 2004 from me to Mr. Bradford (director of the TIC) wherein I request that the TIC not compete with my firm.

Attachment F) is a copy of an email dated 03 Aug 2004 from me to Mr. Bradford wherein I notify him that I am trying to make a sale to Extreme Networks.

Attachment G) is a copy of an email dated 13 Sep 2004, 02:29 PM from Mr. Bradford to me wherein he tells me that the TIC is going to offer testing services to Extreme.

Attachment H) is a copy of an email dated 13 Sep 2004, 04:19 PM from me to Mr. Bradford wherein I request that the TIC not offer testing services to Extreme. In this email I point out that Army Policy 73-1 prohibits this type of competition.

The TIC did provide testing services to Extreme. These services were in competition with services offered by my firm. My company has suffered because of this competition.

Discussions between the TIC and my firm revealed that there had been an earlier competitive event when both organizations offered testing services to the company Adtran Inc. The TIC won that order and also took that business away from my firm.

A detailed audit of the TIC commercial lab will uncover three significant violations of Army policy:

1)  A technical review of the tests performed in the TIC commercial lab will reveal that many (if not all) of those tests could have been performed by U.S. commercial firms. Thus the TIC is using Army facilities to compete with private industry. This is prohibited.

2)  A close examination of the tests performed will reveal that the tests were not "in the interest of national defense". Specifically the Adtran and Extreme tests were intended to help those companies market their products to the Army. Tests to assist companies in sales and marketing are not allowed under 2539b or 73-1.

3)  A review of the costs associated with equipping and staffing the TIC commercial lab will reveal that there has been an increase in costs to operate this lab. This is prohibited by Army Policy 73-1.

Since all of these are clear and easily documented violations of Army Policy, and my company is suffering because of these violations, I would like to see the Army take appropriate action to correct these problems.

Thank you for your attention to this matter,

Sincerely,

Neal Nelson



TITLE 10--ARMED FORCES

Subtitle A--General Military Law

PART IV--SERVICE, SUPPLY, AND PROCUREMENT

CHAPTER 148--NATIONAL DEFENSE TECHNOLOGY AND INDUSTRIAL BASE, DEFENSE
REINVESTMENT, AND DEFENSE CONVERSION

SUBCHAPTER V--MISCELLANEOUS TECHNOLOGY BASE POLICIES AND PROGRAMS

Sec. 2539b. Availability of samples, drawings, information, equipment, materials, and certain services

(a) Authority.--The Secretary of Defense and the secretaries of the military departments, under regulations prescribed by the Secretary of Defense and when determined by the Secretary of Defense or the Secretary concerned to be in the interest of national defense, may each--

(1) sell, rent, lend, or give samples, drawings, and manufacturing or other information (subject to the rights of third parties) to any person or entity;

(2) sell, rent, or lend government equipment or materials to any person or entity—

(A) for use in independent research and development programs, subject to the condition that the equipment or material be used exclusively for such research and development; or

(B) for use in demonstrations to a friendly foreign government; and

(3) make available to any person or entity, at an appropriate fee, the services of any government laboratory, center, range, or other testing facility for the testing of materials, equipment, models, computer software, and other items.

(b) Confidentiality of Test Results.--The results of tests performed with services made available under subsection (a)(3) are confidential and may not be disclosed outside the Federal Government without the consent of the persons for whom the tests are performed.

(c) Fees.--Fees for services made available under subsection (a)(3) shall be established in the regulations prescribed pursuant to subsection (a). Such fees may not exceed the amount necessary to recoup the direct and indirect costs involved, such as direct costs of utilities, contractor support, and salaries of personnel that are incurred by the United States to provide for the testing.

A

(d) Use of Fees.--Fees received for services made available under subsection (a)(3) may be credited to the appropriations or other funds of the activity making such services available.

(Added Pub. L. 103-160, div. A, title VIII, Sec. 822(b)(1), Nov. 30, 1993, 107 Stat 1705, Sec. 2541; renumbered Sec. 2539b, Pub. L. 103-337, div. A, title X, Sec. 1070(a)(13)(A), Oct. 5, 1994, 108 Stat. 2856; amended Pub. L. 103-355, title III, Sec. 3022, Oct. 13, 1994, 108 Stat. 3333; Pub. L. 104-106, div. A, title VIII, Sec. 804, div. D, title XLIII, Sec. 4321(a)(8), Feb. 10, 1996, 110 Stat. 390, 671.)

Prior Provisions

Prior sections 2540 and 2541 were renumbered sections 2539a and 2539b of this title, respectively.

Amendments

1996--Subsec. (a). Pub. L. 104-106, Sec. 4321(a)(8), made technical correction to Pub. L. 103-355, Sec. 3022. See 1994 Amendment note below. Subsec. (c). Pub. L. 104-106, Sec. 804, inserted ``and indirect'' after ``recoup the direct''. 1994--Pub. L. 103-337 renumbered section 2541 of this title as this section. Subsec. (a). Pub. L. 103-355, Sec. 3022, as amended by Pub. L. 104- 106, Sec. 4321(a)(8), inserted ``rent,'' after ``sell,'' in par. (1) and ``, rent,'' after ``sell'' in par. (2).

Effective Date of 1996 Amendment

Section 4321(a) of Pub. L. 104-106 provided that the amendment made by that section is effective as of Oct. 13, 1994, and as if included in Pub. L. 103-355 as enacted.

Army Regulation 73–1

$\beta$

Test and Evaluation

# Test and Evaluation Policy

Headquarters
Department of the Army
Washington, DC
10 November 2004

**UNCLASSIFIED**



*c.* For LFT&E waivers see paragraph 4–2b(6)(h).

**7–2. Delay, suspension, or termination of testing**
Start of testing will be delayed when a problem is identified that would affect the validity of the data being collected to address the evaluation issues. Start of testing will also be delayed when it is apparent that the system has little chance of successfully attaining critical technical parameters or satisfying critical operational criteria, and deficiencies cannot be resolved before the start of the test. Testing will be suspended when a problem is identified during the test that cannot be resolved within the test schedule. Testing is terminated when test resources are released and the test must be rescheduled.

*a.* Testers may delay or suspend testing when necessary, such as when critical or catastrophic safety or health hazards to personnel or equipment are discovered.

*b.* The MATDEV may delay or suspend developmental testing. Any T&E WIPT member may recommend delay or suspension of testing to the materiel developer. (See chap 8.)

*c.* The CG, USATEC or commander of the command conducting the test may delay or suspend testing. Any T&E WIPT member may recommend delay or suspension of testing to the testing commander.

*d.* When a test is delayed or suspended, the MATDEV convenes a program review to consider future actions. Once the MATDEV has solved the problem, the T&E WIPT will be convened to determine necessary additional tests to validate the solutions. Before testing is restarted, appropriate test readiness reviews will be conducted.

*e.* The MATDEV notifies the Milestone Decision Authority when there are cost and schedule implications.

*f.* The MATDEV recommends termination of DT to the Milestone Decision Authority when circumstances warrant. The CG, USATEC, or commanders of other assigned OT activities, recommend termination of OT to the VCSA when circumstances warrant.

**7–3. HQDA major range and test facility base**
*a.* The DOD MRTFB is a national asset consisting of a broad base of T&E activities managed and operated under uniform guidelines to provide T&E support to DOD Components responsible for developing and operating military systems (DODD 3200.11). The Army's portion of the MRTFB consists of the following facilities:

(1) Under the management of USATEC - White Sands Missile Range, NM, including the Electronic Proving Ground at Fort Huachuca, AZ; Yuma Proving Ground, AZ; Dugway Proving Ground, UT; and Aberdeen Test Center at Aberdeen Proving Ground, MD.

(2) Under the management of the USASMDC - USAKA in the Marshall Islands and the HELSTF at White Sands Missile Range, NM.

*b.* Scheduling of test resources will be according to DODD 3200.11.

*c.* While the MRTFB is maintained primarily for DOD T&E support missions, other U.S. Government agencies (Federal, State, and local), allied foreign governments, and defense contractors, as well as private organizations and commercial enterprises may be permitted to use MRTFB facilities. Without compromising primary responsibility to DOD customers, MRTFB commanders will assure equitable consideration for commercial customers and non-DOD users at their facilities according to DODD 3200.11.

*d.* Funding of MRTFB activities will be in a uniform manner and all costs incurred in support of T&E will be billed according to DOD 7000.14–R, volume 11A.

**7–4. Testing for commercial entities**
*a.* There are two statutes that allow Army test facilities to conduct business with U.S. commercial concerns. Their applicability is dependent on whether or not the test facility is designated as an element of the MRTFB.

(1) *MRTFB facilities.* Section 2681 of title 10, U.S. Code, allows the MRTFB activity to enter into contracts with U.S. commercial entities desiring to conduct commercial T&E activities at the MRTFB. To ensure that government users outside of DOD are not charged more than commercial users, OSD's implementing guidance (see DODD 3200.11) expands the policy to cover such use by other Government users (including State and local entities). The MRTFB activity is reimbursed for all direct costs associated with the T&E activities conducted under the contract as well as any additional costs related to the use of the facility as deemed appropriate by the MRTFB commander. Charges to commercial customers will be at least as large as the marginal (additive) cost of providing the service. A DOD contractor is charged at the same rate as any other commercial customer unless the contractor has appropriate contractual language with the DOD contract sponsor that provides the use of test support from the MRTFB as Government-furnished services.

(2) *Non-MRTFB facilities.* Section 2539b of title 10, U.S. Code, provides the Army with the authority to provide cost reimbursable test services to commercial entities, when in the interest of national defense. This authority may not be used to supplant the authority granted under section 2681 of title 10, U.S. Code. The non-MRTFB test activity or laboratory is reimbursed for the total costs incurred as a result of performing the test activities defined in the contractual agreement. Less than total costs may be approved if there are compelling reasons to do so (see DOD 7000.14–R, volume 11A, chap 14).

*b.* Use of any Army test facility by a commercial enterprise is allowed only if it does not increase the cost to operate the facilities and after ensuring that the Army is not competing with U.S. commercial sector in providing such services.

## Chapter 8
## Test and Evaluation Working-level Integrated Product Team

### 8–1. Essential role
*a.* A T&E WIPT must be established for every program to ensure that test and evaluation integration is accomplished. The primary purpose of the T&E WIPT is to optimize the use of appropriate T&E expertise, instrumentation, facilities, simulations, and models to achieve test integration, thereby reducing costs to the Army and decreasing acquisition cycle time.

*b.* The T&E WIPT supports the integrated T&E strategy, resolves issues, and assists the MATDEV in developing and coordinating the TEMP. The primary objectives are to identify and resolve issues early, understand the issues and the rationale for the approach, and document a quality TEMP that is acceptable to all organizational levels as quickly and as efficiently as possible. All documents should be delivered in a timely manner to keep pace with T&E and acquisition schedules. The T&E WIPT will—

(1) Integrate T&E requirements, accelerate the TEMP approval process by producing a coordinated TEMP, resolve cost and scheduling problems, and determine test data confirmation requirements.

(2) Provide a forum to assist personnel responsible for T&E documentation and execution, and ensure that T&E planning, execution, and reporting are directed toward common goals. The T&E WIPT will be the forum through which T&E coordination among all members of the acquisition team is accomplished.

(3) Support the CE process by accomplishing early, more detailed, and continuing T&E documentation, planning, integration, and sharing of data.

(4) Within their area of expertise, assist in preparing the T&E portions of the acquisition strategy, the RFP, and related contractual documents, and assist in evaluating contractor or developer proposals when there are T&E implications.

(5) Operate under the spirit and principles of the Integrated Product Team (IPT) and integrated product and process management (IPPM) or integrated product and process development (IPPD). The T&E WIPT will adhere to principles in the Defense Acquisition Guidebook to include: open discussion, proactive participation, empowerment, and early identification and resolution of issues.

(6) Be established by the MATDEV after approval of a materiel need (for example, Mission Need Statement or DTLOMS Needs Analysis Report) to assist in finalizing the initial critical technical parameters, COIC, and TEMP for program initiation (MS B). To ensure an integrated effort, the T&E WIPT must coordinate with other functional groups.

(7) Be chaired by the MATDEV or designated representative.

(8) Coordinate on requests for waivers of testing in an approved TEMP.

(9) Immediately elevate disagreement on matters of substance through the Integrating IPT or command channels to the next higher level for decision. Problems not resolved at this point will be brought to the DUSA(OR) for decision.

*c.* Minutes of all T&E WIPT meetings will be prepared by the T&E WIPT chairperson and distributed within 10 working days.

### 8–2. Test and evaluation working-level integrated product team composition
*a.* The MATDEV will ensure that all commands, field agencies, human resource elements, and other organizations, as appropriate, that have a role or may have a potential role in a particular program's T&E are extended invitations to the initial T&E WIPT meeting. These organizations include but are not limited to the following:

(1) MATDEV (PEO, PM, or other as appropriate).

(2) Combat developer.

(3) System evaluator.

(4) Developmental tester.

(5) Operational tester.

(6) Threat integrator (DCS, G–2 or designated representative).

(7) Logistician (DCS, G–4 or designated representative).

(8) Training developer/trainer.

(9) For Army-level approvals, the following HQDA offices are included: DUSA(OR), ASA(ALT), the DCS, G–3, DCS, G–8, DCS, G–4, DCS, G–1, DCS, G–2, and DCS, G–6. Failure of any of these offices to provide representatives to attend the initial T&E WIPT (or declare intent not to participate in the T&E WIPT process) forfeits organizational inclusion in the coordination of the TEMP prior to HQDA approval.









# NEAL NELSON & ASSOCIATES

## BENCHMARKS THAT MEAN BUSINESS

C



# UNIQUE COMBINATION OF TOOLS AND EXPERIENCE

We are the only company that offers a complete set of computer performance measurement tools, including:

- Artificial benchmarks that measure and report system component speed
- Pre-written remote terminal emulation scripts for quick, inexpensive benchmarking of hardware and software systems
- Custom-developed remote terminal emulation and client/server tests
- Highly qualified, full-time performance measurement consultants
- A fully-equipped benchmarking laboratory

At Neal Nelson & Associates, we address your computer performance issues promptly, accurately and economically – no matter how complex they may be.

# NEAL NELSON & ASSOCIATES

330 NORTH WABASH AVENUE, CHICAGO, ILLINOIS 60611-3604

INVOICE

D

| | |
|---|---|
| DATE: | 03/11/98 |
| TERMS: | Net 30 Days |
| P.O. No.: | 4540010185 |
| INVOICE No.: | 26124 |

Cabletron Systems
35 Industrial Way
PO Box 5010
Rochester        NH  0388665010

| DESCRIPTION | AMOUNT |
|---|---|
| Testing in Neal Nelson's RTE Lab<br>8 days testing @$1500. per day | 12,000.00 |
| Total Charges | 12,000.00 |

Please make check payable to: Neal Nelson & Associates

/13681/02153/051341

TELEPHONE (312) 755-1000        FACSIMILE (312) 755-1010        E-MAIL office@nna.com

# NEAL NELSON & ASSOCIATES
302 EAST MAIN STREET, EAST DUNDEE, ILLINOIS 60118-1324

**INVOICE**

D

| | |
|---|---|
| Date: | 09/19/03 |
| Terms: | Net 45 Days |
| P.O. No.: | SBY70169 |
| Invoice No.: | 27089 |

HP Smartbuy
P.O. Box 2992
Colorado Springs    CO   80901

| DESCRIPTION | AMOUNT |
|---|---|
| Testing in Neal Nelson's RTE Lab | 8,400.00 |
| One Week usage of the Neal Nelson multi-node RTE software running on a 96-machine test bed in the Neal Nelson & Associates offices. | |
| Partial Invoice | |
| Total Charges | 8,400.00 |

Please make check payable to: Neal Nelson & Associates

/15708/02841/024102

TELEPHONE (847)851-8900          FACSIMILE: (847)851-8901          E-MAIL: office@nna.com

# NEAL NELSON & ASSOCIATES

330 NORTH WABASH AVENUE, CHICAGO, ILLINOIS 60611-3604

INVOICE

D

| | |
|---|---|
| DATE: | 04/02/98 |
| TERMS: | Net 30 Days |
| P.O. No.: | 18734 |
| INVOICE No.: | 26139 |

Bay Networks, USA, Inc.
1725 Duke Street
Suite 700
Alexandria       VA  22314

| DESCRIPTION | AMOUNT |
|---|---|
| Testing in Neal Nelson's RTE Lab | 9,000.00 |
| 6 days at $1500.00 per day | |
| | ---------- |
| Total Charges | 9,000.00 |

Please make check payable to: Neal Nelson & Associates

/13726/02172/050595

TELEPHONE (312) 755-1000          FACSIMILE (312) 755-1010          E-MAIL office@nna.com

**NEAL NELSON & ASSOCIATES**

330 NORTH WABASH AVENUE, CHICAGO, ILLINOIS 60611-3604

D

INVOICE

DATE: 04/16/98

TERMS: Net 30 Days

P.O. No.: 4540011497

INVOICE No.: 26163

Cabletron Systems
35 Industrial Way
PO Box 5010
Rochester        NH  0388665010

| DESCRIPTION | AMOUNT |
|---|---|
| Testing in Neal Nelson's RTE Lab<br>4/13/98 - 4/15/98 Chicago | 4,500.00 |
| Total Charges | 4,500.00 |

Please make check payable to: Neal Nelson & Associates

/13746/02184/051341

TELEPHONE (312) 755-1000      FACSIMILE (312) 755-1010      E-MAIL office@nna.com

**NELSON & ASSOCIATES**
E. MARQUARDT DRIVE, WHEELING, ILLINOIS 60090-6428

**INVOICE**                                              D

**DATE:**        04/29/02

**TERMS:**       Net 60 Days

**P.O. No.:**    USC-108164

**INVOICE No.:** 26939

Nortel Networks, Inc.
Attn: Accounts Payable
P.O. Box 280510

Nashville          TN   37228

| DESCRIPTION | AMOUNT |
|---|---|
| Testing in Neal Nelson's RTE Lab | 12,000.00 |
| Item 1: U.S. Army test validation of 8000 series equipment. | |
| Total Charges | 12,000.00 |

Please make check payable to: Neal Nelson & Associates

/15271/02683/050597

TELEPHONE (847) 353-3000       FACSIMILE (847) 353-3001       E-MAIL office@nna.com

# NEAL NELSON & ASSOCIATES
### 302 EAST MAIN STREET, EAST DUNDEE, ILLINOIS 60118-1324

D

**INVOICE**

| | |
|---|---|
| Date: | 03/07/03 |
| Terms: | Net 30 Days |
| P.O. No.: | USC-108412 |
| Invoice No.: | 27048 |

Nortel Networks, Inc.
Attn: Accounts Payable
P.O. Box 280510

Nashville      TN   37228

| DESCRIPTION | AMOUNT |
|---|---|
| Testing in Neal Nelson's RTE Lab | |
| Line item 1: US Army test validation of 8000 | 24,000.00 |
| | |
| Total Charges | 24,000.00 |

Please make check payable to: Neal Nelson & Associates

/15499/02792/050597

TELEPHONE (847)851-8900      FACSIMILE: (847)851-8901      E-MAIL: office@nna.com

# NEAL NELSON & ASSOCIATES

302 EAST MAIN STREET, EAST DUNDEE, ILLINOIS 60118-1324

E

July 12, 2004

Mr. Dan Bradford
U.S. Army
HQISEC - TIC
Building 53302
Fort Huachuca, AZ 85613

Dear Dan,

In the early 1990's I created a benchmarking labratory in my Chicago office. My reason for doing this was to offer testing services on a fee basis primarily to the commercial market.

I am aware that you have created a benchmarking labratory at the TIC and are now offering testing services on a fee basis to the commercial market. Thus there exists the potential for competition between your lab and my lab.

I understand that your lab is equipped with a wide variety of testing tools from a number of hardware and software suppliers. My lab is only configured to run my software. I feel that the easiest way to avoid any possible competition between our labs is for the TIC to offer testing with any or all of its tools except those that are based on my software, such as the multi-node RTE software.

I feel that this solution is appropriate for two reasons. First, I don't believe that government agencies typically try to compete against commercial firms offering the same services. Second, the TIC has never requested, I have not granted and therefore the TIC does not have a license that allows them to use my software to compete against me.

The word competition is a misnomer here since there is no way that my company with its three employees could ever hope to sucessfully compete against an arm of the federal government like the TIC.

Thank you for your consideration in this matter.

Sincerely,


Neal Nelson

TELEPHONE (847) 851-8900          FACSIMILE: (847) 851-8901          E-MAIL office@nna.co●

Message

F

**From:** neal@nna.com
**To:** "Bradford, Dan Q HQISEC" <daniel.q.bradford@us.army.mil>
**Date:** 03 Aug 2004, 08:22:47 AM
**Subject:** Re: Neal Nelson

Dan,

I plan to go to California next week. I want to meet
with Extreme Networks while I am there. They will not
return my phone calls asking for a meeting.

Did you offer Extreme testing services from the TIC
labs in competition with the testing services that I
offer to the commercial marketplace?

Message                                                          Page 1 of 1

**From:** "Bradford, Dan Q HQISEC" <daniel.q.bradford@us.army.mil>
   **To:** "'neal@nna.com'" <neal@nna.com>
   **Cc:** "Rosen, Marc J CECOM Legal Office-Huachuca" <Marc.Rosen@us.army.mil>,
         "Aragon, Arthur J LTC HQISEC" <Arthur.Aragon@us.army.mil>
 **Date:** 13 Sep 2004, 02:29:09 PM
**Subject:** RTE Testing and the Government's Position

G

HTML content follows

Message
Neal,

I am forwarding a coordinated memo that relates to our use of the NNA RTE software. This memo has been coordinated with the CECOM legal staff and accurately reflects the TIC's position on the use of your tool. Having said that, I want to continue to work with you in an attempt to grow business for NNA and the TIC. Please understand that these are not "business as usual" times - things have drastically changed, and I am trying to find new work. These small RTE tests with the commerical testing pay for nothing, but they are essential for me to guarantee that Army systems work properly before we recommend fielding. That was the entire purpose of the RTE testing.

Extreme Networks did make contact with us on 7 Sept and ask us to run them through Ken's lab. No matter what I do, it will not convince them to buy an entire RTE setup from your company. You are free to market anyone you like for RTE setups Neal, regardless of my opinion with this one company. If you would care to discuss this, please let me know.

Dan

*Daniel Q. Bradford*
*Director, Technology Integration Center*

U.S. Army
HQUSAISEC
ATTN: AMSEL-IE-TI
Building 53302
Fort Huachuca, AZ 85613-5300

Phone: (Commercial): 520-533-7195 / 2794
       (DSN): 821-7195 / 2794
       (Cell): 520-249-7274

Pager: 800-664-0143
Email: Bradfordd@hqisec.army.mil
      daniel.q.bradford@us.army.mil

Attachment: Letter to Neal Nelson Sept 2004.pdf

G



**DEPARTMENT OF THE ARMY**
HEADQUARTERS, US ARMY INFORMATION SYSTEMS ENGINEERING COMMAND
FORT HUACHUCA, ARIZONA 63545-0300

REPLY TO
ATTENTION OF

September 13, 2004

Mr. Neal Nelson
Neal Nelson & Associates
302 East Main Street
East Dundee, IL 60118-1324

Dear Mr. Nelson:

This is in response to your letter of July 12, 2004 and subsequent communications and emails related to that letter. We have reviewed that letter, our files, and materials which you provided.

As you know, we purchased the RTE hardware and software from you in 1988. The letter dated 19 April 1988 states that the Army accepts your proposal "dated 15 March 1988 for the "C" and "ADA" Benchmark and Installation and for the Remote Terminal Emulator for purchase and installation at a lump sum price of $69,988..." In Contract DAEA18-88-C-0033/DAEA18-88-R-0042, Contract Item No. 0003 is for 1 each "Remote Terminal Emulator (64 Lines) of Hardware and Software with System Monitor" for $58,236. In addition, the contract, in paragraph C.1, states that the "mission of the Computer Engineering Center is to maintain a laboratory facility for mini and micro computer hardware and software evaluation, prototype development, and demonstration; provide consultative services to **Army users and designers of computer systems worldwide.**" (Emphasis added.) Note that no mention is made of any license; the Army purchased this system for its use as it sees fit, and you were on notice at the inception of this contract that the Army may provide services to computer system designers worldwide.

In the intervening years, pursuant to various contracts, the scripts for the RTE and the hardware have been updated and modified by you working jointly with the personnel at the Technology Integration Center (TIC), which is the Army organization that is now using the RTE.

You state in your letter that you believe that a benchmarking laboratory at the TIC is offering testing services on a fee basis to the commercial market, and that there is therefore potential conflict between this laboratory and a laboratory that you set up in Chicago.

The TIC is authorized to provide services to private vendors pursuant to 10 U.S.C. 2539b. Department of Defense policy clarifies that the services provided are not to constitute undue competition with the private sector. As you stated, the TIC does provide services to vendors on a fee basis, as allowed by law. However, contrary to your assertion, we believe that our services do not constitute undue competition with you or any other private sector company, as discussed further below.

The services that the TIC provides are made available to vendors who wish to sell products to the government, and primarily to the Army. The products are evaluated and tested by the TIC to determine whether we can verify that the product's performance meets Army requirements. The testing the TIC provides encompasses a wide variety of different aspects of performance of the product to ensure that it is compatible with Army systems. The TIC is tasked with providing this type of testing to ensure that no products are deployed which may endanger users because they are not compatible or because they cause problems with the Army's systems, or because they cannot perform at an acceptable level when subjected

G

to typical Army critical environments. This testing and evaluation is an inherently governmental function which has not been contracted to non-governmental entities.

Given the nature of the broad range of tests that the TIC performs, and the fundamental purpose of the tests, we do not believe that our testing competes with the testing that you provide. Unlike the testing by the TIC, you test only one aspect of the products, which, as discussed above, is not sufficient to determine the compatibility of the product with Army systems and the real-world use of these systems. Additionally, your company is not authorized to recommend any product for use by the Army, and cannot be so authorized. In part, this is because no outside company is able to have the day-to-day working relationship that the TIC has with the Army's infrastructure, such that it would be able to know specific Army requirements as the TIC does. Therefore, the testing performed by your company cannot, by definition, lead to the same result as the testing by the TIC. For these reasons, there is no competition between us. Your testing is substantially of a different nature than that which we provide.

Your letter also states that "the TIC does not have a license that allows them to use my software to compete against me." Since the Army purchased the RTE hardware and software in 1988, and has contracted for maintenance and upgrades since then (the results of which are owned by the Army), the Army owns the RTE hardware and software that it purchased in 1988 and the upgrades that have been done since then. While we do not believe that there is any undue competition between your company and the Army, it is also clear that there is no software or hardware license between the TIC and your company that limits the use of the software and hardware by the Army and the TIC.

Under these circumstances, we do not believe that it would be reasonable or possible for us to discontinue use of the RTE hardware and software at this time, as suggested in your letter. Nor do we believe that there is any reason for us to do so. If the contract that we currently have with you is not renewed or is terminated for any reason, we have the right, and the intention, to continue using the software and hardware that we have purchased until such time as we determine that it is in our interest to replace that hardware and software with different tools.

I hope this clarifies our position and eliminates any potential misunderstanding. Thank you.

Sincerely,

Daniel Q. Bradford
Director, Technology Integration Center

Message                                                                    Page 1 of 2

**From:** neal@nna.com
   **To:** "Bradford, Dan Q HQISEC" <daniel.q.bradford@us.army.mil>
   **Cc:** "Rosen, Marc J CECOM Legal Office-Huachuca" <Marc.Rosen@us.army.mil>,
         "Aragon, Arthur J LTC HQISEC" <Arthur.Aragon@us.army.mil>
 **Date:** 13 Sep 2004, 04:19:48 PM
**Subject:** Re: RTE Testing and the Government's Position

Dan,

Army Regulation 73-1, page 27, Section 7-4, paragraph b states that
use of an Army test facility is allowed only if it does not compete
with the U.S. commercial sector.

The TIC has already violated this policy when it did the AdTran test.
If the TIC offers runs a test for Extreme it will violate it again.

I request that you reconsider you decision to offer testing services
to Extreme.

Neal

------------------------------

Bradford, Dan Q HQISEC writes:

    Neal,
    I am forwarding a coordinated memo that relates to our use of the NNA RTE

    software.   This memo has been coordinated with the CECOM legal staff and

    accurately reflects the TIC's position on the use of your tool.  Having
    said
    that, I want to continue to work with you in an attempt to grow business
    for
    NNA and the TIC.   Please understand that these are not "business as
    usual"
    times - things have drastically changed, and I am trying to find new
    work.
    These small RTE tests with the commerical testing pay for nothing, but
    they
    are essential for me to guarantee that Army systems work properly before
    we
    recommend fielding.  That was the entire purpose of the RTE testing.
    Extreme Networks did make contact with us on 7 Sept and ask us to run
    them
    through Ken's lab.  No matter what I do, it will not convince them to buy
    an
    entire RTE setup from your company.  You are free to market anyone you
    like
    for RTE setups Neal, regardless of my opinion with this one company.   If

    you would care to discuss this, please let me know.

    Dan
    Daniel Q. Bradford
    Director, Technology Integration Center
    U.S. Army

# NEAL NELSON & ASSOCIATES

302 EAST MAIN STREET, EAST DUNDEE, ILLINOIS 60118-1324

December 2, 2005

Mrs. Raywood
C-E LCMC Inspector General's
Office Attention: AMSEL-IG
U.S. Army Communications-
Electronics Command (CECOM)
Fort Monmouth, NJ 07703

Dear Mrs. Raywood:

Attached you will find copies of documents pertinent to the dispute
between my firm and the Army's Technology Integration Center (TIC) at
Fort Huachuca, Arizona.

These documents relate to violations of software license terms by
the TIC.

Attachment A is a photocopy of a the first 4 pages of a 1988 purchase
order that the Army issued to my firm. The purchase order is for a 64
line Remote Terminal Emulation (RTE) system. This system included both
hardware and software components. The computer hardware became the
property of the Army and has long since been destroyed. There were two
separate software packages that were delivered under this order, one
was a copy of the Santa Cruz Operation (SCO) Unix operating system and
the other was a copy of my firm's Remote Terminal Emulation software.
For these two software packages the Army did not purchase the
software but rather the Army purchased a license to use the software.

Attachment B is a copy of the full text of my company's 1989 software
license.

Attachment C is a photocopy of the signature page from my company's
1989 software license agreement. This agreement was signed by duly
authorized representatives of my firm and the Army on 30 Jun 1999. The
license agreement details several limitations to the Army's use of my
software. This provides proof that the Army was purchasing a license
to use the software and not purchasing the software outright nor was
the Army receiving unrestricted rights to use the software.

Attachment D is a set of photocopies of of documents that relate to
the expansion of the RTE license from the single machine/64 user license
issued in 1989 to a 1,000 user perpetual "site license". The total cost
of this license upgrade was $ 292,000.00. The Army chose to pay this
amount by paying software rental at $ 98,000 per year for two years with
a final rental payment of $ 96,000 in the third year. Army purchase
orders dated 1 Mar 1994 and 23 Sep 1995 confirm the rental payments of
$ 98,000 for 1994 and 1995.

The Army failed to make the third payment in 1996 so the perpetual
1,000 user site license was not granted in 1996. During discussions with
Army representatives a plan was put forth where the Army would make four
payments of $ 24,000 in 1997. The combination of these four payments
would be accepted as the final $ 96,000 installment, and after receipt
of the fourth $ 24,000 payment the 1,000 perpetual license would be
issued. A letter dated 27 Jan 1997 was sent to confirm this option. The
Army made the four payments of $ 24,000 at the times specified in the
letter and the Army was thus granted the 1,000 user perpetual site
license to use the Neal Nelson RTE software.

Attachment E is a photocopy of a letter dated July 12, 2004. In this letter I advised Mr. Dan Bradford, director of the TIC, that the TIC's license to use my software would not allow him to install and use the software in the TIC's "commercial lab".

During the fall and early winter of 2004-2005 there were numerous communications between myself and various Army representatives. These ultimately resulted in a letter from Mr. Brad Blau to me confirming that the Army did not claim to "own" my software but rather it had a 1,000 user site license to use the software at the TIC. Attachment F is a photocopy of this letter.

Attachment G is a copy of a letter from Neal Nelson to Mr. Brad Blau pointing out that while there there was now an agreement that the TIC had a 1,000 user perpetual license to use the Neal Nelson RTE software, the TIC was, in fact, running tests with at least 3,600 emulated users, which is a clear violation of the 1,000 limit.

Almost a year has passed since the Army acknowledged that the TIC had a 1,000 user license. More than ten months have elapsed since the Army was reminded that a 1,000 user license does not permit 3,600 user tests. There have been several communications where Army representatives said essentially "we are investigating" and there have been other communications where Army representatives said essentially "we do not see a problem". The TIC, however, has continued to use the software at user levels that far exceed the 1,000 user limit.

There are only two proper ways to deal with this software license abuse: 1) The TIC could use the licensed software within the 1,000 user limit or, 2) The TIC could purchase a license for a larger number of users and then operate within the new higher limit.

Thank you for your attention to this matter, I will await your finding on this issue.

Sincerely,

Neal Nelson



**DEPARTMENT OF THE ARMY**
UNITED STATES ARMY GARRISON
FORT HUACHUCA, ARIZONA 85613-6000
19 April 1988

**A**

REPLY TO
ATTENTION OF
Directorate of Contracting
Contracting Division

Subject: Contract No. DABA18-88-C-0033, AAP #CCC8825

Neal Nelson & Associates
35 East Wacker Drive, Suite 1510
Chicago, Illinois 60601-2201

<u>NOTICE OF AWARD</u>

Gentlemen:

Your offer, dated 5 April 1988, in response to
Request for Proposal, dated 15 March 1988 for the "C"
and "Ada" Benchmark and Installation and for the Remote
Terminal Emulator for purchase and installation at a
lump sum price of $69,988 is accepted and reward is
hereby made.

A contract in the usual form, dated and numbered as
set forth above, incorporating all the terms and
conditions of the contract hereby created, is being
prepared and will be forwarded to you in the near
future.

The following allotment applies: 2182035 3C-9c88
P5212 2511 502088 T6FC 63-805154 PE58-63-501

UNITED STATES OF AMERICA

*Patricia Woznick*

BY: PATRICIA WOZNICK
Contracting Officer

| SOLICITATION, OFFER AND AWARD | 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) | | RATING C9e | PAGE OF PAGES 1 | 39 |
|---|---|---|---|---|---|
| 2. CONTRACT NO. DAEA18-88-C-0033 | 3. SOLICITATION NO. DAEA18-88-R-0042 | 4. TYPE OF SOLICITATION SEALED BID (IFB) [X] NEGOTIATED (RFP) | 5. DATE ISSUED 15 MAR 88 | 6. REQUISITION/PURCHASE NO. HBB832-8014-052 |

| 7. ISSUED BY | CODE | W61DEX | 8. ADDRESS OFFER TO (If other than Item 7) |
|---|---|---|---|
| Directorate of Contracting Post Office Box 748 Fort Huachuca, Arizona 85613-0748 B. Saulters/ASH-DOC-C/(502) 533-1549/dlm | | | Directorate of Contracting Bid Control Room, Building 22208 Post Office Box 748 Fort Huachuca, Arizona 85613-0748 |

NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".

## SOLICITATION

9. Sealed offers in original and ___1___ copies for furnishing the supplies or services in the Schedule will be received at the place specified in Item 8, or if handcarried, in the depository located in Bid Control Room, Building 22208 until 2PM(MST) (Hour) time 13 APR 88 (Date)

CAUTION — LATE Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-10. All offers are subject to all terms and conditions contained in this solicitation.

| 10. FOR INFORMATION CALL: | A. NAME Barbara Saulters | B. TELEPHONE NO. (Include area code) (NO COLLECT CALLS) (602) 533-1549 |
|---|---|---|

### 11. TABLE OF CONTENTS

| (✓) | SEC. | DESCRIPTION | PAGE(S) | (✓) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I — THE SCHEDULE | | | | PART II — CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 15-25 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III — LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS/WORK STATEMENT | 3-4 | X | J | LIST OF ATTACHMENTS | 26 |
| X | D | PACKAGING AND MARKING | 5 | | | PART IV — REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 6 | X | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | 27-36 |
| X | F | DELIVERIES OR PERFORMANCE | 7-8 | X | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | 37-38 |
| X | G | CONTRACT ADMINISTRATION DATA | 9-11 | X | M | EVALUATION FACTORS FOR AWARD | 39 |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 12-14 | | | | |

### OFFER (Must be fully completed by offeror)

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period.

12. In compliance with the above, the undersigned agrees, if this offer is accepted within ___60___ calendar days (60 calendar days unless a different period is inserted by the offeror) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

| 13. DISCOUNT FOR PROMPT PAYMENT (See Section I, Clause No. 52-232-8) | 10 CALENDAR DAYS NA % | 20 CALENDAR DAYS NA % | 30 CALENDAR DAYS NA % | CALENDAR DAYS NA % |
|---|---|---|---|---|

14. ACKNOWLEDGMENT OF AMENDMENTS (The offeror acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated:)

| | AMENDMENT NO. | DATE | AMENDMENT NO. | DATE |
|---|---|---|---|---|

| 15A. NAME AND ADDRESS OF OFFEROR | CODE 07-702-1020 | FACILITY | 16. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER (Type or print) |
|---|---|---|---|
| NEAL NELSON & ASSOCIATES 35 EAST WACKER DRIVE SUITE 1510 CHICAGO IL 60601-2201 DUNS # 07-702-1020 CAGE # 4JTL41 | | | KAREN McBRIDE DIRECTOR OF MARKETING |

| 15B. TELEPHONE NO. (Include area code) (312) 332-3242 | 15C. CHECK IF REMITTANCE ADDRESS IS DIFFERENT FROM ABOVE - ENTER SUCH ADDRESS IN SCHEDULE. [ ] | 17. SIGNATURE Karen McBride | 18. OFFER DATE 4/5/88 |
|---|---|---|---|

### AWARD (To be completed by Government)

| 19. ACCEPTED AS TO ITEMS NUMBERED 0001, 0002, 0003, and 0004 | 20. AMOUNT $64,990.00 | 21. ACCOUNTING AND APPROPRIATION 2182035 3C 9C88 P5212 2511 S02088 T6FC 63-805 PES 8-63-501 |
|---|---|---|

| 22. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION: [X] 10 U.S.C. 2304(c)( 1 ) [ ] 41 U.S.C. 253(c)( ) | 23. SUBMIT INVOICES TO ADDRESS SHOWN IN (4 copies unless otherwise specified) | ITEM Block 25 |
|---|---|---|

| 24. ADMINISTERED BY (If other than Item 7) CODE W61DEX | 25. PAYMENT WILL BE MADE BY CODE |
|---|---|
| Directorate of Contracting P.O. Box 748, ATTN: ASH-DOC-A Fort Huachuca, Arizona 85613-0748 | Finance and Accounting Office Drawer P, Commercial Accounts Fort Huachuca, Arizona 85613-6000 |

| 26. NAME OF CONTRACTING OFFICER (Type or print) PATRICIA WOZNICK | 27. UNITED STATES OF AMERICA Patricia Woznick (Signature of Contracting Officer) | 28. AWARD DATE 88 Apr. 1 |
|---|---|---|

IMPORTANT — Award will be made on this Form, or on Standard Form 26, or by other authorized official written notice.

DUPLICATE ORIGINAL

STANDARD FORM 33 (REV. 4-Prescribed by GSA FAR (48 CFR) 53.214(c)

**A**

## PART I - THE SCHEDULE

### SECTION C - DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

C.1  The mission of the Computer Engineering Center is to maintain a laboratory facility for mini and micro computer hardware and software evaluation, prototype development, and demonstration; provide consultative services to Army users and designers of computer systems worldwide.

C.2  The Computer Engineering Center has been tasked with the initial benchmarking of the Sperry 5000/80, that can be obtained on a competitively awarded Army-wide indefinite delivery/indefinite quantity contract (DAEA26-86-D-0004) with Sperry (now a part of UNISYS). These benchmarks will provide data, that with modeling of the system, will determine if the Sperry 5000/80 is capable of meeting the Army's needs in the CTASC II environment.

C.3  The Benchmarks and Remote Terminal Emulator are necessary pieces of software and hardware for the initial benchmark.

C.4  The benchmarks shall provide accurate data on the relative performance of the computer that are benchmarking through a series of 18 different tests that are designed to test all the hardware sections of the computer and the operating system interaction with the hardware, reducing the performance of the computer to a set of data.

C.5  Data obtained in the benchmark testing shall be used to compare the performance of the computer that it was run on with the performance of other computer that ran the same series of tests, or it can be used to "fine tune" a computer, finding the best configuration for a given use.  The information provided in the benchmark testing can also be used to model the system, projecting its possible performance when running larger software packages with more users.  Such modeling can determine if a given computer is capable of performing under the projected load set out for it early in the project cycle, when changes can be easily and economically made.

C.6  After completing the benchmark testing, to obtain the initial information about the computer system, the next step shall be to run a selected application to test the computer's actual performance.  This is difficult to accomplish on a multi user system, because a number of people need to be available to run the application and thus load the system.  The Remote Terminal Emulator (RTE) solves this problem by allowing you to duplicate the actions of a single operator, creating as many "operators" as needed.  The RTE allows you to create any number of operators (up to a maximum limit of 128), as well as vary the typing (entry) speed of each.  Using the RTE along with benchmark testing will result in very accurate data on the performance of the computer system under the load of an actual application.  The data thus obtained is essential for the further modeling of the system under actual fielded use.

A

DAEA18-86-R-0042/DAEA18-88- C

# PART I – THE SCHEDULE

## SECTION C – DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

C.1  The mission of the Computer Engineering Center is to maintain a laboratory facility for mini and micro computer hardware and software evaluation, prototype development, and demonstration: provide consultative services to Army users and designers of computer systems worldwide.

C.2  The Computer Engineering Center has been tasked with the initial benchmarking of the Sperry 5000/80, that can be obtained on a competitively awarded Army-wide indefinite delivery/indefinite quantity contract (DAEA26-86-D-0004) with Sperry (now a part of UNISYS). These benchmarks will provide data, that with modeling of the system, will determine if the Sperry 5000/80 is capable of meeting the Army's needs in the CTASC II environment.

C.3  The Benchmarks and Remote Terminal Emulator are necessary pieces of software and hardware for the initial benchmark.

C.4  The benchmarks shall provide accurate data on the relative performance of the computer that are benchmarking through a series of 18 different tests that are designed to test all the hardware sections of the computer and the operating system interaction with the hardware, reducing the performance of the computer to a set of data.

C.5  Data obtained in the benchmark testing shall be used to compare the performance of the computer that it was run on with the performance of other computer that ran the same series of tests, or it can be used to "fine tune" a computer, finding the best configuration for a given use.  The information provided in the benchmark testing can also be used to model the system, projecting its possible performance when running larger software packages with more users.  Such modeling can determine if a given computer is capable of performing under the projected load set out for it early in the project cycle, when changes can be easily and economically made.

C.6  After completing the benchmark testing, to obtain the initial information about the computer system, the next step shall be to run a selected application to test the computer's actual performance.  This is difficult to accomplish on a multi user system, because a number of people need to be available to run the application and thus load the system.  The Remote Terminal Emulator (RTE) solves this problem by allowing you to duplicate the actions of a single operator, creating as many "operators" as needed.  The RTE allows you to create any number of operators (up to a maximum limit of 128), as well as vary the typing (entry) speed of each.  Using the RTE along with benchmark testing will result in very accurate data on the performance of the computer system under the load of an actual application.  The data thus obtained is essential for the further modeling of the system under actual fielded use.

A

Page 4

DAEA18-88-R-0042/DAEA18-88-C-0033

C.7   The "ADA" and "C" Benchmarks will be installed on the Sperry 5000/80 system at the Computer Engineering Center by the Contractor. After the year lease is up it will either be renewed by a follow-on contract or erased from the system by the Government.

ß

# L I C E N S E   A G R E E M E N T

## Neal Nelson & Associates
### REMOTE TERMINAL EMULATOR

This license agreement is made and entered into by Neal Nelson & Associates, an Illinois proprietorship with its principal place of business at 330 North Wabash Avenue, Suite 2627, Chicago, IL 60611 (hereinafter referred to as "NNA"), and _____

(hereinafter referred to as "Licensee"), located at _____

("Site").

**SECTION 1. LIMITED LICENSE.** Licensee has the non-exclusive, non-transferable right to use the REMOTE TERMINAL EMULATOR program, developed by NNA, Serial Number _AO1A0416_ ("Licensed Program"). This license authorizes:

    a. use of this copy of the Licensed Program at the Site;

    b. an authorized Licensee representative to temporarily remove this copy of the Licensed Program from the Site to a Licensee facility or other company site only for purposes of evaluating computers and/or software. Licensee shall remove or destroy all copies or resulting data when evaluation is complete;

    c. Licensee to make one emergency reserve (backup) copy which shall not be removed from the Site;

    d. physical transfer of the Licensed Program from one computer to another, provided the Licensed Program is used on only one computer at a time.

**SECTION 2. RESTRICTIONS.**

    a. Licensee may not use, copy, modify or transfer the Licensed Program, or any copy, modification or merged portion, in whole or in part, except as expressly provided for in this license. Additional licenses are required for any additional copies at the SITE or other location.

    b. If Licensee transfers possession of any copy, modification or merged portion of the Licensed Program to another party, the license is automatically terminated.

    c. Licensee may not sublicense, assign or transfer the license or the Licensed Program except as may be expressly provided in this Agreement. Any attempt otherwise to sublicense, assign or transfer any of the rights, duties, or obligations hereunder is void.

c107-03                                                                                                    091793

1

B

d. Licensee may not electronically transfer the Licensed Program from one computer to another over a network. Licensee may not distribute copies of the Licensed Program or documentation to others. Licensee may not modify or translate the Licensed Program or related documentation, except as described in the manual, without the prior written consent of NNA.

e. Licensee is not authorized to publish the results of the REMOTE TERMINAL EMULATOR testing without prior approval from NNA. NNA, at its sole discretion, may allow selective publishing of results. Licensee shall not compete with NNA by providing results to others.

f. Licensee shall not use the Licensed Program for an evaluation for the benefit of other companies outside the Licensee's company without prior written approval of NNA.

SECTION 3. PAYMENTS. Licensee shall pay NNA the fees specified in Exhibit A. Licensee shall pay the fees without any deductions, including those for any kind of taxes, fees or charges that Licensee may be required to pay with respect to the Licensed Program. All payments to NNA shall be denominated in United States of America dollars.

SECTION 4. LICENSEE LIABILITY. Licensee shall be liable for payment of all applicable license fees for any unauthorized copies discovered containing Licensee's serial number, or for copies where it can be shown such copy was obtained from Licensee's Licensed Program.

SECTION 5. DISCLAIMER OF WARRANTY. The Licensed Program and manual are provided "as is" without warranty of any kind. The entire risk as to the results and performance of the Licensed Program is assumed by Licensee. Should the Licensed Program prove defective, Licensee, and neither NNA nor its distributors, assume the entire cost of all necessary servicing, repair or correction. NNA does not warrant, guarantee or make any representations regarding the use or the results of the use of the Licensed Program as to Licensed Program correctness, accuracy, reliability, currentness, or otherwise. Licensee relies on the Licensed Program and its results solely at Licensee'S own risk.

This Licensed Program is licensed without any warranty of any kind, either expressed or implied, including but not limited to, the implied warranties of merchantability and fitness for a particular purpose.

SECTION 6. COPYRIGHT. The Licensed Program and its related documentation are copyrighted. Licensee may not copy the Licensed Program or its documentation except for a backup copy as provided herein, and to load the Licensed Program into the computer as part of executing the product. Licensee shall reproduce and include the



NNA copyright notice on the backup copy. All other copies of the Licensed Program and its documentation are prohibited or must be specifically licensed.

SECTION 7. TITLE. NNA shall retain title to and full ownership of the Licensed Program. Licensee may, if permitted hereunder, add to, delete from, or modify the Licensed Program in any manner, but no changes, however extensive, shall reduce NNA's title to the Licensed Program or to any portion of the Licensed Program contained in other products. The Licensed Program is NNA's proprietary information and trade secrets, whether or not any portion of it is or may be validly copyrighted or patented.

SECTION 8. TERM AND TERMINATION. The license is effective for the initial term set forth in Exhibit A. Thereafter it shall remain in effect until terminated. It may subsequently be terminated by 30 days notice from either party to the other. Also it may at any time be terminated upon conditions set forth elsewhere in this Agreement or if Licensee fails to comply with any term or condition of this Agreement. Licensee agrees upon such termination to promptly return to NNA the SentinelPro/ProTech security key and to return and/or destroy the Licensed Program together with all copies, modifications, and merged portions in any form. Risk of loss of the SentinelPro/ProTech security key during return shipment to NNA shall be upon Licensee. License fees shall continue to accrue until NNA receives: (1) written notification on Licensee's letterhead stating that Licensee has returned and/or destroyed all copies of the Licensed Program, and (2) delivery of SentinelPro/ProTech security key. Termination of this agreement shall not relieve Licensee of the consequences of any breach of this agreement that occurred prior to it.

SECTION 9. DAMAGES. Neither NNA nor anyone else who has been involved in the creation, production, or delivery of this Licensed Program shall be liable for any interruption of business or organization, direct, indirect, consequential or incidental damages arising out of the use, the results of use, or inability to use the Licensed Program even if NNA has been advised of the possibility of such damages or claim. Some states do not allow the exclusion or limitation of liability for consequential or incidental damages so the above limitation may not apply to Licensee. In any event, NNA's liability shall be limited exclusively to the return of the depreciated value of the original license fee.

SECTION 10. MISCELLANEOUS.

    a. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without giving effect to the portion thereof relating to conflict of laws.

    b. This Agreement expresses the entire agreement between the parties. No changes or additions to it shall be valid unless they are in writing and signed by the parties hereto. The licensing and delivery of the Licensed Program by NNA to Licensee

c107-03

091793



shall be subject only to the terms of this Agreement. The use of any standard or special purchase order form or similar document of Licensee shall not affect the terms of licensing or delivery. This Agreement supersedes any previously delivered standard or special purchase order form or similar document of Licensee.

    c. Titles and paragraph headings are for convenient reference and are not a part of this Agreement.

    d. Licensee is not an employee, agent or representative of NNA. Under no circumstances shall NNA be liable for any act or omission by Licensee whether relating to this agreement or otherwise.

SECTION 11. BINDING EFFECT. Except as otherwise expressly provided above, this Agreement shall inure to the benefit of and be binding upon the parties, their respective heirs, legal representatives, successors and assigns.

NEAL NELSON & ASSOCIATES       *U.S. ARMY (COMPUTER ENGINEERING CENTER)*

BY: _Robin M L P_       BY: _____

PRINT: _ROBIN DELAPENA_       PRINT: _____

ITS (Title): _OPERATIONS MGR_       ITS (Title): _____

DATE ACCEPTED: _6/30/89_       DATE: _6/30/89_

Address:       Address:
330 North Wabash Avenue
Suite 2627
Chicago, Illinois 60611

c107-03       091793

shall be subject only to the terms of this Agreement. The use of any standard or special purchase order form or similar document of Licensee shall not affect the terms of licensing or delivery. This Agreement supersedes any previously delivered standard or special purchase order form or similar document of Licensee.

c. Titles and paragraph headings are for convenient reference and are not a part of this Agreement.

d. Licensee is not an employee, agent or representative of NNA. Under no circumstances shall NNA be liable for any act or omission by Licensee whether relating to this agreement or otherwise.

SECTION 11. BINDING EFFECT. Except as otherwise expressly provided above, this Agreement shall inure to the benefit of and be binding upon the parties, their respective heirs, legal representatives, successors and assigns.

NEAL NELSON & ASSOCIATES          U.S. ARMY (COMPUTER Enterthexenits osiffts)

BY: _Robin L LP_                  BY: _Ohn J Barker_

PRINT: _ROBIN DECAPERIO_          PRINT: _Arlie J. Barber_

ITS (Title): _OPERATIONS MGR_     ITS (Title): _Computer Engineer_

DATE ACCEPTED: _6/30/89_          DATE: _6/30/89_

Address:                          Address:
330 North Wabash Avenue           _CMDR USAISEC_
Suite 2627                        _ATTN: ASQB-OTI-B_
Chicago, Illinois 60611           _Bldg 31043_
                                  _Ft Huachuca, AZ  85613-5300_

| SOLICITATION, OFFER AND AWARD | 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) | | RATING A70 | PAGE OF PAGES 1 | 31 |
|---|---|---|---|---|---|

| 2. CONTRACT NO. DAEA32-94-C-0002 | 3. SOLICITATION NO. DAEA32-94-R-0003 | 4. TYPE OF SOLICITATION ☐ SEALED BID (IFB) ☒ NEGOTIATED (RFP) | 5. DATE ISSUED 02/14/94 | 6. REQUISITION/PURCHASE NO. W61D0B-3347-0101 |
|---|---|---|---|---|

| 7. ISSUED BY | CODE DAEA32 | 8. ADDRESS OFFER TO (if other than Item 7) |
|---|---|---|
| USAISC Contracting Office ATTN: ASPC-T Building 61801, Room 2430 Fort Huachuca, AZ. 85613-5000 | | D |

NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".

## SOLICITATION

9. Sealed offers in original and __0__ copies for furnishing the supplies or services in the Schedule will be received at the place specified in Item 8, or if handcarried, in the depository located in BLDG. 61801, RM 2408 until 2:30 p.m., local time 02/22/94

(Hour) (Date)

CAUTION – LATE Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-10. All offers are subject to all terms and conditions contained in this solicitation.

| 10. FOR INFORMATION CALL: | A. NAME J.R. RICHARDSON | C16 | B. TELEPHONE NO. (Include area code) (NO COLLECT CALLS) (602)538-8244 |
|---|---|---|---|

## 11. TABLE OF CONTENTS

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I – THE SCHEDULE | | | | PART II – CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 5 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 1 | | | PART III – LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | 1 | X | J | LIST OF ATTACHMENTS | |
| X | D | PACKAGING AND MARKING | 1 | | | PART IV – REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 1 | X | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | 12 |
| X | F | DELIVERIES OR PERFORMANCE | 2 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 3 | X | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | 1 |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 1 | X | M | EVALUATION FACTORS FOR AWARD | 2 |

## OFFER (Must be fully completed by offeror)

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period.

12. In compliance with the above, the undersigned agrees, if this offer is accepted within _____ calendar days (60 calendar days unless a different period is inserted by the offeror) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

| 12. DISCOUNT FOR PROMPT PAYMENT (See Section I, Clause No. 52-232-8) | 10 CALENDAR DAYS % | 20 CALENDAR DAYS % | 30 CALENDAR DAYS % | CALENDAR DAYS % |
|---|---|---|---|---|

| 14. ACKNOWLEDGEMENT OF AMENDMENTS (The offeror acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated:) | AMENDMENT NO. | DATE | AMENDMENT NO. | DATE |
|---|---|---|---|---|

| 15A. NAME AND ADDRESS OF OFFEROR | CODE 47640 | FACILITY | 16. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER (Type or print) |
|---|---|---|---|
| Neal Nealson & Associates 330 N. Wabash Ave., Ste 2627 Chicago, Illinois 60611-3604 | | | NEAL NELSON, OWNER |

| 15B. TELEPHONE NO. (Include area code) (312) 755-1000 | 15C. CHECK IF REMITTANCE ADDRESS IS DIFFERENT FROM ABOVE, ENTER SUCH ADDRESS IN SCHEDULE. ☐ | 17. SIGNATURE | 18. OFFER DATE 2/18/94 |
|---|---|---|---|

## AWARD (To be completed by Government)

| 19. ACCEPTED AS TO ITEMS NUMBERED 0001 through 0005 | 20. AMOUNT $98,000.00 | 21. ACCOUNTING AND APPROPRIATION 2142020000000033B304300000000026CP000000 W61DDB33470101PBSY00002086 |
|---|---|---|

| 22. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION: ☒ 10 U.S.C. 2304(c)( 1 ) ☐ 41 U.S.C. 253(c)( ) | 23. SUBMIT INVOICES TO ADDRESS SHOWN IN (4 copies unless otherwise specified) | ITEM see para G.3 |
|---|---|---|

| 24. ADMINISTERED BY (If other than Item 7) | CODE | 25. PAYMENT WILL BE MADE BY Finance & Accounting Officer Drawer P, Commercial Accounts, Ft Huachuca, AZ 85613-5000 | CODE SO2086 |
|---|---|---|---|

| 26. NAME OF CONTRACTING OFFICER (Type or Print) J. R. RICHARDSON, Contracting Officer | 27. UNITED STATES OF AMERICA (Signature of Contracting Officer) J. R. Richardson | 28. AWARD DATE 1 Mar 94 |
|---|---|---|

IMPORTANT – Award will be made on this Form, or on Standard Form 26, or by other authorized official written notice.

NSN 7540-01-152-8064 PREVIOUS EDITION NOT USABLE

33-101

STANDARD FORM 33 (REV. 4-85) Prescribed by GSA FAR (48 CFR) 53.214(c)

D

SECTION B
SUPPLIES OR SERVICES AND PRICES/COSTS

| ITEM | DESCRIPTION | QUANTITY | U/M | U/P | AMOUNT |
|------|-------------|----------|-----|-----|--------|
| 0001 | X-REMOTE TERMINAL EMULATION SOFTWARE LICENSE, V1.2 RATE. | 1 | LT | $96,000.00 | $96,000.00 |
| 0002 | X-REMOTE TERMINAL EMULATION SOFTWARE TRAINING FOR 5 USERS. | 1 | LT | _____.____ | NSP ____.__ |
| 0003 | ON SITE TECHNICAL SUPPORT. | 12 | MO | _____.____ | NSP ____.__ |
| 0004 | SOFTWARE TELEPHONE SUPPORT. | 12 | MO | _____.____ | NSP ____.__ |
| 0005 | SOFTWARE DOCUMENTATION. | 5 | SE | _____.____ | NSP ____.__ |

Licensee is hereby granted a right to use the X-REMOTE TERMINAL EMULATOR program, developed by NNA, Serial Number 00200573 ("Licensed Program") and fifteen (15) SentinelPro/Protech security key(s) bearing serial numbers(s) 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, subject to the restrictions contained in the provisions relating to restricted rights in Computer Software contained in DFARS 252.227-7013.

NNA shall retain title to and full ownership of the Licensed Program. Licensee may, if permitted hereunder, add to, delete from, or modify the Licensed Program in any manner, but no changes, however extensive, shall reduce NNA's title to the Licensed Program or to any portion of the Licensed Program contained in other products. The Licensed Program is NNA's proprietary information and trade secrets, whether or not any portion of it is or may be validly copyrighted or patented.

END OF SECTION B

DAEA32-94-C-0002

# ORDER FOR SUPPLIES OR SERVICES
(Contractor must submit four copies of invoice.)

| Form Approved | PAGE 1 OF |
|---|---|
| OMB No. 0704-0187 | 3 |
| Expires Dec 31, 1993 | |

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503.

**PLEASE DO NOT RETURN YOUR FORM TO EITHER OF THESE ADDRESSES.**
**SEND YOUR COMPLETED FORM TO THE PROCUREMENT OFFICIAL IDENTIFIED IN ITEM 6.**

| 1. CONTRACT / PURCH ORDER NO | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER | 4. REQUISITION / PURCH REQUEST NO. | 5. PRIOR |
|---|---|---|---|---|
| DAEA32-95-P-0403 | | 95SEP23 | HBWXYA-5241-0154 | A70 |

| 6. ISSUED BY | CODE | ASQRA | 7. ADMINISTERED BY (if other than 6) | CODE | DAEA32 | 6. DELIVERY FOB |
|---|---|---|---|---|---|---|

6. ISSUED BY:
USAISC CONTRACTING OFFICE
ATTN: ASQR-A
BUILDING 61801, ROOM 2433
FORT HUACHUCA, AZ 85613-5000
LUCILLE FONTAINE B01 (520) 538-8838

7. ADMINISTERED BY:
USAISC CONTRACTING OFFICE
ATTN ASQR-C
BUILDING 61801 ROOM 2430
FORT HUACHUCA AZ 85613-5000
950930

6. DELIVERY FOB:
[X] DEST
[ ] OTHER
(See Schedule if other)

| 8. CONTRACTOR | Vendor Id: 00032487 | | CODE | 4T640 | FACILITY CODE | 10. DELIVER TO FOB POINT BY (Date) 950930 | 11. MARK IF BUSINESS IS |
|---|---|---|---|---|---|---|---|

NAME AND ADDRESS:
NEAL NEALSON & ASSOCIATES
ATTN: ROBIN DELAPENA
330 N. WABASH AVE., STE 2627
CHICAGO IL 606133604

12. DISCOUNT TERMS: 0% 00 Days Net 030

13. MAIL INVOICES TO: See Block 15

11. MARK IF BUSINESS IS:
[X] SMALL
[ ] SMALL DISAD-VANTAGED
[ ] WOMEN-OWNED

| 14. SHIP TO | CODE | ASO801S | 15. PAYMENT WILL BE MADE BY | CODE | S02086 | MARK ALL PACKAGES AND PAPERS WITH CONTRACTOR ORDER NUMBER |
|---|---|---|---|---|---|---|

14. SHIP TO:
USAISEC, ISED
ATTN: ASQB-OIS, HR# 24831
FT HUACHUCA, AZ 85613-5300
DAEA3295PQ403

15. PAYMENT WILL BE MADE BY:
DEFENSE FINANCE & ACCOUNT SVE
DEFENSE ACCOUNTING OFFICE
DRAWER P
FORT HUACHUCA AZ 856136000

| 16. TYPE OF ORDER | DELIVERY | | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. |
|---|---|---|---|
| | PURCHASE | X | Reference your: ... ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME. |

furnish the following on terms specified herein.

| NAME OF CONTRACTOR | SIGNATURE | TYPED NAME AND TITLE | DATE SIGNED (YYMMDD) |
|---|---|---|---|

[ ] If this box is marked, supplier must sign Acceptance and return the following number of copies:

| 17. ACCOUNTING AND APPROPRIATION DATA/LOCAL USE | | Award Oblig Amt US$ | 98,000.00 |
|---|---|---|---|

A1 2152020000000338304300000000025C5000000HBWXYA52410154BV2A00S02086

| 18. ITEM NO. | 19. SCHEDULE OF SUPPLIES / SERVICE | 20. QUANTITY ORDERED/ACCEPTED* | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| | POC: ARLIE J. BARBER 520-533-2787. E | | | | |
| 0001 | 1000 USER X-RTE SOFTWARE LICENSE | 1.00 | EA | 98000.000000 | 98000. |

*If quantity accepted by the Government is same as quantity ordered, indicate by X. If different, enter actual quantity accepted below quantity ordered and encircle.

| 24. UNITED STATES OF AMERICA | | 25. TOTAL $ | 98000. |
|---|---|---|---|
| BY: RONNIE LOPEZ c06 | CONTRACTING / ORDERING OFFICER | 29. DIFFERENCES | |

| 26. QUANTITY IN COLUMN 20 HAS BEEN | 27. SHIP. NO. | 28. D.O. VOUCHER NO. | 30. INITIALS |
|---|---|---|---|
| [ ] INSPECTED  [ ] RECEIVED  [ ] ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | [ ] PARTIAL  [ ] FINAL | 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |
| DATE     SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | | | |

| 30. I certify this account is correct and proper for payment. | 31. PAYMENT | | 34. CHECK NUMBER |
|---|---|---|---|
| DATE     SIGNATURE AND TITLE OF CERTIFYING OFFICER | [ ] COMPLETE  [ ] PARTIAL  [ ] FINAL | | 35. BILL OF LADING NO. |

| 37. RECEIVED AT | 38. RECEIVED BY (Print) | 39. DATE RECEIVED (YYMMDD) | 40. TOT. CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |
|---|---|---|---|---|---|

DD Form 1155, APR 93     PREVIOUS EDITIONS MAY BE USED.     480/

*tic net tx.*

**D**

# NEAL NELSON & ASSOCIATES

330 NORTH WABASH AVENUE, CHICAGO, ILLINOIS 60611-3604

January 27, 1997

Mr. George Robbins
HQ USAISEC
Attn: AMSEL-IE-TI
Building 53302
Ft. Huachuca, AZ
85613-5300

Dear George:

This correspondence will confirm our agreement regarding the $96,000.00
payment for the perpetual 1000 User RTE License.

There are to be four equal payments of $24,000.00. The first was due on
or about December 1, 1996. An invoice for that has been forwarded to Fort
Huachuca. This grants you a License to use the RTE until February 14, 1997.

The second payment is due February 15, 1997. This will cover the period of
February 15, 1997 through April 30, 1997. If we have not received a Purchase
Order for the $24,000.00 installment by that time, then the 1000 User RTE
License will be suspended until we receive it.

The third payment is due May 1, 1997. This will cover the period of May 1,
1997 through June 14, 1997. If we have not received a Purchase Order for
the $24,000.00 installment by that time, then the 1000 User RTE License will
be suspended until we receive it.

The fourth payment is due June 15, 1997. Once we have received the Purchase
Order and payment, then the Perpetual License will be in place. If we do not
receive the Purchase Order and payment in a timely fashion, then the License
will be suspended. Should payment be delayed excessively, then the terms of
the Perpetual 1000 User RTE License shall be renegotiated.

Please contact me if you have any questions regarding the above.

Thank you for your assistance in this matter.

Sincerely,

*Julene R. DuPuy*

Julene R. DuPuy

| ORDER FOR SUPPLIES OR SERVICES | Form Approved OMB No. 0704-0187 Expires Jun 30, 1997 | PAGE 1 OF 3 |
|---|---|---|

(Contractor must submit four copies of invoice.)

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503.

**PLEASE DO NOT RETURN YOUR FORM TO EITHER OF THESE ADDRESSES.**
**SEND YOUR COMPLETED FORM TO THE PROCUREMENT OFFICIAL IDENTIFIED IN ITEM 6.**

| 1. CONTRACT / PURCH ORDER NO. DAAB07-97-P-0315 | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER 97JAN09 | 4. REQUISITION / PURCH REQUEST NO. N3JAAA-6344-0022 | 5. PRIORIT A70 |
|---|---|---|---|---|

| 6. ISSUED BY | CODE DAAB07 | 7. ADMINISTERED BY (If other than 6) | CODE DAAB07 | 8. DELIVERY FOB |
|---|---|---|---|---|
| CECOM ACQUISITION CENTER ATTN: ANSEL-AC-CC-E-CA BUILDING 61801 ROOM 2604 FT HUACHUCA AZ 85613-6000 DONNA MARTIN CO3 (520) 533-1439 | | See Block 6 | | ☒ DEST ☐ OTHER (See Schedule if other |

| 9. CONTRACTOR Vendor Id: 00012487 | 4T640 | FACILITY CODE | 10. DELIVER TO FOB POINT BY (Date) 97FEB09 | 11. MARK IF BUSINESS IS |
|---|---|---|---|---|
| NAME AND ADDRESS | CODE | DUPLICATE ORIGINAL | 12. DISCOUNT TERMS 0% 00 Days Net 030 | ☒ SMALL ☐ SMALL DISAD-VANTAGED ☐ WOMEN-OWNED |
| NEAL NELSON AND ASSOCIATES 330 NORTH WABASH AVENUE SUITE 2627 CHICAGO IL 606113604 | | | 13. MAIL INVOICES TO See Block 15 | |

| 14. SHIP TO | CODE A50B0TT | 16. PAYMENT WILL BE MADE BY | CODE S02086 | MARK ALL PACKAGES AND PAPERS WITH CONTRACTOR ORDER NUMBER |
|---|---|---|---|---|
| HQ, USAISEC BLDG 53302 ATTN: ANSEL-IE-TI (GEORGE ROBBINS) DAAB0797P0315 FT HUACHUCA, AZ 85613-5300 | | VENDOR PAY BRANCH DFAS-SS-FPV 400 GIGLING ROAD SEASIDE CA 939556771 | | |

| 16. TYPE OF ORDER | | | |
|---|---|---|---|
| ☐ DELIVERY | | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. | |
| ☒ PURCHASE | X | Reference your ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME. | furnish the following on terms specified herein. |

| NAME OF CONTRACTOR | SIGNATURE | TYPED NAME AND TITLE | DATE SIGNED (YYMMDD) |
|---|---|---|---|
| If this box is marked, supplier must sign Acceptance and return the following number of copies: | | | |

| 17. ACCOUNTING AND APPROPRIATION DATA / LOCAL USE | |
|---|---|
| AA:2172020000006275504300000000025C500000011P/AAA534400022R/3A00S02086 Award Oblig Amt US$ | 24,000.00 |

| 18. ITEM NO. | 19. SCHEDULE OF SUPPLIES / SERVICE | 20. QUANTITY ORDERED / ACCEPTED* | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| 0001 | POC: GEORGE ROBBINS (520) 533-7189 1000 USER ASCII/X-RTE SOFTWARE LICENSE | 1.00 | EA | 24000.000000 | 24000.00 |

*If quantity accepted by the Government is same as quantity ordered, indicate by X. If different, enter actual quantity accepted below quantity ordered and encircle.

| 24. UNITED STATES OF AMERICA BY: RONALD J. FUSKI SO5 | 25. TOTAL $ | 24000.0 |
|---|---|---|
| CONTRACTING / ORDERING OFFICER | 26. DIFFERENCES | |

| 26. QUANTITY IN COLUMN 20 HAS BEEN | 27. SHIP NO. | 28. D.O. VOUCHER NO. | 30. INITIALS |
|---|---|---|---|
| ☐ INSPECTED ☐ RECEIVED ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | ☐ PARTIAL ☐ FINAL | 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |
| DATE SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | | | |
| 31. I certify this account is correct and proper for payment. | 31. PAYMENT | | 34. CHECK NUMBER |
| DATE SIGNATURE AND TITLE OF CERTIFYING OFFICER | ☐ COMPLETE ☐ PARTIAL ☐ FINAL | | 35. BILL OF LADING NO. |

| 37. RECEIVED AT | 39. RECEIVED BY (Print) | 38. DATE RECEIVED (YYMMDD) | 40. TOT. CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |
|---|---|---|---|---|---|

**DD Form 1155, JUN 94**      PREVIOUS EDITIONS MAY BE USED.      480/12

910

SFI034 - EDP PUBLIC VOUCHERS FOR PURCHASES AND SERVICES OTHER THAN PERSONAL

```
US DEPARTMENT, BUREAU, OR          DTE YOU PREP              VOUCHER NUM
ESTABLISHMENT AND LOCATION         02/25/97                    285894
DIR FOR CENT DISBURS               CONTRACT NO
DFAS-INDPLS CENTER                 DAAB07-97P0315        PAID BY
ATTN: DFAS-IN-FD                                         CHARLES L PETEFISH
8899 E. 56TH STREET                PAYMENT NO. 001       DISBURSING OFFICER
INDIANAPOLIS, IN                   TYPE: FIKAL           02/25/97
                                                         5570

PAYEE'S       NEAL NELSON AND ASSOCIATES
NAME          330 NORTH WABASH AVENUE
AND           SUITE 2627
ADDRESS       CHICAGO IL 60611-3604
```

| INVOICE NUMBER | MDSE AMOUNT | INTEREST/ (DISCOUNT) | DAYS LATE | INT RATE % | FREIGHT | AMOUNT |
|---|---|---|---|---|---|---|
| 25507 | 24000.00 | 0.00 | 0 | 0.0000% | 0.00 | 24000.00 |

```
                                         VOUCHER SUBTOTAL:        24000.00
                                              TAX WITHHELD:           0.00
97041100552CAPS                 EXCHANGE RATE/DIFFERENCE:            0.00
PREPARED BY: 301
                                             TOTAL PAYMENT:       24000.00
```

AUT-CER: N. HENDRICKS

I CERTIFY THIS VOUCHER CORRECT AND PROPER FOR CHECK PAYMENT
02/25/97      CHARLES L. PETEFISH              DIRECTOR, CENTRALIZED
DATE          AUTHORIZED CERTIFYING OFFICER          TITLE

ACCOUNTING CLASSIFICATION
2172020.0000 62-7550  P432610 25C6 002086 US BJ3AE3 E3BJ3A HBJAAA63440022
                                          24000.00

CHECK NUMBER  90161323

987

SF1034 - EDP PUBLIC VOUCHERS FOR PURCHASES AND SERVICES OTHER THAN PERSONAL

US DEPARTMENT, BUREAU, OR
ESTABLISHMENT AND LOCATION
DIR FOR CENT DISBURS
DFAS-INDPLS CENTER
ATTN: DFAS-IN-FD
8899 E. 56TH STREET
INDIANAPOLIS, IN

DTE VOU PREP
04/29/97
CONTRACT NO
DAAB07-97P0444
PAYMENT NO.  001
TYPE: FINAL

VOUCHER NUM
252828
PAID BY
CHARLES L PETEFISH
DISBURSING OFFICER
04/29/97
5570

PAYEE'S
NAME
AND
ADDRESS

NEAL NELSON AND ASSOCIATES
330 NORTH WABASH AVENUE
SUITE 2627
CHICAGO IL 60611-3604

| INVOICE NUMBER | MOSE AMOUNT | INTEREST/ (DISCOUNT) | DAYS LATE | INT RATE % | FREIGHT | AMOUNT |
|---|---|---|---|---|---|---|
| 25693 | 24000.00 | 0.00 | 0 | 0.0000% | 0.00 | 24000.00 |

97111104222CAPS    WCD: SSCVP
PREPARED BY: 301

VOUCHER SUBTOTAL:        24000.00
TAX WITHHELD:             0.00
EXCHANGE RATE/DIFFERENCE:  0.00

TOTAL PAYMENT:          24000.00

AUT-CER: M. HENDRICKS

I CERTIFY THIS VOUCHER CORRECT AND PROPER FOR CHECK PAYMENT
04/29/97      CHARLES L. PETEFISH              DIRECTOR. CENTRALIZED
DATE          AUTHORIZED CERTIFYING OFFICER                 TITLE

ACCOUNTING CLASSIFICATION
2172020.0000 62-7550  P432610 25C6 002086 US BJ3CE3 E3BJ3C HBJAAA70550068
24000.00

CHECK NUMBER  90258978

SF1034 - EDP PUBLIC VOUCHERS FOR PURCHASES AND SERVICES OTHER THAN PERSONAL

| US DEPARTMENT, BUREAU, OR ESTABLISHMENT AND LOCATION DIRECTORATE FOR CEN DISB DFAS-INDIANAPOLIS CENTER ATTN: DCD-FD MAIL STOP #101 8899 E. 56TH STREET | DTE VOU PREP 06/17/97 CONTRACT NO DAAB07-97P0629 PAYMENT NO. 001 TYPE: FINAL | VOUCHER NUM 213797 PAID BY CHARLES L PETEFISH GS-15 06/17/97 5570 |
|---|---|---|

PAYEE'S NAME AND ADDRESS
NEAL NELSON AND ASSOCIATES
330 NORTH WABASH AVENUE
SUITE 2627
CHICAGO IL 60611-3604

| INVOICE NUMBER | MDSE AMOUNT | INTEREST/ (DISCOUNT) | DAYS LATE | INT RATE % | FREIGHT | AMOUNT |
|---|---|---|---|---|---|---|
| 25760 | 24000.00 | 0.00 | 0 | 0.0000% | 0.00 | 24000.00 |

VOUCHER SUBTOTAL: 24000.00
TAX WITHHELD: 0.00
97150103755CAPS  WCD: SSCTP   EXCHANGE RATE/DIFFERENCE: 0.00
PREPARED BY: 301
TOTAL PAYMENT: 24000.00

AUT-CER: H. HENDRICKS

I CERTIFY THIS VOUCHER CORRECT AND PROPER FOR EFT PAYMENT
06/17/97   CHARLES L. PETEFISH          DIRECTOR FOR CENTRALIZED DISBU
DATE       AUTHORIZED CERTIFYING OFFICER            TITLE

ACCOUNTING CLASSIFICATION
2172020.0000 62-7550  P432610 25CZ 002086 US BJ5EE3 E3BJ5E HBJAAA71120079
24000.00

TRACE NUMBER  074036050169650

# ORDER FOR SUPPLIES OR SERVICES
(Contractor must submit four copies of invoice.)

| Form Approved OMB No. 0704-0187 Expires Jun 30, 1997 | PAGE 1 OF 6 |

oblic reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503.

**PLEASE DO NOT RETURN YOUR FORM TO EITHER OF THESE ADDRESSES.**
**SEND YOUR COMPLETED FORM TO THE PROCUREMENT OFFICIAL IDENTIFIED IN ITEM 6.**

| 1. CONTRACT / PURCH ORDER NO. DAAB07-97-P-0636 | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER 97JUN27 | 4. REQUISITION / PURCH REQUEST NO. XBJAAA-7167-0106 | 5. PRIORITY A70 |
|---|---|---|---|---|

| 6. ISSUED BY | CODE | DAAB07 | 7. ADMINISTERED BY (if other than 6) | CODE | DAAB07 | 8. DELIVERY FOB |
|---|---|---|---|---|---|---|

ISCOM ACQUISITION CENTER
ATTN: AMSEL-AC-CC-E-CA
BUILDING 61801 ROOM 2604
FT HUACHUCA AZ 85613-6000
DONNIS SELF C24 (520) 533-1382

See Block 6

☒ DEST
☐ OTHER
(See Schedule if other)

| 9. CONTRACTOR Vendor Id: 00012487 | CODE | 47649 | FACILITY CODE | 10. DELIVER TO FOB POINT BY (Date) | 11. MARK IF BUSINESS IS |
|---|---|---|---|---|---|

NAME AND ADDRESS
NEAL NELSON AND ASSOCIATES
330 NORTH WABASH AVENUE
SUITE 2627
CHICAGO IL 606113606

DUPLICATE
ORIGINAL

☒ SMALL
☐ SMALL DISADVANTAGED
☐ WOMEN-OWNED

| 12. DISCOUNT TERMS 00 00 Days Net 030 |
| 13. MAIL INVOICES TO See Block 15 |

| 14. SHIP TO | CODE | AMSELIST | 15. PAYMENT WILL BE MADE BY | CODE | S92086 | MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER |
|---|---|---|---|---|---|---|

CDR USAISEC
ATTN AMSEL IE TI
BUILDING S3302
FORT HUACHUCA, AZ 85613

DAAB0797P0636

VENDOR PAY BRANCH
DFAS-SB-EPV
400 GIGLING ROAD
SEASIDE CA 939556771

| 16. TYPE OF ORDER | DELIVERY | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. |
|---|---|---|
| | PURCHASE X | Reference your _____ furnish the following on terms specified herein. ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME. |

| NAME OF CONTRACTOR | SIGNATURE | TYPED NAME AND TITLE | DATE SIGNED (YYMMDD) |
|---|---|---|---|
☐ If this box is marked, supplier must sign Acceptance and return the following number of copies:

**17. ACCOUNTING AND APPROPRIATION DATA / LOCAL USE**
AA:21722200000062755043000000000025C5000060HBJAAA71670106BJ3C00S02086     Award Oblig Amt US$     24,000.00

| 18. ITEM NO. | 19. SCHEDULE OF SUPPLIES / SERVICE | 20. QUANTITY ORDERED/ACCEPTED* | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| | POC: MAJOR EDWARD E. HOYT PHONE: 520-533-3236 APC: BJ3C PERIOD OF PERFORMANCE: 1 JULY 1997 THROUGH 30 JUNE 1998 NON PERSONAL SERVICE: | | | | |

| * If quantity accepted by the Government is same as quantity ordered, indicate by X. If different, enter actual quantity accepted below quantity ordered and encircle. | 24. UNITED STATES OF AMERICA BY: CHERYL L. JONES C69 | *Cheryl L. Jones* CONTRACTING/ORDERING OFFICER | 25. TOTAL $ 24000.00 |
|---|---|---|---|
| | | | 26. DIFFERENCES |

| 26. QUANTITY IN COLUMN 20 HAS BEEN ☐ INSPECTED ☐ RECEIVED ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | 27. SHIP. NO. | 28. D.O. VOUCHER NO. | 30. INITIALS |
|---|---|---|---|
| ____ DATE   SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | ☐ PARTIAL ☐ FINAL | 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |

| 36. I certify this account is correct and proper for payment. | 31. PAYMENT ☐ COMPLETE ☐ PARTIAL ☐ FINAL | | 34. CHECK NUMBER |
|---|---|---|---|
| ____ DATE   SIGNATURE AND TITLE OF CERTIFYING OFFICER | | | 35. BILL OF LADING NO. |

| 37. RECEIVED AT | 38. RECEIVED BY (Print) | 39. DATE RECEIVED (YYMMDD) | 40. TOT. CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |
|---|---|---|---|---|---|

**DD Form 1155, JUN 94**          PREVIOUS EDITIONS MAY BE USED.          480/122

# NEAL NELSON & ASSOCIATES

302 EAST MAIN STREET, EAST DUNDEE, ILLINOIS 60118-1324

E

July 12, 2004

Mr. Dan Bradford
U.S. Army
HQISEC - TIC
Building 53302
Fort Huachuca, AZ 85613

Dear Dan,

In the early 1990's I created a benchmarking labratory in my Chicago
office. My reason for doing this was to offer testing services on a
fee basis primarily to the commercial market.

I am aware that you have created a benchmarking labratory at the TIC
and are now offering testing services on a fee basis to the commercial
market. Thus there exists the potential for competition between your
lab and my lab.

I understand that your lab is equipped with a wide variety of testing
tools from a number of hardware and software suppliers. My lab is
only configured to run my software. I feel that the easiest way to
avoid any possible competition between our labs is for the TIC to
offer testing with any or all of its tools except those that are based
on my software, such as the multi-node RTE software.

I feel that this solution is appropriate for two reasons. First, I
don't believe that government agencies typically try to compete against
commercial firms offering the same services. Second, the TIC has never
requested, I have not granted and therefore the TIC does not have a
license that allows them to use my software to compete against me.

The word competition is a misnomer here since there is no way that my
company with its three employees could ever hope to sucessfully compete
against an arm of the federal government like the TIC.

Thank you for your consideration in this matter.

Sincerely,


Neal Nelson



**DEPARTMENT OF THE ARMY**
HEADQUARTERS, US ARMY INFORMATION SYSTEMS ENGINEERING COMMAND
FORT HUACHUCA, ARIZONA 85613-5300

REPLY TO
ATTENTION OF

January 25, 2005

Technical Director/Deputy

Mr. Neal Nelson
Neal Nelson & Associates
302 East Main Street
East Dundee, Illinois 60118-1324

Dear Mr. Nelson:

This is in response to your letter dated December 15, 2004. The prior letters and emails from Mr. Bradford, Mr. Rosen and me referred to therein, speak for themselves, and will not be commented upon further. You indicate that you have information regarding the Technology Integration Center (TIC) competing with your firm; again, we have previously responded to your concerns on this issue and will not comment further.

The major point of your letter is to clarify a statement made by Mr. Bradford, regarding ownership of the RTE software. At no time has the Army claimed that it owns the intellectual property rights to this software. Mr. Bradford's statement about software ownership referred to the fact that the Army had purchased a copy of the software, with those rights that allow the Government to use the software perpetually and without any further compensation to your company. In 1997, the Army paid your company $96,000.00 for a perpetual 1000 User RTE License for the software, as well as additional maintenance fees and other payments since that time. Under this license, the Government is entitled to continue to use the software, without further obligation to your company, along with whatever improvements have been made to the software.

We would also like to address an additional matter. As you know, you and Mr. Bradford agreed verbally that you would be provided with scripts that run on the RTE kernel. These scripts were developed in cooperation between you, Government personnel and Government contractors.

F

-2-

About a year after their development, they were made available for your use. Henceforth, we will be unable to provide your company with any scripts that are developed by Government personnel or Government contractors.

Sincerely,

BRAD N. BLAU
Deputy/Technical Director

# NEAL NELSON & ASSOCIATES

302 EAST MAIN STREET, EAST DUNDEE, ILLINOIS 60118-1324

G

February 3, 2005


Mr. Brad N. Blau
Deputy/Technical Director
Department of the Army
Information Systems Engineering Command
Fort Huachuca, Arizona 85613-5300


Dear Mr. Blau,

Your January 25, 2005 letter stated repeatedly that the Command will not comment
further regarding the TIC's alleged competition with my firm. I regretfully accept your
decision on this topic and I will pursue this issue through other channels.

The balance of this letter is in reference to the second paragraph of your January 25, 2005
letter relating to the 1000 user license.

If you refer to Army Publication TR No AMSEL-IE-TI-04-014 titled "ETHERNET
SWITCH EVALUATION PLAN" dated May, 2004, Appendix H, Section H-2:2,
Paragraph f (page H-8) titled "Mix Baseline Script" you will find a list of traffic "flows".
These flows are generated by my RTE software. Each flow results from a single RTE
emulated user. The list includes "672 WWW flows, 240 FTP flows, ..." plus some
additional VoIP and Mulitcast users in unspecified numbers. The total of the listed flows
(users) is 1248. If you interview the technicians that run this test you will discover that
the "Mix" test actually runs 1800 RTE users. This is a clear violation of the TIC's 1000
user license.

When Dan Bradford told me that he was going to use my software in the "commercial"
lab to run tests for Extreme, I told him that his license would not permit that use. My
statement was based on the fact that: when the software was installed and configured in
both the I3MP lab and the commercial lab at the same time, the TIC would be running
3600 emulated users. This would be a flagrant violation of the 1000 user license.

In response, Mr. Bradford: 1) Terminated my 18 year working relationship with the TIC
and its predecessor organizations, 2) Sent me a letter stating that he owned my software
and could run whatever tests he wanted with it, and 3) Offered testing services to
Extreme in spite of my objections. These actions constituted a conscious, willful and
flagrant violation of the clearly specified 1000 user license limitation.

G

Is the Command interested in working with me to uncover the full extent of the license abuse and formulate an appropriate response? If so, please notify me no later than 5:00 P.M. Central Standard Time on Thursday February 11, 2005.

Respectfully,

Neal Nelson

# EXHIBIT 10

CASE NUMBER XC-05-0149

## REPORT OF INQUIRY
### (Case Number XC-05-0149)
### As of 21 November 2006

## 1. BACKGROUND:

(1) On or about 12 September 2005, [b)(7)(C) _____ [b)(7)(C)] , forwarded to our office an Inspector General Action Request (IGAR) from a contractor, Neal Nelson and Associates (NNA). The Commanding General requested that our office conduct an Inquiry regarding the issues at hand. The C-E LCMC Legal Office has been attempting to resolve these issues with the contractor, for the past couple of years without results. Letter to NNA, dated 7 September 2005, signed by ▓▓▓▓▓▓▓▓▓▓ forwarded by CE LCMC Legal Office, ▓▓▓▓▓▓▓▓ via facsimile to the Inspector General Office, stated that the issues were not substantiated and the Inspector General will conduct an Inquiry.

(2) The complainant, NNA, alleged that Technology Integration Center (TIC) at Fort Huachuca, Arizona was competing against their firm by providing testing services to non-government commercial customers.

(3) The contractor further stated that TIC was running their NNA's software at user levels that far exceeded the 1,000 user license that the TIC had purchased.

(4) TIC was under the umbrella of USA Information Systems Engineering Command (USAISEC).

2. **Issue 1**: That TIC was improperly competing with NNA by providing testing services to non-government commercial customers in violation of Army Regulation (AR) 73-1, Chapter 7, Testing for Commercial Entities.

a. **Evidence**: NNA alleged that TIC was competing against their firm by providing testing services to non-government, commercial customers.

(1) **Standard**: AR 73-1, Chapter 7, Section 7-4, paragraph b, Testing for Commercial Entities, stated "Use of any Army facility by a commercial enterprise was allowed only if it does not increase the cost to operate the facilities and after insuring that the Army was not competing with U.S. commercial sector in providing such services."

1

CASE NUMBER XC-05-0149

### (2) Documentary Evidence:

(a) By Letter, dated 1 August 2005, NNA stated that TIC at Fort Huachuca, Arizona was competing against their firm by providing testing services to non-government commercial customers.

(b) Letter to NNA, dated 7 September 2005, signed by ███████████ ███████ forwarded by C-E LCMC Legal Office, ██████████████ via facsimile to the Inspector General stated that the issues were Not Substantiated and the IG Office conduct an Inquiry.

(c) By letter dated 7 October 2005, to the C-E LCMC Inspector General (IG), NNA stated that AR 73-1 specified Army Laboratories may only offer testing services after confirming that the Army was not competing with the commercial sector.

(d) NNA's letter, dated 1 November 2005, to the IG, with attachments A – H, stated the following:

<u>1</u>  That pages 27 and 28 from AR 73-1, section 7-4, a, 2 (restated from Title 10 Section 2539b) "when in the interest of national defense." Section 7-4b adds the two additional requirements "does not increase the cost to operate the facilities" and "after ensuring that the Army was not competing with U.S. commercial sector."

<u>2</u>  That TIC and NNA offered testing services to the vendor, ADTRAN Incorporated. NNA stated that TIC won that order and also took that business away from NNA.

<u>3</u>  That a detailed audit of the TIC commercial Laboratory will uncover three significant violations of Army policy: a technical review of the tests performed in the TIC commercial laboratory would reveal that many of those tests could have been performed by US commercial firms. Thus the TIC was using Army facilities to compete with private industry; a close examination of the tests performed will reveal that the tests were not in the interest of national defense, specifically the ADTRAN and EXTREME tests were intended to help those companies market their products to the Army. Tests to assist companies in sales and marketing were not allowed under AR 73-1; a review of the costs associated with equipping and staffing the TIC commercial laboratory will reveal there has been an increase in costs to operate this laboratory and this was prohibited by AR 73-1.

2

CASE NUMBER XC-05-0149

    (e) By Email, dated 3 August 2004, from NNA to ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓ notified ▓▓▓▓▓▓▓▓ that NNA was trying to make a sale to the vendor, EXTREME NETWORKS.

    (f) By Email, dated 13 September 2004, from ▓▓▓▓▓▓▓▓ to NNA, ▓▓▓▓▓▓▓▓ stated that TIC was offering services to EXTREME NETWORKS.

    (g) By Email, dated 13 September 2004, from NNA to ▓▓▓▓▓▓▓▓ NNA requested TIC not to offer services to EXTREME NETWORKS because services were in competition with services offered by NNA.

(3) **Testimonial Evidence:**

    (a) By telephonic interviews and emails dated 25 April 2006, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ft. Huachuca, AZ, stated the following:

    <u>1</u> That TIC's testings, whether vendor or Government funded, were in the interest of the US Army, the DOD, and national security. The TIC's testing were for the design and implementation of networking, telecommunication, and infrastructure solutions used in the US Army to perform Command and Control functions for deployed forces and those in garrison supporting tactical reachback.

    <u>2</u> That vendor funded testing was authorized in US Law (US Title 10, Section 2539B), and the TIC was in compliance with this section of the law the way it was being executed.

    <u>3</u> That the TIC was in compliance with AR 73-1, and was even working with the Army CIO/G6 to add verbiage into AR 73-1 as to the TIC's role in Army enterprise testing. Other Army and DoD test organizations, including the JITC, EPG, ATEC, and the CTSF also received funds from reimbursable customers (including vendors).

    <u>4</u> That TIC was being singled out by NNA because NNA holds the US Government (specifically the TIC) responsible for his business woes rather than addressing the real issues with his company, which only NNA can speak to and were outside the purview of the U.S. Army. TIC based their assertion on the fact that TIC has only done three (3) commercial tests since 2001 totaling $196,914 (these were the tests that NNA was using and NNA's basis for claims of competition). These tests were done by TIC under the pretext mentioned above, supported the Army's I3MP program, and influenced technology insertion for the PM Defense Communications and Army Switched Systems.

CASE NUMBER XC-05-0149

     <u>5</u> That NNA was solely basing his complaint of competition on three (3) tests done over a five (5) year period. These three tests were done directly for Army infrastructure programs, regardless of the funding source.

     <u>6</u> That NNA's information as to what the TIC has done with commercial entities was inaccurate. NNA claimed that TIC performed testing for a contractor called ADTRAN. TIC met with ADTRAN in January 2005 to explain the TIC testing process, and ▮▮▮▮▮▮▮ exchanged two e mails with ADTRAN in March 2005. Their last e mail dated 28 March 2005 said that ADTRAN were to meet with ▮▮▮▮▮▮▮▮▮▮▮▮ at Fort Monmouth; that was TIC's last contact with ADTRAN, and ADTRAN never paid the TIC to perform testing.

     <u>7</u> That the allegation that the TIC was competing with NNA simply was not true. NNA and others in the commercial space do not test in accordance with TIC developed test plans and procedures meant to ascertain how well Army or DoD systems that use commercial-off-the-shelf equipment were able to meet the functional requirements of Army users.

     <u>8</u> That specifically, NNA or other vendors do not have the knowledge of Army PEO/PM requirements, the understanding, capabilities, access, test setup, TMDE, or knowledge of the system testing that the TIC does, nor were vendors able to evaluate results and tell the Army what they mean from an operational and Army enterprise perspective. Only the TIC was in a unique position to perform this function on behalf of the soldiers represented by respective PMs and PEOs. The TIC also used its test results to perform Campus Area Network (CAN) system engineering design on behalf of PM DCASS. NNA cannot and does not perform system engineering for data networks.

     (b) By several telephonic interviews and by emails, dated 20 June 2006, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ stated that regarding the issue of the Army competing against industry, NNA claims that by providing this testing service, the TIC is violating AR 73-1 and its prohibition regarding competition with commercial entities. The available contracts reviewed do not contain provisions relating to this issue. The Acquisition Center does not have sufficient information to confirm or deny this allegation, therefore does not have an opinion on this allegation.

CASE NUMBER XC-05-0149

       (c) In several telephonic interviews and by emails, dated 12 January 2006 and 13 April 2006, with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Fort Huachuca, Arizona, GS 0903-14, stated the following:

       <u>1</u> That NNA, has worked with the USAISEC since the late 1980s. NNA developed a tool called the Remote Terminal Emulator (RTE). The purpose of the RTE was to emulate many users accessing a computer system or device at the same time.

       <u>2</u> That TIC, a Directorate of USAISEC, C-E LCMC, was the organization that has worked with NNA. Part of TIC's mission was to test various ADPE technologies and equipment to ensure that they were compatible with Army systems, both operationally and regarding security. The RTE has been used as one part of the suite of tests which the TIC has utilized.

       <u>3</u> That since 1988 a variety of contract vehicles has been used between NNA and the Government. These include GSA contracts, maintenance agreements, and other direct contracts between the TIC and NNA for work on the RTE. Pursuant to some of these contracts, NNA has modified the RTE over the years. These changes included modifications to the hardware, to the software, to the number of users that can be emulated, and other aspects of its operation. As part of the process, software scripts were developed jointly by TIC personnel and NNA which enabled the RTE to be used to test various processes and devices.

       <u>4</u> NNA alleged that TIC was violating AR 73-1. This regulation allows the use of Army facilities for testing commercial products if this would not interfere with the facility's mission, and if there was no competition with the commercial sector. Following the passage of the law which allows for this testing, the TIC began providing testing services to various commercial vendors. These vendors usually wish to sell a product to the Army, or to Department of Defense (DOD). The vendors could pay to have their product tested at the TIC to ensure the test was compatible with Army or DOD systems. If a particular Program Manager or other DOD organization was interested in the product, the vendor could inform those organization that the product has been tested and meets the appropriate requirements.

       <u>5</u> That NNA claimed that by providing this service the TIC was violating AR 73-1 and its prohibition regarding competition with commercial entities. NNA claimed that vendors have refused to purchase the RTE tool because they could get the testing from the TIC for considerably less money than they can purchase the tool, and therefore the TIC was in competition with NNA, which violated the regulation.

CASE NUMBER XC-05-0149

     6 That NNA's claims were simply not supported by the facts. The testing performed by the TIC was different in its scope and its intent from the testing performed by NNA. The work performed by the TIC was based on a test plan developed by the Army to ensure that products which were tested were compatible with Army systems and meet the required security standards. The RTE tool comprised of only one test, while the TIC's test plan includes an entire, comprehensive battery of tests. Also, NNA was not authorized to determine a product's compatibility with Army systems, which was the purpose of the TIC test plan.

     7 That these vendors do not have access to the designs, functional requirements, specific program standards, performance requirements, formal architectures, parameters, and proprietary and sensitive Army information that dictate the use of the products. In other words, they don't have the Program Manager requirements nor the TIC developed test plans and procedures meant to test these requirements. In general, these vendors could not prepare this on their own as part of an industry test. The TIC was using Army facilities to support command and control programs that directly support the war fighter, the PEO, and the PMs.

     8 That perhaps an analogy will help illustrate the matter: an individual who owned a car decided to take the car to a garage and have all the systems checked. The mechanic at the garage tests the brakes, the electrical system, the engine, the tires, the fluid levels, the air conditioning system and all the other parts of the car. It would be a specious argument for the manufacturer of the battery tester to claim that the mechanic at the local garage was in competition with that company. The individual who owns the car wanted to have the entire car tested by someone with the specialized skill and knowledge to test everything; the individual does not want to be a mechanic and do all the tests themselves and pay for all the equipment required to perform all the different diagnostics. Similarly, the vendors that hired the TIC to test their products want to be sure that those products were compatible and work properly with the Army's system. The vendors didn't want to try to do all the tests themselves. In fact, the vendors could not do all the tests themselves since some of the tests involved elements of the Army system that were proprietary so they would not know what or how to test those parts of the system.

     9 That, therefore, it was not reasonable to assert that the TIC was competing with NNA. The TIC used the RTE for part of the test, but the purpose of the testing was much broader and covered systems which NNA could not test, and produce a result that NNA was not authorized to provide.

CASE NUMBER XC-05-0149

      10  That NNA claimed that the tests were not in the interest of national defense was similarly incorrect. When this laboratory was set up pursuant to the relevant laws and regulations, the Army determined that it met the criteria required by statute. The purpose of the testing by the TIC was to ensure that products sold to the Army would work properly with Army and DoD systems and meet security requirements. Surely that was peculiarly within the province of the Army to test. It was obvious that compatibility of systems was vital to the nation's defense since if a system was deployed that was incompatible with Army systems, soldier's lives could be lost and other direct impacts on the warfighters could have serious negative consequences. Further, the tests done by the commercial team included switch evaluations that were intended to help the vendors to prepare for the test of record for the I3MP program, which provided backbone data networks that relay command and control information from the tactical environment to sustaining base systems and applications for further processing. It was via these networks that the decision-makers were passing command and control data that determined the success of our troops in the field.  There was no basis upon which to argue that this was not in the interest of national defense when these tests were supporting decision makers on the ground in Southwest Asia, the Pacific, Europe, and CONUS.

      11  That the commercial team also has supported quick reaction missions by building 'fly-away' packages for the ARCENT Commander and USAREUR. These packages were for Lieutenant Generals.  Special projects include Signal Intelligence packages consisting of specialized gear, routing equipment, encryption devices, satellite transmission equipment, and power systems. These packages were transportable, mountable in HMMVs, and used in tactical operations in Southwest Asia.

      12  That other efforts included testing of products to increase allowable bandwidth on dedicated links. Specifically, the commercial team tested products that could squeeze more bandwidth out of dedicated links used in the tactical environment. Clearly, all of these efforts support national defense.

      13  That NNA's claim the cost of the laboratories violated AR 73-1 was also incorrect. The regulation required that there not be an increase in the cost to operate the facility. Because this laboratory charged private firms for this testing in a manner that meets all fiscal requirements, any cost for this lab was covered by the firms whose products were tested. There was, therefore, no increase in the cost to operate the facility borne by the Army. This clearly met the requirements of AR 73-1.

      14  That TIC has not violated any policies, regulations, laws or licenses regarding relationship with NNA. There was no competition with NNA in violation of AR 73-1.

CASE NUMBER XC-05-0149

b. **Discussion:** There was no evidence to support the allegation that TIC was improperly competing with NNA by providing testing services to non-government commercial customers. The documentary evidence and witnesses statements revealed that the testing performed by the TIC was different in its scope and intent from the testing performed by NNA. The work performed by the TIC was based on a test plan developed by the Army to ensure that products which were compatible with Army systems and meet the required security standards. The RTE tool comprised of only one test, while the TIC's test plan includes an entire comprehensive battery of tests.

c. **Conclusion:** That TIC was improperly competing with NNA by providing testing services to non-government commercial customers in violation of Army Policy (AR) 73-1, Chapter 7, Testing for Commercial Entities was **UNFOUNDED.**

3. **ISSUE 2:** That TIC was improperly running NNA's software at user levels that exceeded 1,000 users under a license agreement in violation of DFARS 227.7202-1(a), Rights in Computer Software and Software documentation.

a. **EVIDENCE:** NNA alleged that TIC was running the NNA's software at user levels that exceeded 1,000 users in violation of a license Agreement.

(1) **STANDARD:** DFARS 227.7202-1 (a), Rights in Computer Software and Computer Software Documentation, stated "Commercial Computer software or commercial computer software documentation shall be acquired under the licenses customarily provided to the public unless such licenses are inconsistent with Federal Procurement law or do not other wise satisfy user needs."

(2) **Documentary Evidence:**

(a) By Letter dated 1 August 2005, NNA stated that TIC at Fort Huachuca, AZ was running their company's software at user levels that far exceeded the 1,000 user license that TIC had purchased.

(b) Contract Number DAEA18-88-C-0033, awarded to NNA, dated 5 April 1988, for the procurement of 64 line Remote Terminal Emulation System This system included both hardware and software components.

(c) Copy of Software License Agreement (not authenticated), dated 30, June 1989, between NNA and USAISEC ▓▓▓▓▓▓▓▓▓▓ for non-exclusive, non-transferable right to use the Remote Terminal Emulator program, developed by NNA Serial Number 00100416.

CASE NUMBER XC-05-0149

    (d)  Contract No. DAEA32-94-C-0002, awarded to NNA, dated 1 March 1994, for the procurement of X Remote Terminal Emulation Software License at $98,000.

    (e)  Contract No. DAEA32-95-P-0403, awarded to NNA, dated 23 September 1995, for the procurement of 1,000 user x-Remote Terminal Emulator at $98,000.

    (f)  Contract No. DAAB07-97-P-0315, awarded to NNA, dated 9 January 1997, for the procurement of 1000 user X-Remote Software License.

    (g)  Contract No. DAAB07-97-P-0636, awarded to NNA, dated 27 June 1997, for the procurement of non-personal Service at $24,000.

    (h)  Letter dated 12 July 2004 from NNA to ▓▓▓▓▓▓▓▓▓ stated that, in part, "I understand that your lab is equipped with a wide variety of testing tool from a number of hardware and software suppliers. My lab is only configured to run my software. I feel that the easiest way to avoid any possible competition between our labs is for the TIC to offer testing with any or all of its tools except those that are based on my software, such as the multi-node RTE software."

    (i)  Letter, dated 25 January 2005, from ▓▓▓▓▓▓▓▓▓ to NNA, stated in part, "At no time has the Army claimed that it owns the intellectual property rights to this software. ▓▓▓▓▓▓▓▓▓ statement about software ownership referred to the fact that the Army had purchased a copy of the software, with those rights that allow the Government to use the software perpetually and without any further compensation to your company. In 1997, the Army paid your company $96,000 for a perpetual 1000 User RTE License for the software, as well as additional maintenance fees and other payments since that time. Under this license, the Government is entitled to continue to use the software, without further obligation to your company, along with whatever improvements have been made to the software."

    (j)  Letter, dated 3 February 2005, from NNA to ▓▓▓▓▓▓▓▓▓, stated, in part, "If you refer to Army Publication TR No AMSEL-IE-TI-04-014 titled "ETHERNET SWITCH EVALUATION PLAN" dated May 2004, Appendix H, Section H-2.2, paragraph f (page H-8) titled "Mix Baseline Scrip" you will find a list of traffic flows. These flows are generated by my RTE software. Each flow results from a single RTE emulate user. The list includes "672 WWW flows, 240 FTP flows,…"plus some additional VOIP and Multicast users in unspecified numbers. The total of the listed flows (users) is 1248. If you interview the technicians that run this test you will discover that the mix test actually 1800 RTE users. This is a clear violation of the TIC's 1000 user license. When (b)(7)(C) told me that he was going to use my software in the commercial lab to run tests for Extreme, I told him



CASE NUMBER XC-05-0149

that his license would not permit that use. "My statement was based on the fact that: when the software was installed and configured in both the 13MP lab and the commercial lab at the same time, the TIC would be running 3600 emulate users. This would be a flagrant violation of the 1000 user license."

(3) **Testimonial Evidence:**

(a) By letter dated 2 December 2005 and via telephone interviews, NNA stated the following:

1 That the 1988 Purchase Order DAEA18-88-C-0033 issued by the Army was for 64 line Remote Terminal Emulation (RTE) system. This system included both hardware and software components. The computer hardware became the property of the Army and has long since been destroyed. There were two separate software packages that were delivered under this order, one was a copy of the Santa Cruz Operation (SCO) Unix operating system and the other was a copy of NNA's firm's Remote Terminal Emulation Software. For those two software packages the Army did not purchase the software but rather the Army purchased a license to use the software.

2 That the Software License Agreement, dated 30 June 1989, was signed by duly authorize representatives of NNA and the Army on 30 June 1989. The license agreement detailed several limitations to the Army's use of NNA's software. NNA stated that this provided proof the Army had purchased a license to use the software and did not purchase the software outright. The Army did not receive unrestricted rights to use the software.

3 That the contracts mentioned above in section 3 (2)(d-G) above related to the expansion of the RTE license from the single machine /64 user license issued in 1989 to a 1,000 user perpetual "site license." The total cost of this license upgrade was $292,000.00. The Army chose to pay this amount by paying software rental at $98,000 per year for two years with a final rental payment of $96,000 in the third year. Army Purchase Orders dated 1 March 1994 and 23 September 1995 confirmed the rental payments of $98,000 for 1994 and 1995.

4 That the Army failed to make the third payment in 1996 so the perpetual 1,000 user site license was not granted in 1996. During discussions with Army representative, a plan was put forth where the Army would make four payments of $24,000 in 1997. The combination of these four payments would be accepted as the final $96,000 installment, and after receipt of the fourth $24,000 payment the 1,000 perpetual license would be issued. A letter dated

CASE NUMBER XC-05-0149

27 January 1997 was sent to confirm this option. The Army made the four payments of $24,000 at the times specified in the letter and the Army was thus granted the 1,000 user perpetual site license to use the NNA RTE software.

> <u>5</u> That NNA Letter dated 12 July 2004 to Mr. Bradford stated the TIC's license to use NNA's software would not allow Mr. Bradford to install and use the software in the TIC's commercial laboratory.

> <u>6</u> That during the fall and early winter of 2004 – 2005, there were numerous communications between NNA and various Army representatives. These ultimately resulted in a letter, dated 25 January 2005, from Mr. Brad Blau (TIC employee) to NNA confirming that the Army did not claim to "own" NNA's software but rather it had a 1,000 user site license to use the software at the TIC.

> <u>7</u> That the letter, dated 3 February 2005, from NNA to Mr. Blau pointing out that while there was an agreement that TIC had a 1,000 user perpetual license to use NNA's RTE software, the TIC was, in fact, running tests with at least 3,600 emulated users, which was a clear violation of the 1,000 limit.

> <u>8</u> That there were only two proper ways to deal with this software license abuse: the TIC could use the licensed software within the 1,000 user limit; or the TIC could purchase a license for a larger number of users and then operate within the new higher limit.

> b. By telephone interviews and email dated, dated 25 April 2006, ████████████ stated the following:

> <u>1</u> That NNA's software was not designed by NNA to do network testing. When the TIC engaged NNA in the late 1980s, NNA's business paradigm was client/server software testing. NNA's software was intended to test client interactions against servers to determine if Operating Systems were tuned correctly, if servers were sized appropriately, and to get an idea of how well an application could be hosted on its intended platform.

> <u>2</u> That TIC first used NNA's tool for the Navy Super-Mini testing. In 1989 when NNA indicated that TIC licensed NNA's software, it was for this purpose -- not network testing. As a matter of fact, NNA's software was originally designed to run in a serial fashion between the machines; this indicated that network testing was not part of the intended use of NNA's software nor was network testing a consideration. Serial connections were a way to essentially hardwire clients and servers together without the use of today's IP networking protocols. NNA adapted their product to do what NNA claimed was network testing (run the NNA software over a client/server cluster with a network in between) only after the TIC designed

CASE NUMBER XC-05-0149

such a test. In effect, NNA took the idea from Government sponsored and TIC developed testing, for which TIC developed scripts to make it work.

<u>3</u> That at the time, NNA was not under a formal contract with TIC. The TIC did this to support network designs for the I3MP program (then called CUITN). NNA took those Government developed scripts and marketed them as part of NNA's tool set. TIC did not agree that NNA could do this, but regardless, NNA did it. TIC expressed concern to NNA over this, but NNA found TIC scripts were vital to NNA selling NNA's software as a network testing tool, which it was not. NNA took several scripts developed on Government customer funds including IPV6, VOIP, and video streaming/multicast. Any of the scripts TIC used that NNA claimed were developed by NNA were paid for under the maintenance agreements as part of NNA's so-called tool suite.

<u>4</u> That the TIC had used NNA's software, which was legally bought and paid for via a perpetual license, to perform only one small piece of the system testing. Performing only one test procedure out of many using NNA's tool does not constitute complete testing as outlined in TIC developed test plans. These test plans also have traceability back to functional user requirements.

<u>5</u> That NNA argued that the TIC exceeded the rights of the license, even though NNA was the one who configured the software and test setup to operate at the limits TIC was operating.

<u>6</u> That on 28 June 2005, the TIC agreed to restrict testing to 1,000 users per the perpetual licensing agreement, even though the Army and NNA never agreed on what the definition of a user was. The Government's interpretation was different and less restrictive than NNA's. When the TIC did use NNA's tool between 28 June 2005 and January 2006, TIC kept the test scenarios under the 1,000 user limit.

<u>7</u> That on January 2006, the TIC abandoned the use of the NNA software entirely and began using a TIC-developed tool instead. TIC has been using that tool since then and has retired the NNA tool, although TIC still has legal use of tool.

<u>8</u> That the TIC had close relationships with industry, academia, and other Government agencies. The TIC also worked closely with companies that NNA would consider competitors such as SPIRENT and IXIA. TIC had acquired these contractor's hardware and software to perform system and component testing just as TIC did NNA's tools. TIC had used these tools to complement the system testing as TIC did with the NNA tool when TIC was using it. In other words, TIC had a similar relationship with NNA's competitors. The TIC never had any complaints

CASE NUMBER XC-05-0149

from these contractors related to competition so this matter would appear to be isolated to NNA.

     c. By interviews and e mail dated 20 June 2006, ▓▓▓▓▓▓▓ stated the following:

     <u>1</u> That NNA had multiple contracts with the US Army at Fort Huachuca, Arizona. Various contracts were awarded by three contracting offices. The three contracting offices were: The Directorate of Contracting, the Information Systems Command Contracting Activity, and the C-E LCMC Acquisition Center located all located at Fort Huachuca, Az. The Information Systems Command Contracting Activity became the CECOM Acquisition Center in 1997.

     <u>2</u> That due to the passage of time, and required retention of records, many of the records to completely support any or all allegations made by NNA were not available. The facts were based on the documentation available.

     <u>3</u> The earliest record of NNA doing business with the ISEC/TIC at Fort Huachuca, AZ was in 1988 with Contract Number DAEA18-88-C-0033. That contract, in 4 out of 39 pages located, made a purchase of the RTE. Per the statement of work in the contract, the RTE was able to emulate as many "operators" as needed up to a limit of 128.

     <u>4</u> That a license agreement, number c107-03, 091793, dated 30 June 1989, containing the signature of an ISEC/TIC employee in 1989, did not reference the number of users or the term of the license.

     <u>5</u> That in 1994, NNA and ISEC/TIC entered into Contract Number DAEA32-94-C-0002 for a license for 1,000 users for one year for the RTE software, for which ISEC agreed to pay a total of $292,000.00, to be paid over three years. ISEC paid $98,000 each in 1994 and 1995 towards this license fee. However, since no funding was available in 1996, NNA and ISEC/TIC agreed to make a series of payments in 1997 to cover the remaining $96,000. In 1997 the Army made four payments of $24,000.

     6 That a letter dated January 27, 1997, from ▓▓▓▓▓▓▓▓▓▓ at NNA to ▓▓▓▓▓▓▓▓▓ of the TIC stated that once NNA had "received the Purchase Order and payment, then the perpetual license would be in place." The C-E LCMC Acquisition Center Southwest files were checked for relevant documents, but since they were older than 6 years, any documents regarding these transactions have been purged in accordance with Modern Army Record Keeping System 715 filing instructions. This office has no record of these payments being made.

CASE NUMBER XC-05-0149

     7 That in October of 1999 contract number DAAB32-00-P-0022 was awarded to NNA for Software license renewal for RTE with a period of performance of October 1999 through June of 2000.

     8 That in May of 2000 contract number DAAB32-00-P-0229 was awarded to NNA for Software Maintenance Fee for the RTE.

     9 That in July of 2001 contract number DAAB32-01-P-0194 was awarded to NNA for NM Multi-node RTE Software maintenance fee - renewal of DAAB32-00-P-0022.

     10 That in May of 2002 contract number DAAB32-02-P-0183 was awarded to NNA for Annual Maintenance and Support for the RTE.

     11 That in July of 2003 contract number DAAB32-03-F-0088 was awarded for Annual Maintenance and Support for Multi-Node RTE.

     12 That additional contracts were awarded between July of 2001 and September of 2003 for technical support, upgrade and script support for the RTE.

     13 That in June of 2004 contract number W9128Z-04-P-0065 was awarded to NNA for Multinode RTE Software. This contract expired on 30 June 2005.

     14 That no new contracts have been awarded to NNA after 16 June 2004.

     15 That to support an allegation of license violation, NNA will need to submit a certified claim under the terms of one of the contracts referenced above.

     16 That documentation provided by NNA does not support a contract claim.

     d. By telephone interviews and emails, dated 13 April 2006 and 12 January 2006, Mr. Rosen stated the following:

     1 That in regards to NNA's claim that the Army purchased a license as opposed to purchasing the software, was a distinction without a difference. In 1997, the Army purchased a "perpetual 1000 User RTE License" according to the January 27, 1997 letter from ▨▨▨▨▨▨▨▨ of NNA. A perpetual license gave the licensee the right to use the software/hardware perpetually. At no time has the Army claimed it owned the intellectual property rights to the software or hardware. However, by

CASE NUMBER XC-05-0149

virtue of the many thousands of dollars it spent, the Army does own the right to use the RTE that was purchased, for as long as the Army deems appropriate.

<u>2</u> That there was considerable question as to whether any provisions of any prior license agreements would remain in effect after the Army purchased the perpetual license in 1997, and there was no document in either the Army's possession or has been tendered by NNA that would clarify that issue. Given the course of dealing of the parties prior to NNA's departure, the Army used the RTE and had the right to do so regardless of whether the situation was characterized as owning the software or a license to use the software.

<u>3</u> That in reviewing the license agreement, dated 30 June 1989 NNA forwarded to the Inspector General on or about 2 December 2005 several concerns about its authenticity should be addressed. There was a number on the bottom that appears to be a date in 1993 (091793), not 1989 as indicated in the signature block. The signature of ▓▓▓▓▓▓▓ was his, according to ▓▓▓▓▓▓▓ but ▓▓▓▓▓▓▓ doesn't remember signing this particular document and the signature appears to have been pasted in from a different document. There were many provisions in the document that were contrary to what the Army would have wanted, so it would be difficult to give credence to the idea that the Army would have signed such a document. Also, it should be pointed out that in 1989 ▓▓▓▓▓▓▓ was a ▓▓▓▓▓▓▓ who had no authority to bind the Government. Cases have consistently held that it was the contractor's responsibility to ensure that the personnel they're dealing with have the necessary authority and if they don't have the authority, then the contractor was not entitled to recover from the Government.

<u>4</u> That even if this subject license agreement forwarded to the Inspector General were valid, it has been superseded in the intervening years. NNA himself agreed and undertook modifications of the RTE based on other contracts and maintenance agreements, and the perpetual license agreement entered into in 1997 would have modified or replaced provisions of the 1989 agreement. Prior to NNA's departure, NNA modified the RTE to operate for more than 1,000 simultaneous users, without requiring any payment or written modification of any license agreement.

<u>5</u> That the TIC reduced the usage of the RTE to less than 1,000 simultaneous users on 28 June 2005. In January 2006, they ceased using NNA's tool entirely.

b. **Discussion:**

(1) There was no evidence to support the allegation that TIC was improperly running NNA's software at user levels that exceeded 1,000 users under a license agreement. Documentary evidence and witnesses' statement revealed that a copy of a

CASE NUMBER XC-05-0149

license agreement NNA forwarded to the Inspector General on or about 2 December 2005 could not be authenticated due to discrepancies with the dates and signatures. Even if the license agreement was valid, it would have been superseded by a license agreement entered into 1997 which would have modified the agreement sent to the Inspector General. Under this 1997 license agreement, the Army purchased a "perpetual 1000 user RTE License." This perpetual license gave the Government the right to use the software/hardware perpetually. Therefore, it was questionable as to whether any provisions of any prior license agreement would have remained in effect after the Army purchased the perpetual license in 1997.

(2) In addition, prior to NNA's departure, NNA modified the RTE to operate more than 1000 simultaneous users without requiring any payment or written modification of any license agreement.

(3) Testimony and evidence further disclosed that due to the different legal interpretation of the perpetual License Agreement between the parties(NNA and Army) and since the Government has developed its own tool, the Government restricted or ceased the testing since both the Government and NNA never agreed on the definition of user. On or about 28 June 2005, TIC reduced the usage of the RTE to less than 1,000 simultaneous users, even under NNA's interpretation of the license agreement. In January 2006, TIC ceased using NNA's tool entirely.

c. **Conclusion:** That TIC was improperly running NNA's software at user levels that exceeded 1,000 users under a license agreement in violation of DFARS 27.7202-1(a), Rights in Computer Software and Software documentation was **NOT FOUNDED.**

**RECOMMENDATIONS:**

1. That this report is approved and the case closed at this office.

2. That Neal Nelson and Associate be advised that, if it maintains that the Army has violated the provisions of a binding license agreement, notwithstanding the Army's position to the contrary, the proper avenue for redress would be for NNA to file a claim in accordance with the terms of the contract under which the license at issue was conveyed.

CASE NUMBER XC-05-0149



CONCUR: APPROVED:

 

17



CASE NUMBER XC-05-0149

## Witnesses Interviewed

(1) Complainant, Mr. Neal Nelson, President of Neal Nelson and Associates, 302 E. Main Street, East Dundee, Illinois.

(2) ███████████████████████████████ Ft. Huachuca, AZ. Did consent to release under FOIA.

(3) ██████████████████████████████████████████ DID NOT consent to release under FOIA.

(4) ████████████████████████████████████████Ft. Huachuca, AZ. DID consent to release under FOIA.

## EXHIBIT A: DOCUMENTS

(1) Letter to NNA, dated 7 Sep 2005, signed by 

(2) AR 73-1, Chapter 7, Section 7-4, paragraph b, Testing for Commercial Entities.

(3) Letter, dated 1 Aug 2005, signed by NNA.

(4) Letter, dated 7 Oct 2005, signed by NNA.

(5) Letter, dated 1 Nov 2005, signed by NNA.

(6) CC Mail, dated 3 Aug 2004 from NNA to █████████████

(7) CC Mail, dated 13 Sep 2004, from ██████████ to NNA.

(8) DFARS 227.7202-1(a), Rights in Computer Software and Software Documentation.

(9) Contract Number DAEA18-88-C-0033, dated 5 April 88, awarded to NNA.

(10)   Copy of Software License Agreement (not authenticated), dated 30 Jun 89, submitted by NNA.

(11)   Contract Number DAEA32-94-C-0002, dated 1 Mar 94, awarded to NNA.

CASE NUMBER XC-05-0149

(12)     Contract Number DAEA32-95-P-403, dated 23 Sep 95, awarded to NNA.

(13)     Contract Number DAAB07-97-P-0315, dated 9 Jan 97, awarded to NNA.

(14)     Contract Number DAAB07-P-0636, dated 27 Jun 97, awarded to NNA.

(15)     Letter, dated 12 Jul 2004, from NNA to ███████████████

(16)     Letter, dated 25 Jan 05, from ████████ to NNA.

(17)     Letter, dated 3 Feb 05, from NNA to ███████████████

(18)     Letter, dated 2 Dec 05, from NNA to IG office.

(19)     Letter dated, 27 Jan 97, from ██████████ of NNA.

**Report of Inquiry (XC 05-0149)**
**Executive Summary**



Date 1 DEc 2006

RECOMMEN
APPROVAL:

Date 4 DEC 2006

3

# EXHIBIT 11

May 17, 2010

**FILED**

MAY 1 8 2010

JUDGE REBECCA R. PALLMEYER
UNITED STATES DISTRICT COURT

Neal Nelson, Plaintiff, (pro se)
222 North River Street
East Dundee, Illinois 60118

Honorable Rebecca R. Pallmeyer
United States District Court
Northern District of Illinois, Eastern Division
219 South Dearborn Street
Chicago, Illinois 60604

Re: 1:10-cv-01735

Dear Judge Pallmeyer,

The required Parties Pretrial Planning Meeting for this case has not
yet taken place because the opposing counsel, David R. Lidow, has
responded to any of my repeated attempts to schedule the meeting.

On April 20, 2010 I sent David an email. He did not respond.

On April 23, 2010 I sent David a letter. He did not respond.

On May 4, 2010 I left David a voice mail message. He did not
respond.

On May 6, 2010 I sent David a fax. He did not respond.

Attached is a copy of a proposed planning meeting report that reflects
my understanding of the discovery and scheduling issues for this
case.

Respectfully,

Neal Nelson
(847) 851-8900
neal@nna.com

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Neal Nelson,

    Plaintiff,

    vs.

United States Army,

    Defendant

Case No.:  1:10-cv-01735

Judge: Rebecca R. Pallmeyer

**Proposed Report of Parties Planning Meeting**

**1. Meeting.** Pursuant to FED. R. CIV. P. 26(f), a meeting should have been held on or before April 24, 2010 at 219 South Dearborn Street, Chicago, Illinois and should have been attended by:

    Neal Nelson for plaintiff

    David R. Lidow for defendant.

**2. Pre-trial Schedule.** The parties might have proposed to the court the following discovery plan:

    a.  Discovery will be needed on the following subjects: Validation of various documents that establish dates and events concerning the Freedom of Information Act requests.

    b.  Disclosures pursuant to FED. R. CIV. P. 26(a)(1) to be made by June 24, 2010. All discovery to be commenced in time to be completed by June 24, 2010.

    c.  The parties do not expect that they will need any depositions.

    d.  The parties do not expect to require any expert testimony. If expert testimony were required, reports from retained experts under Rule 26(a)(2) due:

        from plaintiff by June 24, 2010.

        from defendant by June 24, 2010.

- 1 -

1    e.  Parties should be allowed until July 24, 2010 to join additional parties and to amend the
2         pleadings.

3    f.  All potentially dispositive motions should be filed by July 24, 2010.

4    g.  Final pretrial order: Plaintiff to prepare proposed draft by July 10, 2010; parties to file
         joint final pretrial order by July 24, 2010.

5    h.  The case should be ready for trial by July 24, 2010 and at this time is expected to take
6         approximately one day.

7    **3. Settlement.** At least 14 days prior to the Rule 16(b) scheduling conference, plaintiff is
     directed to make a written settlement demand to the defendant. At least 7 days prior to the
8    scheduling conference defendant is to respond in writing to the plaintiff's settlement demand.

9    **4. Consent.** Parties do not consent unanimously to proceed before a Magistrate Judge.

10

11   Date: _____

12

13

14   By: _____          By: _____
15        Neal Nelson (pro se)                  David R. Lidow
          Plaintiff                             Assistant United States Attorney
16        222 North River Street                219 South Dearbon Street
          East Dundee, Illinois 60118           Chicago, Illinois 60604
17        (847) 851-8900                        (312) 886-1390
          neal@nna.com                          david.lidow@usdoj.gov
18

19

20

21

22

23

24

25

- 2 -

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NEAL NELSON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10 C 1735 |
| | ) | |
| v. | ) | |
| | ) | Judge Pallmeyer |
| UNITED STATES ARMY, | ) | |
| | ) | |
| Defendant. | ) | |

## ANSWER

The United States of America, by its attorney, Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, hereby answers the complaint as follows:

### First Defense

Plaintiff has failed to exhaust his administrative remedies to the extent that the Department of the Army has not made a determination as to whether the information sought by plaintiff is properly subject to any exemptions provided under the Freedom of Information Act, 5 U.S.C. § 522, *et seq.*, due to plaintiff's refusal to pay the requisite fees associated with the predisclosure notification process.

### Second Defense

Answering the specific allegations of the complaint, using the same paragraph numbering as set forth therein, defendant admits, denies, or otherwise avers as follows:

### INTRODUCTION

1. **Complaint:** This action is premised upon, and consequent to, violations of both the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 et. seq., and the Administrative Procedure Act ("APA"), 5 U. S. C. § 701 et. seq. It challenges the unlawful failure of the Defendant, The United States Army ("Army"), to respond to Plaintiff's FOIA requests in the manner, and within the time, required by the FOIA.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NEAL NELSON,                          )
                                      )
                    Plaintiff,        )        No. 10 C 1735
                                      )
          v.                          )
                                      )        Judge Pallmeyer
UNITED STATES ARMY,                   )
                                      )
                    Defendant.        )

**MEMORANDUM OF LAW IN SUPPORT OF THE
UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

### Introduction

Plaintiff Neal Nelson brings this action under the Freedom of Information Act ("FOIA"), 5

U.S.C. § 552, *et seq.*, based upon a FOIA request he submitted to the Army seeking information and

records pertaining to non-government use of the Army's Technology Integration Center ("TIC") in

Fort Huachuca, Arizona. The TIC operates and maintains a computer network testing facility for the

purpose of ensuring product compatibility with existing Army network infrastructure. Non-

government commercial vendors seeking to do business with the Army must submit their products

for testing at the TIC for consideration and approval for purchase by the Army.

Pursuant to Army regulations, and as mandated by executive order, the Army is required to

provide pre-disclosure notification to any vendors who submit private commercial information to

the Army in the course of product testing by the TIC, and to afford the vendors an opportunity to

comment on whether such information was commercially sensitive and therefore exempt from

disclosure under FOIA. Nelson's initial FOIA request, which sought information about the private

vendors, including their identities, amounts paid for TIC testing, and the dates on which such tests were conducted, was denied because Nelson refused to pay the pre-disclosure notification costs.

The purpose of the pre-disclosure notification process is to enable the Army to make an informed decision regarding whether the information sought in a FOIA request could potentially fall within Exemption 4 of FOIA, 5 U.S.C. § 552(b)(4) ("Exemption 4"), which exempts from disclosure certain categories of commercially sensitive information. Nelson contends that pre-disclosure notification was unnecessary because, in his opinion, the information sought in his FOIA requests would not fall within Exemption 4. Nelson's assertions are misguided, however. The entire purpose of pre-disclosure notification is to afford vendors an opportunity to be heard, and to enable the Army to make a proper, factually supported determination regarding whether the information was subject to Exemption 4. But the Army was unable to make an Exemption 4 determination here because Nelson refused to pay the pre-disclosure notification costs and thus no subsequent review was undertaken. The Army's decision to require pre-disclosure notification was amply supported by the record and complied with FOIA and applicable Army regulations, as mandated by executive order. Accordingly, judgment should be entered in favor of the United States and Nelson's complaint should be dismissed.

**Factual Background**

Nelson initiated a FOIA request by letter dated September 12, 2007 to the United States Army Garrison at Fort Monmouth, New Jersey, in which he sought "[i]nvoices issued by the government to all (approximately 30) non-government organizations that have paid to use the 'commercial' testing facilities at the [TIC] between 01 January 2001 and the present." ("1st FOIA Request"). Local Rule 56.1 Statement of Material Facts in Support of the United States' Motion for

Summary Judgment ("LR 56.1 Statement"), ¶ 1. The Army responded to Nelson's 1st FOIA Request by letter dated October 1, 2007 from Army FOIA Officer Ellen Edwards, informing Nelson that there were no responsive records in its possession, but that the Army could provide the names of companies that had submitted their products for review, and the amounts paid by those companies to utilize the TIC testing facility, subject to pre-disclosure notification that would be provided to the vendors. *Id.*, ¶ 3. FOIA Officer Edwards also provided an estimate of the disclosure costs in the amount of $600, which consisted of searching and compiling the information, issuing pre-disclosure notifications to the affected vendors, and reviewing the responses from the vendors. *Id.*

On October 5, 2007, Nelson responded to the letter from FOIA Officer Edwards indicating that the information offered by the Army would satisfy his request, but stating that he disagreed with the Army's determination that pre-disclosure notifications were necessary and therefore refused to pay the $600 fee. *Id.*, ¶ 4. By letter dated May 16, 2008 prepared by the Initial Denial Authority for the Army's FOIA office, the Army informed Nelson that his 1st FOIA Request was denied based upon his refusal to pay the $600 fee for pre-disclosure notification and review. *Id.* Nelson appealed the denial of his 1st FOIA Request by letter dated May 29, 2008 to the Secretary of the Army, General Counsel's Office, restating his contention that pre-disclosure was not necessary because the information sought in his request did not fall within FOIA Exemption 4. *Id.*, ¶ 5

On January 22, 2009, Nelson issued a second FOIA request for "[i]nformation about non-government organizations that have paid to use the 'commercial' testing facilities at the TIC between 01 January 2001 and the present." *Id.*, ¶ 6 ("2nd FOIA Request"). Nelson further specified that he was seeking "1) the name of the non-government organization, 2) the amount of money paid to the

TIC by the non-government organization, and 3) the approximate dates that the non-government organization used the TIC facilities." *Id.*

On February 9, 2009, the Army affirmed the denial of Nelson's 1st FOIA Request. *Id.*, ¶ 7. The Army Office of General Counsel, which reviews FOIA appeals, agreed with the Initial Denial Authority that pre-disclosure notification to the affected vendors was required under FOIA and applicable Army regulations. *Id.* The Office of General Counsel reiterated that, given the nature and use of the TIC, disclosing the identities of the vendors and the amounts such vendors paid for testing services could reasonably be expected to cause substantial competitive harm to the vendors, thereby requiring pre-disclosure notifications. *Id.*

The Army subsequently responded to Nelson's 2nd FOIA Request by letter dated March 19, 2009 from FOIA Officer Edwards, who informed Nelson that his 2nd FOIA Request was substantially similar to his 1st FOIA Request, except that the 2nd FOIA Request sought more current information in that it encompassed a time period through January 22, 2009 instead of September 22, 2007. *Id.*, ¶ 8. As such, FOIA Officer Edwards again explained that pursuant to FOIA and applicable regulations, pre-disclosure notification would be required because disclosure of the information could reasonably be expected to cause substantial competitive harm to the vendors. *Id.* Nelson responded on May 1, 2009, by reasserting his position that pre-disclosure notification was unnecessary and that he would not pay the costs associated therewith. *Id.*

Nelson's 2nd FOIA Request was formally denied by the Initial Denial Authority by letter dated June 12, 2009 due to Nelson's continued refusal to pay the pre-disclosure notification costs. *Id.*, ¶ 9. Nelson appealed the Initial Denial Authority's decision on June 22, 2009. *Id.* On March 1, 2010, the Army Office of the General Counsel affirmed the denial of Nelson's 2nd FOIA Request

4

on the same basis as his previous appeal, *i.e.*, that the Initial Denial Authority properly required pre-disclosure notification because the information sought in Nelson's 2nd FOIA Request could reasonably be expected to cause substantial competitive harm to the vendors. *Id.*, ¶ 10. Nelson commenced this suit shortly thereafter.

### Standard of Review

Summary judgment is appropriate when the record reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Five Points Rd. Joint Venture v. Johanns*, 542 F.3d 1121, 1124 (7th Cir. 2008). When considering a motion for summary judgment, the court must view the facts and any inferences to be drawn from them in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). In response, the non-moving party cannot rest on the pleadings, but must designate specific material facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Summary judgment is appropriately entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 479 (7th Cir.1996) (citations omitted).

Most FOIA claims are resolved on summary judgment. *Bassiouni v. C.I.A.*, No. 02 C 4049, 2004 WL 1125919, *2 (N.D. Ill. March 31, 2004) (citing *Misciavige v. IRS*, 2 F.3d 366, 369 (11th Cir.1993)). "In a suit brought to compel production of records, an agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is wholly exempt from FOIA's inspection requirements.'" *Wheeler v. CIA*, 271 F. Supp. 2d 132, 136 (D.D.C. 2003) (citations omitted); *Miller*

5

*v. U.S. Dept. of State*, 779 F.2d 1378, 1382 (8th Cir.1985) ("Summary judgment is available to the government in an FOIA case where the agency proves that it has fully discharged its obligations under the FOIA . . . .")

An agency satisfies the summary judgment requirements in a FOIA case by providing the court and the plaintiff with affidavits or declarations and other evidence which show that the documents in question were produced or are exempt from disclosure. *See Carney v. U.S. Dept. of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (noting that affidavits submitted by an agency are "accorded a presumption of good faith") (citations omitted).

### Argument

Pursuant to Executive Order 12600, in response to Nelson's FOIA Requests, the Army was required to notify vendors and to provide them with an opportunity to comment prior to the release of commercially sensitive information belonging to the vendor. *See* Exec. Order No. 12600, 52 Fed. Reg. 23,781 (1987) ("E.O. 12600"). To justify pre-disclosure notification, the Army did not need to conclude that the information was subject to Exemption 4 in the first instance. Rather, the Army needed only to show that the information sought in Nelson's FOIA request could reasonably be expected to cause substantial competitive harm to the vendor, which is a significantly less burdensome standard. *See OSHA Data/CIH, Inc. v. United States Dept. of Labor*, 220 F.3d 153, 167 (3rd Cir. 2000). The Army plainly met that lower standard in this case.[1]

---

[1] As an preliminary matter, Nelson's seven-count complaint purports to assert several different bases for violations of FOIA as separate counts, but all of them, in substance, relate to the Army's decision to require pre-disclosure notification. Accordingly, to secure judgment in its favor on Count I–II and IV–VI, the Army need only demonstrate that its denial of Nelson's FOIA Requests was supported by the record and complied with Executive Order 12600, as discussed

## I.  Executive Order 12600 Mandates Pre-Disclosure Notification.

Exemption 4 authorizes an agency to withhold information sought in a FOIA request to the extent such information consists of "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4).  A federal agency must carefully evaluate Exemption 4 applicability when private commercial information is requested for several reasons.  First, improper disclosure could subject the agency or its personnel to criminal penalties under the Trade Secrets Act, 18 U.S.C. § 1905.  Second, the agency may be enjoined from the contemplated disclosure under the Administrative Procedures Act if such disclosure would be "arbitrary and capricious" or "not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Chrysler Vorp. v. Brown*, 441 U.S. 281, 218 (1970) (commonly known as "reverse FOIA suits").

Executive Order 12600 guides agencies in addressing the concerns implicated by Exemption 4 and outlines the appropriate procedure for their resolution.  It is designed to enhance an agency's ability to make the confidentiality determinations that are typically at the heart of Exemption 4 review, and to develop a fuller administrative record for potential reverse FOIA judicial review.  It does this by creating a mechanism for ensuring a submitter's input into the disclosure determination whenever an agency has any reason for concern that the contemplated disclosure may run afoul of Exemption 4.

---

below.  In Count VII, Nelson purports to allege a violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, *et seq.*, but the Seventh Circuit has previously stated that the APA does not provide an independent cause of action to FOIA.  *Walsh v. U.S. Dept. of Veterans Affairs*, 400 F.3d 535, 537 (7th Cir. 2005) ("Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action . . . .") (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)).  Finally, to the extent Nelson takes issue in Count III with the Army's estimate of pre-disclosure notification costs generally, the reasonableness of the Army's estimates is discussed in Section II.C.

Under E.O. 12600, when an agency reviewing a FOIA request determines that it may be required to disclose a submitter's commercial information which "arguably" may be confidential, and thus exempt under Exemption 4, because the agency "has reason to believe . . . [that] disclosure could reasonably be expected to cause substantial competitive harm," the agency must, *inter alia*, notify the submitter, must afford the submitter a reasonable period of time in which to object to the disclosure of any specified portion of the information and to state all grounds upon which disclosure is opposed, and must give careful consideration to all such specified grounds for non-disclosure prior to making an administrative determination of the issue.  *See* E.O. 12600 §§ 1, 2(a), 3(a)(ii) & 3(b)(ii), 4–5.  The agency is relieved of these notification and review requirements only if it has already determined that the information should not be disclosed, or the information has already been published or officially made available to the public, or the agency is compelled by law (other than FOIA) or agency regulation to disclose the information.  *Id.* § 8.  The procedures outlined in E.O. 12600 are implemented as part of Department of Defense FOIA Regulations, (*see, generally*, 32 C.F.R. § 286, *et seq.*), which govern the procedures for processing FOIA requests submitted to the various DOD components, including the Army.  *See* 32 C.F.R. § 286.23(h).

## II.    The Army Properly Concluded that Pre-disclosure Notification was Required Under the Guidelines Set Forth in E.O. 12600.

### A.    The Standard for Pre-Disclosure Notification Under E.O. 12600

The Third Circuit Court of Appeals, which is the only court to have squarely addressed pre-disclosure notification under E.O. 12600, set forth the appropriate standard and factors for consideration in *OSHA Data/CIH, Inc. v. United States Dept. of Labor*, 220 F.3d 153 (3rd Cir. 2000) .  In that case, OSHA Data, a private company engaged in the business of aggregating labor

and employment data and reselling it to its clients, issued a FOIA request to the Department of Labor for workplace compliance records and other information from the Occupational Health and Safety Administration. *OSHA Data*, 220 F.3d at 156–7. Relying on E.O. 12600, the DOL notified OSHA Data that pre-disclosure notification would be required and that OSHA Data would have to pay the associated review costs before its FOIA request could continue processing. *Id.* at 158–59. OSHA Data refused to pay the review costs, arguing that the DOL had not shown a basis for its determination that disclosure could be expected to cause substantial competitive harm.

The court disagreed, observing that the "standard for triggering mandatory predisclosure notification is obviously much less burdensome than the standard for justifying an ultimate withholding of information under Exemption 4." *Id.* at 167. The court also noted that "[t]he DOL need not show that the disclosure of the information requested *would* cause substantial competitive harm, but must show only that the DOL had 'reason to believe that disclosure . . . could reasonably be expected to cause substantial competitive harm.'" *Id.* Under this "much less onerous showing," the Third Circuit affirmed the district court's conclusion that "the totality of the evidence of the potential for substantial competitive harm that was available to the DOL at the time it assessed the need for predisclosure notification was sufficient to give the DOL reason to believe that substantial competitive harm might reasonably result from some of the disclosures in question." *Id.* at 167–68. As discussed below, the Army undertook the same analysis and applied the same principles in concluding that disclosure could reasonably be expected to cause substantial competitive harm to the vendors implicated by Nelson's FOIA Requests.

9

**B.    The Army's Basis for Finding a Reasonable Expectation of Competitive Harm**

With respect to Nelson's FOIA Requests, the Army's decision to initiate pre-disclosure notification plainly complied with E.O. 12600 and its own regulations. At various stages throughout his FOIA application, the Army informed Nelson that pre-disclosure notification was necessary because, given the nature and use of the TIC, disclosing the identities of the vendors and the amounts such vendors paid for testing services could reasonably be expected to cause substantial competitive harm to the vendors. L.R. 56.1 Statement, ¶ 11. This was not a rote or perfunctory conclusion offered simply to deny Nelson's FOIA Requests. On the contrary, as explained further in the Declaration of Caryn L.M. Hargrave (LR 56.1 Statement, Ex. A), Army FOIA counsel, the Army's concerns regarding the potential for competitive harm resulting from disclosure were well-founded. Vendors utilize the TIC for purposes of testing their products at an Army facility in order to increase their competitive opportunity to sell their products to the Army, and for possible acceptance on an Army approved products list. Id., ¶ 12. This is done to ensure that the product under consideration is compatible with the existing Army network infrastructure. Id. Only the TIC and similarly approved Army labs have the capabilities to conduct this type of testing. Id.

The information initially offered to Nelson in response to his FOIA Requests consisted of various compilations of data, including the identities of the vendors who utilized the TIC for product testing over nearly a nine-year period, the dates on which the tests were conducted, and the costs incurred by the vendors in conducting the tests. Id., ¶ 13. This information is not available to the public, and there are approximately 45 vendors whose information would potentially be subject to disclosure. Id. Disclosure of such information without providing the vendors with an opportunity to comment could result in serious competitive harm to the vendors. Id., ¶ 14. For example, such

10

information could allow competitors to have information about what stage in the product release cycle a particular product is (or was), which would enable competitors to identify opportunities in developing similar products. *Id.* Releasing the cost of the test could also benefit competitors by informing them as to the amounts incurred by the vendor in conducting TIC testing, possibly enabling the competitor to evaluate the impact of such costs on the vendor's revenue. *Id.*

Even disclosing the very fact that certain vendors had their products tested could cause competitive harm to the vendor. *Id.,* ¶ 15. If a particular vendor's product was not approved, or did not pass TIC testing, it would not be available for sale to the Army. *Id.* For a competitor to know that a product was tested and yet did not become available for sale to the Army could be very valuable information to a competitor, since that company might be able to develop a competing product or at least know that a competitor failed the testing. *Id.* Indeed, the very same categories of information were considered in *OSHA Data*, where the court found a potential for competitive harm stemming from the disclosure of data that could give competitors insights into productivity, hours worked, market share, and production. *See OSHA Data*, 220 F.3d at 165 (also expressing concern with enabling competitors to calculate via reverse engineering a business's labor costs and profit margins) (citations omitted).

In short, these are precisely the types of factors the Army was required to—and did—take into consideration in concluding that disclosure could reasonably be expected to cause substantial competitive harm. Of course, to conduct a complete analysis under Exemption 4, the Army would still need to review the responses from the vendors, but that was not the basis for the Army's denial of Nelson's FOIA Requests. LR Statement, ¶ 19. At this early stage in Nelson's FOIA application, the Army was entirely justified in its decision to require pre-disclosure notification, and it properly

11

discontinued processing Nelson's FOIA Request based upon his refusal to pay the costs associated therewith.

**C.    The Army's Pre-Disclosure Notification Cost Estimates Were Reasonable**

In Count III, Nelson takes issue with the Army's estimate of the pre-disclosure notification costs, suggesting that the cost estimates should be lower because the information he is requesting can "easily fit on a single sheet of paper." Compl., ¶ 71. This misses the point. The vast majority of the work and expense that goes into the pre-disclosure notification process consists of identifying affected vendors, notifying such vendors of a pending FOIA request and providing them with an opportunity to comment on the potential for competitive harm in the release of information sought, and reviewing vendor responses to make an independent determination regarding the applicability of FOIA Exemption 4. LR 56.1 Statement, ¶ 16.

In this regard, the pre-disclosure notification cost for Nelson's 1st FOIA Request was estimated at $600, consisting of approximately 2 hours, for professional level personnel at $44 per hour, to search and compile the information regarding affected vendors; 8 hours, for clerical personnel at $20, to generate and follow up on correspondence with affected vendors; and 8 hours, for professional level personnel, at $44 per hour, to perform review and analysis regarding vendor responses to determine the applicability of FOIA Exemption 4. *Id.*, ¶ 17. The review time estimates were calculated to require approximately 0.25 hours for each of the 32 affected vendors. *Id.*, ¶ 18.

This is the normal and customary process (amount of time multiplied by level of personnel needed for review) by which pre-disclosure costs are estimated, which complies with FOIA and applicable Army regulations published at 32 C.F.R. § 286.29. *Id.* In fact, because the amount of time initially allocated to each vendor for correspondence and review was determined to be

12

unrealistically low (only 15 minutes per vendor), that time estimate was increased to 0.5 hours for

purposes of Nelson's 2nd FOIA Request, which represents a more accurate estimate of time

necessary to complete a FOIA review for each vendor.  *Id.*  Nelson's second FOIA request

implicated 13 additional vendors and was estimated to cost $559.  *Id.*

The Army is permitted by FOIA to promulgate regulations specifying the schedule of fees

applicable to processing FOIA requests.  *See* 5 U.S.C. § 552(a)(4)(A).  Consistent with FOIA, Army

regulations set forth the applicable fees in responding to FOIA requests.  32 C.F.R. § 286.29.  In

arriving at an estimate for pre-disclosure notification costs with regard to Nelson's FOIA Requests,

the Army's methodology was perfectly consistent with its own regulations, taking into account labor

time and personnel level necessary for review.  LR Statement, ¶ 18.  Moreover, because the fee

determination was not a final agency determination to withhold records, but rather the Army's

interpretation of its own regulations, the Army's estimate of pre-disclosure notification costs would

be entitled to *Chevron* deference in any event.  *See Chevron v. Natural Resources Defense Council,*

*Inc.*, 467 U.S. 837, 842–44 (1984); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)

(courts "must give substantial deference to the agency's interpretation of its own regulations.").

Accordingly, the Army is entitled to judgment on the claim asserted in Count III as well.

## Conclusion

For the foregoing reasons, judgment should be entered in favor of the United States on all

counts and Nelson's complaint should be dismissed.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: s/ David R. Lidow
    DAVID R. LIDOW
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 886-1390
    david.lidow@usdoj.gov

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NEAL NELSON,                                    )
                                                )
                          Plaintiff,            )
                                                )       No. 10 C 1735
               v.                               )
                                                )       Judge Pallmeyer
UNITED STATES ARMY,                             )
                                                )
                          Defendant.            )

**LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS
IN SUPPORT OF THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

The United States of America, by its attorney, Patrick J. Fitzgerald, United States Attorney

for the Northern District of Illinois, submits the following statement of material facts as to which

there is no genuine issue pursuant to Local Rule 56.1 of the United States District Court for the

Northern District of Illinois.

1.      Plaintiff Neal Nelson initiated a FOIA request by letter dated September 12, 2007 to

the United States Army Garrison at Fort Monmouth, New Jersey, wherein he sought "[i]nvoices

issued by the government to all (approximately 30) non-government organizations that have paid to

use the 'commercial' testing facilities at the U.S. Army Technology Integration Center, Fort

Huachuca, AZ between 01 January 2001 and the present." Compl., Ex. 1 ("1st FOIA Request").

2.      The Army Technology Integration Center ("TIC") is a facility maintained by the

Department of the Army, which operates a computer network testing facility for the purpose of

ensuring product compatibility with existing Army network infrastructure. Declaration of Caryn

L.R. Hargrave ("Hargrave Decl."), attached hereto Exhibit A, at ¶ 5. Non-government commercial

vendors seeking to do business with the Army must submit their products for testing at the TIC for consideration and approval for purchase by the Army. *Id.*

3. The Army responded to Nelson's 1st FOIA Request by letter dated October 1, 2007 from Army FOIA Officer Ellen Edwards, informing Nelson that there were no responsive records in its possession, but that the Army could provide the names of companies that had submitted their products for review, and the amounts paid by those companies to utilize the TIC testing facility, subject to pre-disclosure notification that would be provided to the vendors. Compl., Ex. 2. FOIA Officer Edwards also provided an estimate of the disclosure costs in the amount of $600, which consisted of searching and compiling the information, issuing pre-disclosure notifications to the affected vendors, and reviewing the responses from the vendors. *Id.*

4. On October 5, 2007, Nelson responded to the letter from FOIA Officer Edwards indicating that the information offered by the Army would satisfy his request, but stating that he disagreed with the Army's determination that pre-disclosure notifications were necessary and therefore refused to pay the $600 fee. *Id.*, Ex. 3. By letter dated May 16, 2008 prepared by the Initial Denial Authority for the Army's FOIA office, the Army informed Nelson that his 1st FOIA Request was denied based upon his refusal to pay the $600 fee for pre-disclosure notification and review. *Id.*

5. Nelson appealed the denial of his 1st FOIA Request by letter dated May 29, 2008 to the Secretary of the Army, General Counsel's Office, restating his contention that pre-disclosure was not necessary because the information sought in his request did not fall within FOIA Exemption 4. *Id.*, Ex. 4.

2

6.      On January 22, 2009, Nelson issued a second FOIA request for "[i]nformation about non-government organization that have paid to use the 'commercial' testing facilities at the TIC between 01 January 23001 and the present." *Id.*, Ex. 5 ("2nd FOIA Request"). Nelson further specified that he was seeking "1) the name of the non-government organization, 2) the amount of money paid to the TIC by the non-government organization, and 3) the approximate dates that the non-government organization used the TIC facilities." *Id.*

7.      On February 9, 2009, the Army affirmed the denial of Nelson's 1st FOIA Request. The Army Office of General Counsel, which reviews FOIA appeals, agreed with the Initial Denial Authority that pre-disclosure notification to the affected vendors was required under FOIA and applicable Army regulations. *Id.*, Ex. 7. The Office of General Counsel reiterated that, given the nature and use of the TIC, disclosing the identities of the vendors and the amounts such vendors paid for testing services could reasonably be expected to cause substantial competitive harm to the vendors, thereby requiring pre-disclosure notifications. *Id.*

8.      The Army subsequently responded to Nelson's 2nd FOIA Request by letter dated March 19, 2009 from FOIA Officer Edwards, who informed Nelson that his 2nd FOIA Request was substantially similar to his 1st FOIA Request, except that the 2nd FOIA Request sought more current information in that it encompassed a time period through January 22, 2009 instead of September 22, 2007. *Id.*, Ex. 10. FOIA Officer Edwards explained that pursuant to FOIA and applicable regulations, pre-disclosure notification would be required because disclosure of the information could reasonably be expected to cause substantial competitive harm to the vendors. Nelson responded on May 1, 2009 by reasserting his position that pre-disclosure notification was unnecessary and that he would not pay the costs associated therewith. *Id.*, Ex. 11.

3

9.     Nelson's 2nd FOIA Request was formally denied by the Initial Denial Authority by letter dated June 12, 2009 due to Nelson's continued refusal to pay the pre-disclosure notification costs. *Id.*, Ex. 12. Nelson appealed the Initial Denial Authority's denial of his 2nd FOIA request on June 22, 2009. *Id.*, Ex. 13.

10.     On March 1, 2010, the Army Office of the General Counsel affirmed the denial of Nelson's 2nd FOIA Request on the same basis as his previous appeal, *i.e.*, that the Initial Denial Authority properly required pre-disclosure notification because the information sought in Nelson's 2nd FOIA Request could reasonably be expected to cause substantial competitive harm to the vendors. *Id.*, Ex. 17.

11.     At various stages throughout his FOIA application, the Army informed Nelson that pre-disclosure notification was necessary because, given the nature and use of the TIC, disclosing the identities of the vendors and the amounts such vendors paid for testing services could reasonably be expected to cause substantial competitive harm to the vendors. Hargrave Decl., ¶ 7.

12.     Vendors utilize the TIC for purposes of testing their products at an Army facility in order to increase their competitive opportunity to sell their products to the Army, and for possible acceptance on an Army approved products list. *Id.*, ¶ 8. This is done to ensure that the product under consideration is compatible with the existing Army network infrastructure. *Id.* Only the TIC and similarly approved Army labs have the capabilities to do this type of testing. *Id.*

13.     The information initially offered to Nelson in response to his FOIA Requests consisted of various compilations of data, including the identities of the vendors who utilized the TIC for product testing over nearly a nine-year period, the dates on which the tests were conducted, and the costs incurred by the vendors in conducting the tests. *Id.*, ¶ 9. This information is not

4

available to the public, and there are approximately 45 vendors whose information would potentially be subject to disclosure. *Id.*

14.     Disclosure of such information without providing the vendors with an opportunity to comment could result in serious competitive harm to the vendors. *Id.*, ¶ 10. For example, such information could allow competitors to have information about what stage in the product release cycle a particular product is (or was), which would enable competitors to identify opportunities in developing similar products. *Id.* Releasing the cost of the test could also benefit competitors by informing them as to the amounts incurred by the vendor in conducting TIC testing, possibly enabling the competitor to evaluate the impact of such costs on the vendor's revenue. *Id.*

15.     Even disclosing the very fact that certain vendors had their products tested could cause competitive harm to the vendor. *Id.*, ¶ 11. If a particular vendor's product was not approved, or did not pass TIC testing, it would not be available for sale to the Army. *Id.* For a competitor to know that a product was tested and yet did not become available for sale to the Army could be very valuable information to a competitor, since that company might be able to develop a competing product or at least know that a competitor failed the testing. *Id.*

16.     The cost estimates for pre-disclosure notification resulting from Nelson's FOIA requests were based upon the amount of personnel time required (1) to identify potentially affected vendors, (2) to notify such vendors of a pending FOIA request and to provide such vendors with an opportunity to comment on the potential for competitive harm in the release of information sought, and (3) to review vendor responses and make an independent determination regarding the applicability of FOIA Exemption 4 to Nelson's FOIA requests. *Id.*, ¶ 12.

17.     The pre-disclosure notification process for Nelson's first FOIA request in September

2007 was estimated to require approximately 2 hours, for professional level personnel at $44 per

hour, to search and compile the information regarding affected vendors; 8 hours, for clerical

personnel at $20, to generate and follow up on correspondence with affected vendors; and 8 hours,

for professional level personnel, at $44 per hour, to perform review and analysis regarding vendor

responses to determine the applicability of FOIA Exemption 4. *Id.*, ¶ 13. The total costs for pre-

disclosure notification were estimated to be $600 for Nelson's first FOIA request. *Id.*

18.     This is the normal and customary process (amount of time multiplied by level of

personnel needed for review) by which pre-disclosure costs are estimated, which complies with

FOIA and applicable Army regulations published at 32 C.F.R. § 286.29. *Id.*, ¶ 14. For Nelson's first

FOIA request, the review time estimates were calculated to require approximately 0.25 hours for

each of the 32 affected vendors. *Id.* In fact, because the amount of time initially allocated to each

vendor for correspondence and review was determined to be unrealistically low (only 15 minutes per

vendor), that time estimate was increased to 0.5 hours for purposes of Nelson's second FOIA

request, which represents a more accurate estimate of time necessary to complete a FOIA review for

each vendor. *Id.* Nelson's second FOIA request implicated 13 additional vendors and was estimated

to cost $559. *Id.*

6

19.    The Army made no decision on the merits of Nelson's FOIA Requests, nor did it

claim any exemptions under FOIA; rather, Nelson's FOIA Requests were discontinued based upon

his refusal to pay the pre-disclosure notification costs. *Id.*, ¶ 15.

<div style="margin-left:40%">

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: s/ David R. Lidow
    DAVID R. LIDOW
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 886-1390
    david.lidow@usdoj.gov

</div>

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NEAL NELSON,                                        )
                                                    )
                        Plaintiff,                  )
                                                    )        No. 10 C 1735
                                                    )
            v.                                      )
                                                    )        Judge Pallmeyer
UNITED STATES ARMY,                                 )
                                                    )
                        Defendant.                  )

## DECLARATION OF CARYN L.M. HARGRAVE

In accordance with the provisions of Title 28, United States Code, Section 1746, I, the undersigned Caryn L.M. Hargrave, do hereby make the following declaration regarding the above-captioned matter:

1.      I, Caryn L.M. Hargrave, hereby state that I am the Freedom of Information Act ("FOIA") Attorney for the U.S. Army Communications and Electronics Command, Life Cycle Management ("CECOM" or "Command"), Office of Chief Counsel, in Fort Monmouth, New Jersey.  CECOM regularly receives and reviews FOIA requests submitted to the Department of the Army.

2.      In my capacity as FOIA attorney, I provide legal review on all Command responses to FOIA requests, ensuring that such responses are compliant with all applicable federal statutes and regulations, are issued in a timely fashion, and that all exemptions are appropriately applied.  I provide advice to the Command on all areas related to FOIA, and general release of information generated or maintained by the Government.

3.      I am also responsible for generating policies related to the Command's activities in those areas.  I prepare and present all required training for Command personnel related to FOIA, ensuring that the content reflects the most current developments in relevant law and regulations.  I have held this

1

position for approximately six years. I have also practiced FOIA law as part of my responsibilities as a general administrative law attorney while on active duty in the Army.

4.    I am familiar with the FOIA requests submitted by Neal Nelson in September 2007 and January 2009 seeking information and records pertaining to non-government use of the Army's Technology Integration Center ("TIC") in Fort Huachuca, Arizona, and I was primarily responsible for the Army's processing of Nelson's FOIA requests.

5.    The TIC is a computer network testing facility maintained by the Army for the purpose of ensuring product compatibility with existing Army network infrastructure.  Non-government commercial vendors seeking to do business with the Army must submit their products for testing at the TIC for consideration and approval for purchase by the Army.

6.    A true and correct chronology and summary of the correspondence regarding Nelson's FOIA requests are set forth in the Local Rule 56.1 Statement of Material Facts in Support of the United States' Motion for Summary Judgment, at ¶¶ 1–10.

7.    The Army denied Nelson's FOIA requests due to his refusal to pay for pre-disclosure notification. The Army informed Nelson that pre-disclosure notification was necessary because, given the nature and use of the TIC, disclosing the identities of the vendors and the amounts such vendors paid for testing services could reasonably be expected to cause substantial competitive harm to the vendors.

8.    Vendors utilize the TIC for purposes of testing their products at an Army facility in order to increase their competitive opportunity to sell their products to the Army, and for possible acceptance on an Army approved products list.  This is done to ensure that the product under consideration is compatible with the existing Army network infrastructure. Only the TIC and similarly approved Army labs have the capabilities to do this type of testing.

2

9.    The information initially offered to Nelson in response to his FOIA Requests consisted of various compilations of data, including the identities of the vendors who utilized the TIC for product testing over nearly a nine-year period, the dates on which the tests were conducted, and the costs incurred by the vendors in conducting the tests. This information is not available to the public, and there are approximately 45 vendors whose information would potentially be subject to disclosure.

10.    Disclosure of such information without providing the vendors with an opportunity to comment could result in serious competitive harm to the vendors. For example, such information could allow competitors to have information about what stage in the product release cycle a particular vendor's product is (or was), which would enable competitors to identify opportunities in developing similar products. Releasing the cost of the test could also benefit competitors by informing them as to the amounts incurred by the vendor in conducting TIC testing, possibly enabling the competitor to evaluate the impact of such costs on the vendor's revenue.

11.    Even disclosing the very fact that certain vendors had their products tested could cause competitive harm to the vendor. If a particular vendor's product was not approved, or did not pass TIC testing, it would not be available for sale to the Army. For a competitor to know that a product was tested and yet did not become available for sale to the Army could be very valuable information to a competitor, since that company might be able to develop a competing product or at least know that a competitor failed the testing.

12.    The cost estimates for pre-disclosure notification resulting from Nelson's FOIA requests were based upon the amount of personnel time required (1) to identify potentially affected vendors, (2) to notify such vendors of a pending FOIA request and to provide such vendors with an opportunity to comment on the potential for competitive harm in the release of information sought, and (3) to review

3

vendor responses and make an independent determination regarding the applicability of FOIA Exemption 4 to Nelson's FOIA requests.

13.     The pre-disclosure notification process for Nelson's first FOIA request in September 2007 was estimated to require approximately 2 hours, for professional level personnel at $44 per hour, to search and compile the information regarding affected vendors; 8 hours, for clerical personnel at $20, to generate and follow up on correspondence with affected vendors; and 8 hours, for professional level personnel, at $44 per hour, to perform review and analysis regarding vendor responses to determine the applicability of FOIA Exemption 4. The total costs for pre-disclosure notification were estimated to be $600 for Nelson's first FOIA request.

14.     This is the normal and customary process (amount of time multiplied by level of personnel needed for review) by which pre-disclosure costs are estimated, which complies with FOIA and applicable Army regulations published at 32 C.F.R. § 286.29. For Nelson's first FOIA request, the review time estimates were calculated to require approximately 0.25 hours for each of the 32 affected vendors. In fact, because the amount of time initially allocated to each vendor for correspondence and review was determined to be unrealistically low (only 15 minutes per vendor), that time estimate was increased to 0.5 hours for purposes of Nelson's second FOIA request, which represents a more accurate estimate of time necessary to complete a FOIA review for each vendor. Nelson's second FOIA request implicated 13 additional vendors and was estimated to cost $559.

15.     The Army made no decision on the merits of Nelson's FOIA requests, nor did it claim any exemptions under FOIA; rather, Nelson's FOIA Requests were discontinued based upon his refusal to pay the pre-disclosure notification costs.

4

I declare under penalty of perjury, the foregoing is true and correct, to the best of my

knowledge.

Executed this, the 19th day of July, 2010.

Caryn L.M. Hargrave
Freedom of Information Act Attorney
Office of the Chief Counsel
SJA Division
HQ, CECOM LCMC
Fort Monmouth NJ 07703